**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Towaki Komatsu,

          Plaintiff,

      v.

The City of New York, Lisa Fitzpatrick, Nigel Marks, Vincent Pullo, Molly Park (in her capacity as the Commissioner of the New York City Department of Social Services), Ann Marie Scalia, Samuel Spitzberg, Daniel Tietz (in his capacity as the Commissioner of the New York State Office of Temporary and Disability Assistance), Top Choice Meat Market Corp., Top Choice Owner John Doe, Z & H Cleaners,

          Defendants.

No. 23-cv-5406

**ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

Upon the affirmation of Towaki Komatsu, July 10, 2023, and upon the copy of the complaint that he filed in this case, it is ORDERED, that the above named defendants show cause before a motion term of this Court, at Room _____, United States Courthouse, 500 Pearl Street, in the City, County and State of New York, on July ____, 2023 at _____ am / pm (circle one), or as soon thereafter as counsel may be heard, why an order should not be issued partly pursuant to Rule 65 of the Federal Rules of Civil Procedure that:

1.     Has this Court take judicial notice of the following:

    a.     Relief that Plaintiff seeks to be granted as a result of this application is about achieving turnabout that is fair play.

    b.     _US v. Diallo_, 40 F.3d 32 (2d Cir. 1994) states that "Turnabout is fair play, even in the federal courts."

c.      _Walwyn v. US_, 51 F. Supp. 2d 320 (E.D.N.Y. 1999) states that "Turnabout is fair play under law and equity".

d.      _Alabama Association of Realtors v. Department of Health and Human Services_, 594 S. Ct. (U.S., August 26, 2021) is controlling law that states that "our system does not permit agencies to act unlawfully even in pursuit of desirable ends."

e.      Both government food-stamp benefits and cash-assistance benefits that the New York City Human Resources Administration ("HRA") has been providing to Plaintiff are issued to him by HRA through electronic funds transfers.

f.      15 U.S.C. §1693f is part of the Electronic Funds Transfer Act ("EFTA") and 15 U.S.C. §1693f(f)(1) points out that an unauthorized electronic fund transfer is an act that constitutes an error.

g.      18 NYCRR §352.31(f)(1) states the following:

> "Social services districts must correct any underpayments to current recipients, and to those who would be current recipients if the error causing the underpayment had not occurred, by making appropriate payments in each case within 30 days after discovery of the underpayments."

h.      _Fisher v. City of New York_, 2021 N.Y. Slip Op 30210 (Sup. Ct. 2021) states the following:

> "The New York State Constitution, Article XVII, Section 1 (adopted in 1938, in the wake of the Great Depression) provides as follows: "The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner, and by such means, as the legislature may from time to time determine."

i.      18 NYCRR §352.23(a) applies to legal duties that HRA has to Plaintiff and states that "resources "must be so used as to eliminate or reduce the need for public assistance, rehabilitate the client".

    j.    <u>*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 129 S. Ct. 1800, 173 L. Ed. 2d 738 (2009)</u> is controlling law that points out that "an agency must act consistently" and that an "agency must follow its own rules".

    k.    <u>*Singh v. US Dept. of Justice*, 461 F.3d 290 (2d Cir. 2006)</u> similarly states the following:

        i.    "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."

        ii.    "the Supreme Court has held that an administrative agency must adhere to its own regulations."

        iii.    "agencies are bound to follow regulations on which individuals justifiably rely"

    l.    <u>*Shakhnes v. Eggleston*, 740 F. Supp. 2d 602 (S.D.N.Y. 2010)</u> includes the following finding and was issued in a case against the commissioners of HRA and the New York State Office of Temporary and Disability Assistance ("OTDA"):

        "the alleged unlawful administrative delay leads to cumulative injury; the injury and the delay grow in tandem as time passes."

    m.    <u>*Securities & Exch. Com'n v. Management Dyn., Inc.*, 515 F.2d 801 (2d Cir. 1975)</u> contains the following findings about the propriety of issuing injunctive relief to prevent further illegal and otherwise abusive acts and omissions:

        i.    "the commission of past illegal conduct is highly suggestive of the likelihood of future violations."

        ii.    "the "critical question" in issuing an injunction is whether "there is a reasonable likelihood that the wrong will be repeated.""

        iii.    "Whether the inference that the defendant is likely to repeat the wrong is properly drawn, however, depends on the totality of circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant."

    n.    The first exhibit that appears in the **<u>Exhibit A</u>** that is annexed to the

attached supporting affirmation and is hereinafter simply referred to as "Exhibit A" is a notice

dated 5/2/23 that Jarrod Parker of OTDA issued to Plaintiff. Information shown towards the end

of that notice confirms that Mr. Parker claimed in it that beginning in June of 2023, OTDA

would update a web site that it maintains and is available at

https://otda.ny.gov/workingfamilies/EBT-scam-alert.asp with information on the process and

timeline for people to apply for government food-stamp and cash-assistance benefits to replace

such benefits that they were issued and defrauded the use of.

      o.    Information that is available on 7/10/23 on the web site to which

Plaintiff referred in the preceding paragraph, sufficiently establish that Mr. Parker fraudulently

misled Plaintiff in his 5/2/23 notice to him. This is true because the information on that web site

on 7/10/23 instead states the following:

> "An application for replacement of stolen SNAP benefits will be made
> available once the replacement processes are in place.
>
> **Beginning in August 2023**, OTDA will update this webpage with
> information on the process and timeline for impacted households to apply
> for replacement benefits and what types of benefits may be eligible for
> replacement."

    (boldface formatting added for emphasis)

      p.    The decision that New York State Supreme Court Judge Nancy

Bannon issued in _Komatsu v. New York City Human Resources Administration_, No.

100054/2017 (Sup. Ct. Aug. 10, 2017) appears as the second exhibit within the **Exhibit A** and

confirm that she stated the following on page 6 in it about the material fact that she authorized

Plaintiff to thereafter reinstate claims in that case that she was then dismissing without prejudice

that were about the failure by HRA to pay for and otherwise reimburse him storage unit rental

expenses:

> "Since the submissions do not reflect that the petitioner requested a fair hearing in connection with either of those determinations, so much of the petition as seeks to review those determinations must be dismissed, without prejudice, for failure to exhaust administrative remedies."

q.      On 2/24/22, Nigel Marks of OTDA issued a letter to Plaintiff that appears as the third exhibit within the **Exhibit A** in which he stated the following as he lied by claiming that OTDA didn't have jurisdiction to determine whether something was a forgery:

> "The basis for your request that the Decision be revisited is your allegation that HRA forged your lease agreement. OAH is an entity of limited jurisdiction. Issues that are subject to OAH's jurisdiction are enumerated in the regulations at 18 NYCRR Section 358-3.1. Jurisdiction over an allegation of forgery by HRA or any other social service district statewide is not listed in the regulations. The determination of whether HRA forged your lease agreement must be made by a court with jurisdiction over that issue."

r.      The fact that the fair hearing decision that was issued on 11/12/10 for OTDA fair hearing number 5620861L that is available at https://otda.ny.gov/fair%20hearing%20images/2011-12/Redacted_5620861L.pdf addressed a situation in which a social services agency in New York City erroneously claimed that the appellant enabled someone to commit a forgery confirms that Mr. Marks lied in his 2/24/22 letter to Plaintiff. Also, the material fact that Mr. Marks claimed in his 2/24/22 letter to Plaintiff that OTDA didn't have jurisdiction to address matters about forgery retrospectively established that it never was proper for Plaintiff to have to use OTDA's fair hearing process to litigate claims against HRA that were about personnel of HRA and Urban Pathways, Inc. ("Urban") having committed forgery against Plaintiff that resulted in further harm to Plaintiff partly about storage unit rental expenses. This is true because it was futile to do so as a result of OTDA's alleged lack of jurisdiction about matters pertaining to forgery.

s.      OTDA's 9/15/16 fair hearing decision for fair hearing decision number

7316477K appears as the fourth exhibit within the annexed **Exhibit A** and makes clear that HRA was legally required by it to end up being the sole party that retrospectively would have paid a storage unit rental company named Cubesmart in Queens for storage unit rental expenses for the storage unit rental period between May of 2016 and September of 2016 if HRA did anything on or after 9/15/16 to determine that Plaintiff was eligible to have HRA to pay for those rental expenses on his behalf while Plaintiff resided in apartment 4B located at 802 Fairmount Place in the Bronx that is hereinafter referred to as "Plaintiff's old Urban apartment".

       t.     The fifth exhibit that appears within the annexed **Exhibit A** is a copy of a notice dated 1/27/17 that was issued to Plaintiff by the New York City Department of Homeless Services ("DHS") that is a closely-related to HRA. That notice confirmed that DHS had recently issued a payment to Cubesmart on Plaintiff's behalf while he resided in Plaintiff's old Urban apartment for storage unit rental expenses and that DHS would continue to make those payments for as long as Plaintiff continued to reside in a DHS shelter.

       u.     The sixth exhibit that appears within the annexed **Exhibit A** is a copy of a notice dated 8/1/17 that Defendant Ann Marie Scalia issued to Plaintiff in which she informed him that HRA had recently issued a payment to Cubesmart on his behalf. Plaintiff continued to reside in Plaintiff's old Urban apartment then.

       v.     The eighth exhibit that appears within the annexed **Exhibit A** is a copy of the "Exhibit 8" that an attorney for HRA named Jeffrey Mosczyc file on 4/7/17 in *Komatsu v. New York City Human Resources Administration*, No. 100054/2017. The information in that exhibit confirms that he apprised Judge The seventh exhibit that appears within the annexed **Exhibit A** show 2 checks that HRA issued on 9/11/18 to Cubesmart to pay for storage unit rental expenses on Plaintiff's behalf while he continued to reside in Plaintiff's old Urban apartment.

w.      Bannon then about the fact that Plaintiff was scheduled to participate in a fair hearing on 4/11/17 against HRA for fair hearing number 7406570N about a matter that was about the fact that HRA hadn't paid for storage unit rental expenses on his behalf to Cubesmart while he resided in Plaintiff's old Urban apartment.

x.      The ninth exhibit that appears within the annexed **Exhibit A** is a copy of the $5,000 insurance policy that Plaintiff had for the storage unit that he rented from Cubesmart while he resided in Plaintiff's old Urban apartment.

y.      The tenth exhibit that appears within the annexed **Exhibit A** is a copy of a notice dated 3/14/19 that Cubesmart issued to Plaintiff to inform him that it would arrange to have the contents of the storage unit that he rented from it on 4/10/19 unless Cubesmart was provided all outstanding payments that were owed to it by then for the storage unit that Plaintiff rented from it.

2.      Has this Court also take judicial notice of the following:

a.      The eleventh exhibit that appears within the annexed **Exhibit A** is a notice dated 3/9/22 that Craig Crist of OTDA issued to Plaintiff in his Mr. Crist's capacity as a Deputy Counsel for OTDA. Mr. Crist informed Plaintiff in that notice that OTDA had directed HRA to **a)** conduct an investigation about a matter concerning forgeries and **b)** provide OTDA a report about that investigation. That investigation was about complaints that Plaintiff reported to both OTDA and HRA about the fact that personnel of HRA and Urban had subjected Plaintiff to a bait-and-switch fraud and forgery concerning the binding and fully-enforceable apartment lease agreement that Plaintiff signed on 2/16/16 with Lisa Lombardi of Urban to be issued sole possession with no roommate shortly thereafter of apartment 4C in its entirety that is located in the building located at 802 Fairmount Place in the Bronx.

b.      HRA was required by 18 NYCRR §356.3(e) to respond to OTDA's directive to conduct the investigation that was just discussed by issuing a report within 20 days after that directive was issued and that report needed to have been issued to Plaintiff within that period to inform him about the status and outcome of that investigation. Despite this fact, HRA illegally never provided Plaintiff such a report.

c.      On or about 2/8/17, HRA provided Plaintiff with a report that is known as an evidence packet in response to litigation that Plaintiff that Plaintiff commenced against HRA that was assigned to OTDA. The twelfth exhibit that appears within the annexed **Exhibit A** is a copy of page 42 in that evidence packet report with redactions that Plaintiff applied to it due to confidential and otherwise irrelevant information. Information on that page that wasn't redacted indicates that someone who worked for HRA on 2/18/16 whose last name is Benjamin-Solis reported that a correction had been made to an apartment number that was associated with Plaintiff instead of having reported that a change was made to a street address that corresponded to an apartment that was associated with Plaintiff. That information sufficiently makes clear that personnel of HRA were personally involved in illegally subjecting Plaintiff to tortious interference with the lease agreement that he signed on 2/16/16 with Ms. Lombardi by having apparently created a forgery from that lease. Information on that same page is about the SEPS rental subsidy application that Plaintiff completed and submitted to HRA on 2/16/16 with a copy of the lease that he signed then with Ms. Lombardi. Plaintiff completed that subsidy application to be provided a rental subsidy from HRA for the specific apartment of 4C for which he signed the 2/16/16 lease. Neither that lease nor that subsidy application could be legally modified nor reassigned without Plaintiff's prior consent and he never provided such consent.

d.      The thirteenth exhibit that appears within the annexed **Exhibit A** is a copy of page 43 in the evidence packet report that was just discussed. Plaintiff also applied redactions to parts of that page for the same reasons that he just discussed. Information on that page that wasn't redacted indicates that someone who worked for HRA on 3/16/16 reported that HRA had approved the SEPS rental subsidy application that Plaintiff submitted to it on 2/16/16. Additional information on that page indicates that Plaintiff also reported to HRA personnel on 3/16/16 that he had been subjected to an illegal bait-and-switch fraud in regards to the lease that he signed on 2/16/16 with Ms. Lombardi that proximately caused him to have illegally been denied possession of apartment 4C located at 802 Fairmount Place in the Bronx. Although that circumstance prohibited HRA from issuing payments to Urban on Plaintiff's behalf for rent, HRA illegally did so in relation to its SEPS rental subsidy program.

e.      The fourteenth exhibit that appears within the annexed **Exhibit A** is a copy of the SEPS rental subsidy application that Plaintiff submitted to HRA on 2/16/16 with a copy of the lease that he signed then with Ms. Lombardi. The information on page 1 of that subsidy application contains handwritten information that includes Plaintiff's name that Plaintiff didn't write on it.

f.      The fifteenth exhibit that appears within the annexed **Exhibit A** is a copy of pages 1, 3, and 5 from the lease that Plaintiff signed on 2/16/16 with Ms. Lombardi. The first page of that lease contains handwritten information that includes Plaintiff's name. How Plaintiff's name appears there and how it appears on the first page of the SEPS application that he submitted to HRA on 2/16/16 are a sufficient match with regards to the handwriting style to cause it to be objectively reasonable to conclude that the same person wrote Plaintiff's name in both of those documents on their first page.

g.      The sixteenth exhibit that appears within the annexed **Exhibit A** is a copy of the forgery that Plaintiff was given on or about 3/7/16 by one of Urban's personnel. That forgery has never been a valid lease and was instead manufactured from the lease that Plaintiff signed on 2/16/16 with Ms. Lombardi. This is clearly evident from the fact that the signature page from the lease that Plaintiff signed on 2/16/16 is shown at the end of that forgery. Also, in stark contrast to the first page of the lease agreement that Plaintiff actually signed on 2/16/16 with Ms. Lombardi, no handwritten information is shown on the first page of that forgery and that fact is one of several obvious telltale signs that that document is nothing more than a forgery.

h.      _Lugo v. FJC Sec. Servs. Inc._, 2022 N.Y. Slip Op 32497 (Sup. Ct. 2022) contains the following findings about whether state-court judges in New York should set aside a decision that is reached in a case that include those that don't involve juries in instances in which the weight of the evidence doesn't support such determinations:

> "In _McDermott v Coffee Beanery, Ltd._, 9 AD3d 195 (1st Dept 2004), the First Department opined:
>
>> The court's authority to set aside a verdict as against the weight of the evidence and order a new trial is an inherent one and demands a discretionary balancing of many factors [...]. Such authority is codified in CPLR 4404(a), which provides in pertinent part, that: "the court may set aside a verdict or any judgment entered thereon and direct that judgment be entered in favor of a party entitled to judgment as a matter of law or it may order a new trial of a cause of action or separable issue where the verdict is contrary to the weight of the evidence ..."

i.      Ann Marie Scalia is now HRA's General Counsel and is heard stating the following to Plaintiff at the elapsed time of 6 minutes and 54 second in a relevant video clip that **a)** is available at

https://drive.google.com/open?id=1yoQvpg51rvMhP3Q6zIr652NwR6LkA_n2 and **b)** from a video recording that Plaintiff legally recorded on 4/9/18 of a telephone call that he then had with her while he didn't have his shirt on before he thereafter edited that video to create that video clip strictly to get rid of the part that showed him without his shirt on:

> "Mr. Komatsu, I'm not going to go into this with you because this is the basis for all your arguments"

    j.    Ms. Scalia made the preceding remark in furtherance of an illegal cover-up by HRA against Plaintiff and in response to Plaintiff having just asked her to tell him who was responsible for providing proper oversight of Urban while Plaintiff suspected that HRA was among those that were legally responsible for that.

    k.    *Masullo v. City of Mt. Vernon*, 141 A.D.3d 95, 31 N.Y.S.3d 607 (App. Div. 2016) contains the following relevant findings that support Plaintiff's request to have this Court to immediately issue an order to compel HRA to immediately reimburse Plaintiff for storage unit rental expenses that he paid because these findings confirm that someone who applied to be provided government benefits was determined to have been eligible and entitled to receive those benefits after a government agency that provided the benefits sought  to the applicant claimed that it had issued those benefits to the applicant in error without having substantiated its claim about having issued such benefits in error to the applicant:

> i.    "absent any evidence that the payments were actually erroneously made, the City's payment of benefits to the petitioner demonstrated that he was found eligible for the benefit payment"

> ii.    "Absent from the record, however, is any proof to support the City's allegation that the petitioner's section 207-a (2) benefits were indeed paid in error."

> iii.    "Counsel maintained that by paying the petitioner these benefits for more than four years, the City had made a de facto determination that the petitioner was entitled to receive section 207-a (2) benefits"

l.      The following additional facts are true about Judge Bannon's 8/10/17 decision in _Komatsu v. New York City Human Resources Administration_, No. 100054/2017:

1)      She illegally and prejudicially ignored the audio recording that Plaintiff recorded on 4/11/17 of the fair hearing that OTDA conducted by telephone then between him and HRA for fair hearing number 7406570N that was about storage unit rental expenses. Plaintiff submitted a copy of that recording in that case on 5/19/17 on a USB thumb drive.  She also illegally and prejudicially ignored information shown in the "Exhibit 8" that an attorney for HRA filed in that case on 4/7/17 that confirmed that Plaintiff was scheduled to participate in the fair hearing on 4/11/17 against HRA that was just discussed.

2)      Page 9 and 10 in that decision contains the following findings that confirm that Judge Bannon implicitly authorized Plaintiff to substitute the City of New York as a defendant in that case for HRA by allowing Plaintiff to proceed with claims against City of New York agencies and personnel that were about illegal acts against him that pertained to his ability to lawfully attend public meetings that were public forums:

> "ORDERED that the remaining causes of action in the petition/complaint, which allege that the respondent/defendant was negligent in the provision of security at a homeless shelter, converted the petitioner/plaintiff's property to its own use, and unlawfully precluded the petitioner/plaintiff from attending certain public meetings, and seek both damages and injunctive relief, are severed, and the matter is referred to the Trial Support Office for reassignment to a City Part of this court."

m.      Judge Bannon also issued the decisions in **a)** _NRI Group LLC v. Crawford_, 2016 N.Y. Slip Op 50129 (Sup. Ct. 2016) and **b)** _Bethpage Fed. Credit Union v. Sepyashvily_, 2019 N.Y. Slip Op 30618 (Sup. Ct. 2019). The following relevant facts apply to those decisions:

       i.   *NRI Group LLC v. Crawford* contains the following relevant findings:

    1)    "courts "do not look favorably upon the forfeiture of leases.""

    2)    "Maintaining one's home is an interest that is unquantifiable."

    3)    "Courts have recognized that the realistic possibility of homelessness constitutes irreparable injury."

      ii.   *Bethpage Fed. Credit Union v. Sepyashvily* contains the following relevant findings:

    1)    "Leave to amend a pleading is to be freely given absent prejudice or surprise resulting directly from the delay and where the evidence submitted in support of the motion indicates that the amendment may have merit."

    2)    "The plaintiff has shown that the amendment has merit and, having failed to oppose the motion, the defendants have failed to show any prejudice or surprise. Furthermore, it is well-settled that where pleadings have been served under a misnomer upon the party which the plaintiff intended as the defendant, and the misnomer could not possibly have misled the defendant as to who it was that the plaintiff was in fact seeking to sue, the court should allow an amendment to correct the error rather than dismiss the action."

    n.   *Komatsu v. City of New York*, No. 21-cv-11115 (LTS)(S.D.N.Y. Sep. 16, 2022) was largely about the fact that HRA had been illegally violating Plaintiff's discovery rights in litigation that he commenced against it that was assigned to OTDA. Also, HRA has continued to flagrantly violate those rights since April of 2023 in regards to fair hearings that OTDA has conducted between HRA and Plaintiff and otherwise scheduled to be held between Plaintiff and HRA. Concerning this point, Plaintiff sent the following e-mail message on 4/21/23 partly to Nigel Marks of OTDA and Ms. Scalia about the fact that HRA illegally didn't provide Plaintiff any discovery material in flagrant violation of his First and Fourteenth Amendment

rights and 18 NYCRR §358-3.7(b)(2) prior to the fair hearing that OTDA conducted on 4/20/23

between him and HRA for fair hearing number 8593909M that was about the fact that HRA

illegally transferred Plaintiff to a new shelter on 4/13/23 without providing him 48 hours of

advance notice that it was legally required by and 18 NYCRR §491.15(b) to have provided to

Plaintiff:

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Illegal gamesmanship by HRA
> **Date:** April 21, 2023 at 8:09:26 AM EDT
> **To:** "Marks, Nigel A (OTDA)" <Nigel.Marks@otda.ny.gov>
> **Cc:** "Spitzberg, Samuel L (OTDA)"
> <samuel.spitzberg@otda.ny.gov>, "Scalia, Ann Marie (HRA)"
> <scaliaa@dss.nyc.gov>, "Gill Lambert, Allison (HRA)" <gill-
> lamberta@dss.nyc.gov>, "Fitzpatrick, Lisa (HRA)"
> <fitzpatrickl@hra.nyc.gov>, "Press.Office@exec.ny.gov"
> <press.office@exec.ny.gov>, "parkm@dhs.nyc.gov"
> <parkm@dhs.nyc.gov>
>
> Mr. Marks,
>
> HRA illegally didn't get me the packet of information that it
> provided to OTDA for yesterday's fair hearing involving me until
> several hours after that hearing ended. That flagrantly violated my
> First Amendment rights and other prevailing legal standards.
>
> I'm going to apprise the Second Circuit that you and other OTDA
> personnel have known about such illegal gamesmanship and
> haven't fixed that.
>
> From,
>
> Towaki Komatsu

   o.  Plaintiff is a U.S. Navy veteran and the U.S. Supreme Court's 6/30/23

decision in *303 Creative LLC v. Elenis, No.* 21-476 (U.S. Jun. 30, 2023) is controlling law that

includes the following relevant findings:

     i.  "the First Amendment protects an individual's right to speak his
        mind regardless of whether the government considers his speech
        sensible and well intentioned or deeply "misguided," *Hurley*, 515

U. S., at 574, and likely to cause "anguish" or "incalculable grief," *Snyder v. Phelps*, 562 U. S. 443, 456 (2011). Equally, the First Amendment protects acts of expressive association."

ii.    "The veterans' choice of what to say (and not say) might have been unpopular, but they had a First Amendment right to present their message undiluted by views they did not share."

iii.   "This Court has recognized that governments in this country have a "compelling interest" in eliminating discrimination in places of public accommodation."

iv.    "This Court has recognized, too, that public accommodations laws "vindicate the deprivation of personal dignity that surely accompanies denials of equal access to public establishments.""""

p.    <u>Lewis v. United States Government</u>, No. 5: 23-CV-0346 (DNH/ML) (N.D.N.Y. Apr. 28, 2023) contains the following findings that confirm that judges shouldn't prematurely, prejudicially, abusively, and shortsightedly block plaintiffs from pursuing claims in complaints and amended complaints when discovery and other factors may enable such plaintiffs to sufficiently plead and prove their claims:

"a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." <u>Branum v. Clark,</u> 927 F.2d 698, 704-05 (2d Cir. d1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also* <u>Math on v. Marine Midland Bank, N.A.,</u> 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy")"

q.    According to the Merriam-Webster's online dictionary that is available at https://www.merriam-webster.com/dictionary/occupation, "occupation" is defined there on 7/9/23 as **a)** "an activity in which one engages"; **b)** "the act or process of taking possession of a place or area"; **c)** "the possession, use, or settlement of land"; **d)** "the holding of an office or position".

r.     *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972) is controlling law and confirms that Fourteenth Amendment liberty rights include the right to **a)** "engage in any of the common occupations of life", **b)** "contract", **c)** "establish a home"; and **d)** "acquire useful knowledge".

s.     *Dunn v. Schmitz*, No. 22-1732 (7th Cir. June 6, 2023) cites *Board of Regents of State Colleges v. Roth* while stating the following about the fact that government personnel violate Fourteenth Amendment liberty rights when they opt to stigmatize others in ways that impair their ability to be fully and fairly considered for employment opportunities:

> "A government employer infringes an employee's occupational liberty interest when, without constitutionally adequate process, it places the employee's "good name, reputation, honor, or integrity" at stake or imposes "a stigma or other disability that foreclos[es] his freedom to take advantage of other employment opportunities." *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 573 (1972) (citations omitted). To succeed on an occupational liberty claim, an employee must prove that: "(1) he was stigmatized by the employer's actions; (2) the stigmatizing information was publicly disclosed; and (3) he suffered a tangible loss of other employment opportunities as a result of the public disclosure.""

t.     18 U.S.C. §1964 governs RICO violations and among other things points out that anyone who is harmed in his business or property by as a result of violations of predicate acts for RICO violations that include mail and wire fraud may sue in a U.S. district court and recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

u.     *Cornetta v. Town of Highlands*, No. 18-cv-12070 (KMK) (S.D.N.Y. Jan. 22, 2020) acknowledged that the Second Circuit's decision in *Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) expressed skepticism about the validity of decisions that were issued by other courts in this judicial district that have held that municipalities can't be liable

under respondeat superior for RICO violations that are predicated upon the acts of individual municipal agents acting with criminal intent partly because those courts have determined that a "municipal entity is incapable of forming the criminal intent necessary to support the alleged predicate offenses".

   3. Declares the following:

    a. Defendant Ann Marie Scalia ("Ms. Scalia") issued a binding, fully-enforceable, and permanent agreement (hereinafter referred to as "Plaintiff's HRA contract") to Plaintiff on 8/1/17 on behalf of the New York City Department of Social Services ("DSS"), HRA, her own behalf, and that of other personnel of DSS and HRA that thereafter legally required them to **a)** assist Plaintiff "in any way possible" and **b)** try to address his concerns.

    b. Those who reside in shelters that are funded partly by DHS and/or HRA may freely:

     i. Record video recordings, take photographs, and record audio recordings of deficient conditions in such shelters, crimes in them, harassment in them, and threats in them that they may also freely share with others to block cover-ups and instead befit the public's interest in government transparency, government accountability, and sound procurement practices.

     ii. Bring food and non-alcoholic beverages into such shelters as long as they demonstrate that it **a)** doesn't disturb others due to the smell from such items and allergies that others may have; **b)** attract insects and rats; **c)** will be properly and promptly disposed of following consumption; and **d)** will consistently be kept in locked storage lockers.

   4. Orders Ms. Scalia, DSS, HRA, and DHS to immediately, continuously, fully, and permanently comply with Plaintiff's HRA contract by:

a.    Assisting Plaintiff "in any way possible" and promptly instead of ways that are discretionary, merely practical, convenient, and temporary.

b.    Trying to address my concerns in good-faith instead of ignoring them.

5.    Orders HRA to do all of the following:

a.    Replace government **a)** cash-assistance benefits totaling $347.72 and **b)** food-stamp benefits totaling $752 within 24 hours after this order is issued to cause those benefits to be available for Plaintiff to use in response to the fact that he was defrauded of those benefits on 2/27/23.

b.    Reimburse Plaintiff within 24 hours for the difference between the amounts that he has paid since March of 2022 to buy weekly unlimited ride MTA metrocards since March of 2022 **a)** at full fare and **b)** a discounted rate of 50% off the full fare through HRA's Fair Fares discounted MTA metrocard benefit program.

c.    Reverse all deductions within 24 hours that HRA has made to the cash-assistance benefits that Plaintiff has received from HRA since 2016 by causing that sum to be available within 24 hours for Plaintiff to use.

d.    Immediately cease all deductions to cash-assistance benefits that Plaintiff receives from HRA.

e.    Cause Plaintiff to consistently be issued the first of two monthly payments for cash-assistance benefits on the earliest date each month when such benefits are issued to others by HRA.

f.    Cause Plaintiff to consistently be issued the second of two monthly payments for cash-assistance benefits on the earliest date each month when such benefits are issued to others by HRA.

g.      Cause Plaintiff to consistently be issued monthly food-stamp benefits on the earliest date each month when such benefits are issued to others by HRA.

h.      Inform both New York State Supreme Court Judge Nancy Bannon and OTDA within 24 hours that personnel of HRA named Jeffrey Mosczyc and Marin Gerber lied to both Judge Bannon in *Komatsu v. New York City Human Resources Administration*, No. 100054/2017 (Sup. Ct. Feb. 26, 2020) and litigation that Plaintiff commenced against HRA that was assigned to OTDA by claiming that **a)** Plaintiff was residing in permanent housing instead of temporary shelter while he resided in apartment 4B located at 802 Fairmount Place in the Bronx; **b)** Plaintiff was ineligible to have HRA to pay for storage unit rental expenses on his behalf while he resided there; and **c)** HRA complied with the 9/15/16 decision that OTDA issued for fair hearing number 7316477K.

i.      Reimburse Plaintiff within 24 hours with accumulated compound interest a trebled amount for all storage unit rental expenses that he paid while he resided at 802 Fairmount Place in the Bronx.

j.      Reimburse Plaintiff within 48 hours for a trebled amount of the $5,000 insured value for the property that he kept in a storage unit that he rented from Cubesmart that was auctioned in April of 2019 because HRA illegally refused to pay for storage unit rental expenses on Plaintiff's behalf.

k.      Cause Plaintiff to be provided temporary housing within 24 hours by causing him to be provided a hotel room located at the Candlewood Suites hotel in Manhattan that is located at 339 West 39th Street where Plaintiff must be provided a kitchenette, queen-sized bed, desk, printer, printer paper, printer ink, envelopes, free high-speed and unlimited data wireless Internet service, free laundry service, television, and a private bathroom and shower.

l.      Cause Plaintiff to be able to continue to reside at that hotel until HRA, DSS, and DHS fully comply with this order.

m.      Make certain that Plaintiff can immediately and continuously visit HRA's offices located at 150 Greenwich Street in Manhattan partly on the 37th and 38th floor of that building partly to print for free at those locations and have HRA's personnel that include Defendant Ann Marie Scalia mail legal filings on Plaintiff's behalf and otherwise act as process servers on his behalf whenever Plaintiff seeks for that to occur.

6.      Orders HRA and DHS to:

a.      Cause the security guard who is shown in the screenshot shown next that is from a video recording that Plaintiff recorded on 7/4/23 in the Recreation Room on the second floor of the shelter located at 300 Skillman Avenue in Brooklyn that is hereinafter referred to as "the Skillman shelter" to be immediately prohibited from being employed **a)** in any shelter that is funded partly by HRA and/or DHS and **b)** otherwise on the property of such shelters for proper risk-management reasons with respect to the fact that she criminally threw a water bottle at Plaintiff and threatened to stab Plaintiff with a pen that she held while raising it near Plaintiff's face on 7/4/23 shortly before 10:40 am in the Recreation Room that was just mentioned.



      b.     Provide Plaintiff a copy of all logbook entries within 24 hours and without redactions that may have been recorded about him by security personnel and all other shelter staff since 6/30/23 who have worked in the Skillman shelter.

      c.     Have video security cameras installed throughout the Skillman shelter within 48 hours and require them to be continuously watched thereafter by security personnel who will not condone nor cover-up illegal and otherwise abusive acts and omissions that may be committed by anyone in that shelter that includes security personnel and other shelter staff.

      d.     Establish strict policies that prohibit all personnel who work in and for shelters that are funded partly by HRA and/or DHS from doing the following in them while such personnel are on-duty and consistently enforce those policies by prohibiting those who violate them from being able to work for such shelters:

      i.     Sleeping, participating in cover-ups, lying, leaving security logbooks unattended, and using cell phones for purposes that are unrelated to the jobs that they have for such shelters.

      ii.     Failing to promptly and decisively intervene against security

personnel and shelter staff in such shelters in response to illegal and otherwise abusive acts and omissions..

      iii.    Initiating physical contact against others and/or throwing objects at others without objectively valid legal grounds.

      iv.    Discriminatorily enforcing applicable rules and policies.

      e.    Have paper towels, disposable sanitary wipes, spare towels, wireless high-speed and unlimited data Internet service, free and unlimited printing and document scanning services continuously available for residents in the Skillman shelter.

      f.    Have window screens, air conditioners, cockroach traps, and Flowtron Diplomat indoor fly control devices installed in the dormitories in the Skillman shelter within 48 hours partly to keep out mosquitoes and provide proper cooling.

      g.    Require all mattresses and storage lockers located in shelters that are funded partly by HRA and/or DHS to be thoroughly cleaned and disinfected prior to being assigned to people.

      7.    Orders HRA, DSS, DHS, and Ms. Scalia to provide Plaintiff all records within 72 hours that have been in their possession and that of other current and former personnel of HRA, DSS, and DHS in electronic and text-searchable format; without redactions and other edits; and without any confidentiality and protective order that are about the following matters:

      a.    How current and/or former personnel of HRA, DHS, DSS, and Urban Pathways, Inc. ("Urban") subjected Plaintiff to an illegal bait-and-switch fraud and forgery that concerns the binding and fully-enforceable apartment lease agreement that he signed on 2/16/16 with Lisa Lombardi of Urban.

      b.    How current and/or former personnel of HRA, DHS, DSS, and Urban

directed, condoned, covered-up, and coordinated their actions in regards to the illegal bait-and-switch fraud and forgery that was just discussed.

        c.     How current and/or former personnel of HRA, DHS, DSS, and Urban directed and otherwise caused the reassignment of the SEPS rental subsidy application that Plaintiff completed and submitted to HRA on 2/16/16 to have HRA provide him a rental subsidy for apartment 4C in the building located at 802 Fairmount Place in the Bronx to be reassigned to Room 1 within apartment 4B located in that building.

        d.     The degree to which and when current and/or former personnel of HRA, DHS, DSS, and Urban were aware of and condoned an attempted assault against Plaintiff by Ronald Sullivan on 5/12/16 that occurred inside of apartment 4B in the building that is located at 802 Fairmount Place in the Bronx before Mr. Sullivan was able to and did, in fact, viciously assault Plaintiff in that apartment on 7/2/16.

        e.     The degree to which, when, and why current and/or former personnel of HRA, DHS, DSS, and Urban were aware of and condoned Mr. Sullivan's 7/2/16 assault against Plaintiff by not forcing Mr. Sullivan to be immediately evicted from the building located at 802 Fairmount Place in the Bronx after 7/2/16.

        f.     How and why current and former personnel of HRA, DSS, and DHS acted in concert with others that caused Plaintiff to be prevented from attending public meetings that were public forums and otherwise discriminated against in his efforts to lawfully attend them in rooms in which they were conducted instead of doing so from within overflow rooms.

        g.     How and why current and former personnel of HRA, DSS, and DHS acted in concert with others that has caused Plaintiff to be unable to visit HRA's offices that are located in the building at 150 Greenwich Street in Manhattan.

h.      How and why current and former personnel of HRA, DSS, and DHS never granted me a job interview with those agencies and otherwise sabotaged my efforts to learn about, apply for, and be properly considered for other job opportunities.

i.      How and why current and former personnel of HRA and DSS sabotaged my ability to be provided pro-bono legal representation.

j.      How and why current and former personnel of HRA and DSS engaged in illegal gamesmanship against me in litigation partly by **a)** stealing my scheduled 4/12/17 oral arguments hearing in _Komatsu v. New York City Human Resources Administration_, No. 100054/2017 (Sup. Ct., NY Cty. Feb. 26, 2020) by engaging in illegal ex-parte communications and **b)** illegally not complying with my discovery demands in litigation.

8.      Imposes daily sanctions in the amount of $10,000 against the City of New York to be payable to Plaintiff within 24 hours in the event that the City of New York, its agencies, and/or its personnel fail to comply with this order.

9.      Declares that the City of New York is estopped from requiring Plaintiff to satisfy a work requirement in order to be eligible to receive a voucher from the City of New York for a rental subsidy partly because City of New York government agencies and their personnel have **a)** consistently denied him job interviews for jobs with them that he has been qualified to perform and has applied for; **b)** illegally prevented Plaintiff from attending numerous public meetings since 2017 that were public forums that Plaintiff sought to lawfully attend partly to engage in networking with others partly to improve his job prospects; and **c)** illegally caused Plaintiff to be deprived of suitable attire to wear during job interviews that he possessed.

10.      Grants Plaintiff such other, further, and different relief that this Court may deem just and proper.

It is further ORDERED that, sufficient reason having been shown therefor, pending the hearing of plaintiff's application for a preliminary injunction, pursuant to Federal Rule of Civil Procedure Rule 65, Plaintiff is granted the following relief:

1.      This Court will take judicial notice of the information that Plaintiff urged it in this application to do so.

2.      This Court declares the following:

a.      Ms. Scalia issued a binding, fully-enforceable, and permanent agreement that corresponds to Plaintiff's HRA contract to Plaintiff on 8/1/17 on behalf of DSS, HRA, her own behalf, and that of other personnel of DSS and HRA that thereafter legally required them to **a)** assist Plaintiff "in any way possible" and **b)** try to address his concerns.

b.      Those who reside in shelters that are funded partly by DHS and/or HRA may freely:

i.      Record video recordings, take photographs, and record audio recordings of deficient conditions in them, crimes in them, harassment in them, and threats in such shelters that they may also freely share with others.

ii.      Bring food and non-alcoholic beverages into such shelters as long as they demonstrate that it **a)** doesn't disturb others due to the smell from such items and allergies that others may have; **b)** attract insects and rats; **c)** will be properly and promptly disposed of following consumption; and **d)** will consistently be kept in locked storage lockers.

3.      Ms. Scalia, DSS, HRA, and DHS are ordered to immediately, continuously, fully, and permanently comply with Plaintiff's HRA contract by:

a.      Assisting Plaintiff "in any way possible" and promptly instead of ways that are discretionary, merely practical, convenient, and temporary.

b.       Trying to address my concerns in good-faith instead of ignoring them.

4.       HRA is ordered to do all of the following:

a.       Replace government **a)** cash-assistance benefits totaling $347.72 and **b)** food-stamp benefits totaling $752 within 24 hours after this order is issued to cause those benefits to be available for Plaintiff to use in response to the fact that he was defrauded of those benefits on 2/27/23.

b.       Reimburse Plaintiff within 24 hours for the difference between the amounts that he has paid since March of 2022 to buy weekly unlimited ride MTA metrocards since March of 2022 **a)** at full fare and **b)** a discounted rate of 50% off the full fare through HRA's Fair Fares discounted MTA metrocard benefit program.

c.       Reverse all deductions within 24 hours that HRA has made to the cash-assistance benefits that Plaintiff has received from HRA since 2016 by causing that sum to be available within 24 hours for Plaintiff to use.

d.       Immediately cease all deductions to cash-assistance benefits that Plaintiff receives from HRA.

e.       Cause Plaintiff to consistently be issued the first of two monthly payments for cash-assistance benefits on the earliest date each month when such benefits are issued to others by HRA.

f.       Cause Plaintiff to consistently be issued the second of two monthly payments for cash-assistance benefits on the earliest date each month when such benefits are issued to others by HRA.

g.       Cause Plaintiff to consistently be issued monthly food-stamp benefits on the earliest date each month when such benefits are issued to others by HRA.

h.      Inform both New York State Supreme Court Judge Nancy Bannon and OTDA within 24 hours that personnel of HRA named Jeffrey Mosczyc and Marin Gerber lied to both Judge Bannon in *Komatsu v. New York City Human Resources Administration*, No. 100054/2017 (Sup. Ct. Feb. 26, 2020) and litigation that Plaintiff commenced against HRA that was assigned to OTDA by claiming that **a)** Plaintiff was residing in permanent housing instead of temporary shelter while he resided in apartment 4B located at 802 Fairmount Place in the Bronx; **b)** Plaintiff was ineligible to have HRA to pay for storage unit rental expenses on his behalf while he resided there; and **c)** HRA complied with the 9/15/16 decision that OTDA issued for fair hearing number 7316477K.

i.      Reimburse Plaintiff within 24 hours with accumulated compound interest a trebled amount for all storage unit rental expenses that he paid while he resided at 802 Fairmount Place in the Bronx.

j.      Reimburse Plaintiff within 48 hours for a trebled amount of the $5,000 insured value for the property that he kept in a storage unit that he rented from Cubesmart that was auctioned in April of 2019 because HRA illegally refused to pay for storage unit rental expenses on Plaintiff's behalf.

k.      Cause Plaintiff to be provided temporary housing within 24 hours by causing him to be provided a hotel room located at the Candlewood Suites hotel in Manhattan that is located at 339 West 39th Street where Plaintiff must be provided a kitchenette, queen-sized bed, desk, printer, printer paper, printer ink, envelopes, free high-speed and unlimited data wireless Internet service, free laundry service, television, and a private bathroom and shower.

l.      Cause Plaintiff to be able to continue to reside at that hotel until HRA, DSS, and DHS fully comply with this order.

5.      Orders HRA and DHS to:

a.      Cause the security guard who is shown in the screenshot shown next that is from a video recording that Plaintiff recorded on 7/4/23 in the Recreation Room on the second floor of the Skillman shelter to be immediately prohibited from being employed **a)** in any shelter that is funded partly by HRA and/or DHS and **b)** otherwise on the property of such shelters for proper risk-management reasons with respect to the fact that she criminally threw a water bottle at Plaintiff and threatened to stab Plaintiff with a pen that she held while raising it near Plaintiff's face on 7/4/23 shortly before 10:40 am in the Recreation Room that was just mentioned.



b.      Provide Plaintiff a copy of all logbook entries within 24 hours and without redactions that may have been recorded about him by security personnel and all other shelter staff since 6/30/23 who have worked in the Skillman shelter.

c.      Have video security cameras installed throughout the Skillman shelter within 48 hours and require them to be continuously watched thereafter by security personnel who will not condone nor cover-up illegal and otherwise abusive acts and omissions that may be committed by anyone in that shelter that includes security personnel and other shelter staff.

d.      Establish strict policies that prohibit all personnel who work in and for shelters that are funded partly by HRA and/or DHS from doing the following in them while such personnel are on-duty and consistently enforce those policies by prohibiting those who violate them from being able to work for such shelters:

i.      Sleeping, participating in cover-ups, lying, leaving security logbooks unattended, and using cell phones for purposes that are unrelated to the jobs that they have for such shelters.

ii.      Failing to promptly and decisively intervene against security personnel and shelter staff in such shelters in response to illegal and otherwise abusive acts and omissions..

iii.      Initiating physical contact against others and/or throwing objects at others without objectively valid legal grounds.

iv.      Discriminatorily enforcing applicable rules and policies.

e.      Have paper towels, disposable sanitary wipes, spare towels, wireless high-speed and unlimited data Internet service, free and unlimited printing and document scanning services continuously available for residents in the Skillman shelter.

f.      Have window screens and air conditioners installed in the dormitories in the Skillman shelter within 48 hours to keep out mosquitoes and provide proper cooling.

g.      Require all mattresses and storage lockers located in shelters that are

funded partly by HRA and/or DHS to be thoroughly cleaned and disinfected prior to being assigned to people.

6.  HRA, DSS, DHS, and Ms. Scalia are otherwise ordered to:

a.  Make certain that Plaintiff can immediately and continuously visit HRA's offices located at 150 Greenwich Street in Manhattan partly on the 37th and 38th floor of that building partly to print for free at those locations and have HRA's personnel that include Defendant Ann Marie Scalia mail legal filings on Plaintiff's behalf and otherwise act as process servers on his behalf whenever Plaintiff seeks for that to occur.

b.  Provide Plaintiff all records within 72 hours that have been in their possession and that of other current and former personnel of HRA, DSS, and DHS in electronic and text-searchable format; without redactions and other edits; and without any confidentiality and protective order that are about the following matters:

i.  How current and/or former personnel of HRA, DHS, DSS, and Urban subjected Plaintiff to an illegal bait-and-switch fraud and forgery that concerns the binding and fully-enforceable apartment lease agreement that he signed on 2/16/16 with Lisa Lombardi of Urban.

ii.  How current and/or former personnel of HRA, DHS, DSS, and Urban directed, condoned, covered-up, and coordinated their actions in regards to the illegal bait-and-switch fraud and forgery that was just discussed.

iii.  How current and/or former personnel of HRA, DHS, DSS, and Urban directed and otherwise caused the reassignment of the SEPS rental subsidy application that Plaintiff completed and submitted to HRA on 2/16/16 to have HRA provide him a rental subsidy for apartment 4C in the building located at 802 Fairmount Place in the Bronx to

be reassigned to Room 1 within apartment 4B located in that building.

          iv.      The degree to which and when current and/or former personnel of HRA, DHS, DSS, and Urban were aware of and condoned an attempted assault against Plaintiff by Ronald Sullivan on 5/12/16 that occurred inside of apartment 4B in the building that is located at 802 Fairmount Place in the Bronx before Mr. Sullivan was able to and did, in fact, viciously assault Plaintiff in that apartment on 7/2/16.

          v.      The degree to which, when, and why current and/or former personnel of HRA, DHS, DSS, and Urban were aware of and condoned Mr. Sullivan's 7/2/16 assault against Plaintiff by not forcing Mr. Sullivan to be immediately evicted from the building located at 802 Fairmount Place in the Bronx after 7/2/16.

          vi.      How and why current and former personnel of HRA, DSS, and DHS acted in concert with others that caused Plaintiff to be prevented from attending public meetings that were public forums and otherwise discriminated against in his efforts to lawfully attend them in rooms in which they were conducted instead of doing so from within overflow rooms.

          vii.      How and why current and former personnel of HRA, DSS, and DHS acted in concert with others that has caused Plaintiff to be unable to visit HRA's offices that are located in the building at 150 Greenwich Street in Manhattan.

          viii.      How and why current and former personnel of HRA, DSS, and DHS never granted me a job interview with those agencies and otherwise sabotaged my efforts to learn about, apply for, and be properly considered for other job opportunities.

          ix.      How and why current and former personnel of HRA and DSS sabotaged my ability to be provided pro-bono legal representation.

x.       How and why current and former personnel of HRA and DSS engaged in illegal gamesmanship against me in litigation partly by **a)** stealing my scheduled 4/12/17 oral arguments hearing in _Komatsu v. New York City Human Resources Administration_, No. 100054/2017 (Sup. Ct., NY Cty. Feb. 26, 2020) by engaging in illegal ex-parte communications and **b)** illegally not complying with my discovery demands in litigation.

xi.       When, how, and why current and former personnel of HRA, DSS, and other City of New York personnel violated the sealing order that was issued in _Komatsu v. New York City Human Resources Administration_, No. 100054/2017 on 1/17/17.

7.       This Court will impose daily sanctions in the amount of $10,000 against the City of New York to be payable to Plaintiff within 24 hours in the event that the City of New York, its agencies, and/or its personnel fail to comply with this order.

8.       This Court declares that the City of New York is estopped from requiring Plaintiff to satisfy a work requirement in order to be eligible to receive a voucher from the City of New York for a rental subsidy partly because City of New York government agencies and their personnel have **a)** consistently denied him job interviews for jobs with them that he has been qualified to perform and has applied for; **b)** illegally prevented Plaintiff from attending numerous public meetings since 2017 that were public forums that Plaintiff sought to lawfully attend partly to engage in networking with others partly to improve his job prospects; and **c)** illegally caused Plaintiff to be deprived of suitable attire to wear during job interviews that he possessed.

9.       This Court will grant Plaintiff such other, further, and different relief that this Court may deem just and proper.

It is further ORDERED that no security needs to be posted by the plaintiff to be granted

the relief that he seeks in this application and it is further

ORDERED that the U.S. Marshals Service ("USMS") is ordered to immediately

effectuate personal service of a copy of this order and the annexed affidavit upon the defendants

or their counsel; and it is further

ORDERED that such service by the USMS upon the defendants or their counsel on or

before _____ am / pm (circle one) , _____ shall

be deemed good and sufficient service thereof.


DATED:      New York, New York

ISSUED:      _____ M


_____
                United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Towaki Komatsu,

Plaintiff,

v.

The City of New York, Lisa Fitzpatrick, Nigel
Marks, Vincent Pullo, Molly Park (in her capacity as
the Commissioner of the New York City Department
of Social Services), Ann Marie Scalia, Samuel
Spitzberg, Daniel Tietz (in his capacity as the
Commissioner of the New York State Office of
Temporary and Disability Assistance), Top Choice
Meat Market Corp., Top Choice Owner John Doe, Z
& H Cleaners,

Defendants.

No. 23-cv-5406

**AFFIRMATION IN SUPPORT**

I, Towaki Komatsu am the plaintiff in this case and declare, pursuant to 28 U.S.C. §1746, under

penalty of perjury that the information that is presented throughout this affirmation is accurate.

This affirmation is comprised of the following sections:

| **Section** | **Page** |
|---|---|
| 1. Preliminary Remarks | 1 |
| 2. Relief Sought | 4 |
| 3. Reasons Why Emergency Relief Is Necessary | 4 |
| 4. Reasons to Grant the Relief Sought | 19 |
| 5. Conclusion | 53 |

**Preliminary Remarks**

1.     The acronyms shown in the next table's second column are abbreviations that refer to

entities, people, and other things to which I refer in this affirmation that are identified and

otherwise described in that table's third column.

| # | Acronym | Corresponds To |
|---|---------|----------------|
| 1 | ALJ | Administrative Law Judge |
| 2 | The Appellate Division | The New York State Supreme Court's Appellate Division's First Department |
| 3 | The B&S | The illegal bait-and-switch fraud and forgery that personnel of HRA and Urban subjected me to that **a)** concerns my Urban lease, **b)** proximately caused me to be coerced by Urban's personnel on or about 3/7/16 to accept assignment to my old Urban apartment with a roommate instead of Urban having fully complied with my Urban lease by issuing sole possession of apartment 4C that is located in my old Urban building shortly after 2/16/16 in a fully-furnished condition and with no roommate. |
| 4 | BHC | The Bronx Housing Court |
| 5 | CSO(s) | Federal Court Security Officer(s) |
| 6 | DHS | The New York City Department of Homeless Services |
| 7 | DPM | The Daniel Patrick Moynihan federal courthouse in Manhattan |
| 8 | DSS | The New York City Department of Social Services |
| 9 | FH | Fair hearing |
| 10 | FJC | FJC Security Services, Inc. |
| 11 | HRA | The New York City Human Resources Administration |
| 12 | The Law Department | The New York City Law Department |
| 13 | My BS Urban lease | The forged document that I was provided in March of 2016 by personnel of Urban who claimed that it was a copy of my Urban lease and was for my old Urban apartment. It was instead just a forgery and created from my Urban lease. |
| 14 | My HRA contract | The binding and fully-enforceable agreement that Defendant Ann Marie Scalia issued to me on 8/1/17 and provided to me in an e-mail message that I received from her at 5:58 pm on 8/1/17. |
| 15 | My old Urban apartment | The apartment 4B that is located in my old Urban building and in which I resided until 1/4/23 |
| 16 | My old Urban building | The building that is located at 802 Fairmount Place in the Bronx. |
| 17 | My Urban lease | The binding and fully-enforceable apartment lease agreement that I signed in the presence of witnesses on 2/16/16 with Urban's Lisa Lombardi in HRA's offices located at 33 Beaver Street in Manhattan to be issued sole possession of apartment 4C located in my old Urban building shortly thereafter in a fully-furnished condition with no roommate. That lease contains handwritten information on its first page. |
| 18 | NYSCOA | The New York State Court of Appeals |
| 19 | NYSSC | New York State Supreme Court |

| 20 | OSC | Order to show cause application |
|----|-----|--------------------------------|
| 21 | OTDA | The New York State Office of Temporary and Disability Assistance |
| 22 | SCOTUS | The U.S. Supreme Court |
| 23 | Second Circuit | The U.S. Court of Appeals for the Second Circuit |
| 24 | The Skillman shelter | The shelter that is located at 300 Skillman Avenue in Brooklyn |
| 25 | TM | The Thurgood Marshall federal courthouse in Manhattan |
| 26 | Urban | Urban Pathways, Inc. |
| 27 | USAO | The U.S. Attorney's Office for the Southern District of New York |
| 28 | USMS | The U.S. Marshals Service |

2.      DSS is the parent agency of HRA and DHS. All references that I make to HRA interchangeably refer to DHS and DSS for the sake of brevity and simplicity.

3.      The acronyms shown in the next table's first column refer to litigation involving me that I was previously involved in and/or is otherwise ongoing partly as a result of appeals. Such litigation to which I refer in this affirmation is listed and otherwise described to the right in that table.

| # | Acronym | Litigation |
|---|---------|------------|
| 1 | K1 | *Komatsu v. New York City Human Resources Administration*, No. 100054/2017 (Sup. Ct., NY Cty. Feb. 26, 2020) |
| 2 | K2 | All litigation that I commenced against HRA that was assigned to OTDA in its capacity as a New York State administrative appellate forum |
| 3 | K3 | *Komatsu v. City of New York*, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y. Sep. 27, 2021) |
| 4 | K4 | *Komatsu v. City of New York*, No. 20-cv-7046 (ER)(GWG)(S.D.N.Y. Jun. 6, 2023)[1] |
| 5 | K5 | *People v. Komatsu*, No. 2017BX048917 (Bronx Crim. Ct. Jan. 23, 2020) |
| 6 | K6 | *Komatsu v. City of New York*, No. 23-464 (2d Cir.) |
| 7 | K7 | *Komatsu v. City of New York*, No. 21-cv-11115 (LTS)(S.D.N.Y. Sep. 16, 2022) |
| 8 | K8 | *Komatsu v. Ramos*, No. 22-cv-6076 (LTS)(S.D.N.Y. Aug. 15, 2022) |
| 9 | K9 | *Komatsu v. City of New York*, No. 22-cv-6627 (LTS)(S.D.N.Y. Aug. 15. 2022) |
| 10 | K10 | *Urban Pathways, Inc. v. Komatsu*, No. LT-304821-22/BX (Civ. Ct., Bronx Cty.) |
| 11 | K11 | *Komatsu v. Urban Pathways, Inc.*, No. 23-654 (2d Cir.) |
| 12 | K12 | *Komatsu v. Urban Pathways, Inc.*, No. 22-cv-9080 (LTS) (S.D.N.Y.) |
| 13 | K13 | *Komatsu v. Ramos*, No. 22-1787 (2d Cir. Dec. 22, 2022)[2] |
| 20 | K14 | *Komatsu v. Cubesmart*, No. 20-cv-6510 (LLS) (S.D.N.Y. Oct. 22, 2020) |

---

[1] This was a consolidated case.

[2] This was a consolidated appeal about K4, K7, K8, and K9.

| 21 | K15 | *Komatsu v. Cubesmart*, No. 20-3676 (2d Cir. Jan. 31, 2021) |
| 22 | K22 | *Komatsu v. Cubesmart*, 143 S. Ct. 361 (U.S. 2022). |
| 23 | K23 | *USA v. Komatsu*, No. 18-cr-651 (ST)(Oct. 21, 2019) |
| 24 | K24 | *Komatsu v. USA*, No. 21-cv-1838 (RJD)(RLM)(S.D.N.Y. Jan. 19, 2023) |
| 25 | K25 | *Komatsu v. USA*, No. 23-95 (2d Cir.) |

4.      The brief references to the relevant judges shown in the next table's first column refer to the judges in that table's second column and the fuller descriptions of them in that column.

| # | Judge | Description |
|---|-------|-------------|
| 1 | Judge Bannon | NYSSC Judge Nancy Bannon |
| 2 | Judge Garland | BHC Judge Christel Garland |
| 3 | Judge Ibrahim | BHC Judge Shorab Ibrahim |
| 4 | Judge Ramos | U.S. District Judge Edgardo Ramos |
| 5 | Judge Swain | U.S. Chief District Judge Laura Taylor Swain |

5.      I have added markings to the lower-right corner of the exhibits that appear in the annexed **Exhibit A** for cross-referencing purposes. Such markings appear as "A1", "A2", etc. to reflect the order in which those exhibits appear within **Exhibit A**. References that I make in this affirmation to those exhibits appear in parentheses as "(see A1)", "(see A2)", "(see A3)", etc. For the most part, I have arranged those exhibits in the order in which I refer to them in this affirmation.

## Relief Sought

I incorporate the information shown on pages 1 and 24 in the order to show cause component of this application as though fully set forth herein.

## Reasons Why Emergency Relief Is Necessary

1.      As I discussed in the order to show cause component of this application, a Black female security guard who works for FJC in the Skillman shelter criminally **a)** threatened to stab me with a pen that she then held and **b)** assaulted me on 7/4/23 in that shelter while no video security cameras were installed there. I was informed later that day by a man who works for that shelter who is named Craig Freeman that the guard to whom I just referred is a supervisor for the

security guards who work for that shelter. Despite the fact that there aren't video security cameras in that shelter, I have audio recording evidence from an eyewitness that confirms that she assaulted me then. This circumstance certainly satisfies the threshold for emergency relief that I seek partly to safeguard my safety. Although I contacted senior personnel of HRA, DSS, DHS, and OTDA via e-mail since 7/4/23 partly to demand an immediate transfer to a hotel that is being used as temporary housing to safeguard my safety, no one has contacted me about that. That confirms that I can't rely on HRA, OTDA, and DHS to make certain that sufficient security exists for me in shelters that are funded partly by HRA and/or DHS and that OTDA, DHS, and HRA are required to provide proper oversight for. As a result, this Court needs to promptly intervene on my behalf by immediately granting me decisive injunctive and equitable relief.

2.      I'm a legal guardian for my severely incapacitated Mom and HRA is illegally and unconscionably blocking me from performing my legal and moral duties as her guardian and her son partly by restricting how often I can visit my Mom partly to stay abreast of her needs and assist her in trying to achieve recoveries from strokes she suffered. HRA is doing so partly by illegally shirking legal duties that HRA has had to replace government cash-assistance and food-stamp benefits that I was defrauded of on 2/27/23 within 30 days after I apprised HRA personnel on 4/3/23 about the fact that I was defrauded of that on 2/27/23 quite possibly by HRA personnel. HRA was legally required partly by 18 NYCRR §352.31(f)(1) and my HRA contract's terms to have replaced those benefits for me within 30 days after I apprised HRA on 4/3/23 about the fact that I was defrauded of those benefits to cause them to be fully available for me to use. Since it was HRA's error instead of mine that enabled those benefits to have been stolen from me by not issuing them to me in a manner that would have otherwise had sufficient safeguards in place to block others from being able to steal them from me electronically, 18

NYCRR §352.31(f)(1) clearly applies to that circumstance and caused an underpayment of benefits to have been issued to me by HRA that remains in need of replacement. As I mentioned on page 122 in the PDF file for my complaint in this case, I was defrauded of was $347.72 for government cash-assistance benefits and $752 for government food-stamp benefits on 2/27/23. `

3.      The fact that personnel of HRA and OTDA illegally blocked me from pursuing my appeals to SCOTUS for K13 by causing me to be deprived of sufficient funds to which I was legally entitled to receive from HRA as cash-assistance benefits confirms that I'm entitled to the prompt **a)** recall of the mandate for K13 and **b)** reinstatement of K13 as well as severe sanctions against the City of New York and people who were respondents in the underlying district court actions that K13 concerned in response to their obstruction of justice that proximately blocked me from being able to print and mail all of the copies of the petition for a writ of certiorari that I needed to by 5/21/23 in order for SCOTUS to accept and consider that petition. In order to seek the recall of the mandate of K13 and its reinstatement, I have to print and mail numerous copies of motions to legal adversaries and/or their attorneys as well as to the Second Circuit. I need sufficient funds for that, but personnel of HRA and OTDA are still illegally depriving me of that while subjecting me to a pretextual war of attrition.

4.      On pages 11 and 12 in my complaint in this case, I apprised this Court of the material fact that findings in _Sefick v. Gardner_, 164 F.3d 370 (7th Cir. 1998) and _Braun v. Baldwin_, 346 F.3d 761 (7th Cir. 2003) that is cited by _Hughes v. Lebron_, No. 14-cv-9479 (PAE)(S.D.N.Y. Sep. 19, 2016) confirm that federal judges have illegally condoned the fact that personnel of the USMS and CSOs have been illegally causing images of my face and my name to be conspicuously shown to the general public on tablet computer screens in public areas of DPM and TM while USMS personnel and CSOs were illegally violating my rights against compelled association and

expression by doing so. This pertains to the fact that **a)** the mere display of an image of me with my name communicates a message about me against my wishes and **b)** images and names of others who I have never sought to be associated with are also shown on those tablet computer screens. After I informed this Court about that, when SCOTUS issued its 6/30/23 decision in *303 Creative LLC v. Elenis*, No. 21-476 (U.S. Jun. 30, 2023), it expressed the following findings that confirm that compelled expression and compelled association by government personnel are prohibited:

a. "We part ways with the Tenth Circuit only when it comes to the legal conclusions that follow. While that court thought Colorado could compel speech from Ms. Smith consistent with the Constitution, our First Amendment precedents laid out above teach otherwise. In *Hurley*, the Court found that Massachusetts impermissibly compelled speech in violation of the First Amendment when it sought to force parade organizers to accept participants who would "affec[t] the[ir] message." 515 U. S., at 572. In *Dale*, the Court held that New Jersey intruded on the Boy Scouts' First Amendment rights when it tried to require the group to "propound a point of view contrary to its beliefs" by directing its membership choices. 530 U. S., at 654. And in *Barnette*, this Court found impermissible coercion when West Virginia required schoolchildren to recite a pledge that contravened their convictions on threat of punishment or expulsion. 319 U. S., at 626–629. Here, Colorado seeks to put Ms. Smith to a similar choice: If she wishes to speak, she must either speak as the State demands or face sanctions for expressing her own beliefs, sanctions that may include compulsory participation in "remedial . . . training," filing periodic compliance reports as officials deem necessary, and paying monetary fines. App. 120; *supra*, at 3. Under our precedents, that "is enough," more than enough, to represent an impermissible abridgment of the First Amendment's right to speak freely. *Hurley*, 515 U. S., at 574."

b. "To be sure, our cases have held that the government may sometimes "requir[e] the dissemination of purely factual and uncontroversial in-formation," particularly in the context of "commercial ad-vertising.""

c. "But this case involves noth-ing like that. Here, Colorado does not seek to impose an incidental burden on speech. It seeks to force an individual to "utter what is not in [her] mind" about a question of po-litical and religious significance."

d. "And that, *FAIR* reaffirmed, is something the First Amendment does not tolerate. No government, *FAIR* rec-ognized, may affect a "speaker's message" by "forc[ing]" her to "accommodate" other views, 547 U. S., at 63; no government may "'alter'" the "'expressive content'" of her mes-sage, *id.*, at 63–64 (alteration

omitted); and no government may "interfer[e] with" her "desired message," *id.*, at 64."

e.    "And in *Boy Scouts of America v. Dale*, when the Boy Scouts sought to exclude assistant scoutmaster James Dale from membership after learning he was gay, the Court held the Boy Scouts to be "an expressive association" entitled to First Amendment protection. 530 U. S., at 656. The Court found that forcing the Scouts to include Mr. Dale would undoubtedly "interfere with [its] choice not to propound a point of view contrary to its beliefs.""

f.    "the government may not com-pel a person to speak its own preferred messages. "

g.    "Nor does it matter whether the government seeks to compel a person to speak its mes-sage when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include."

h.    "All that offends the First Amendment just the same."

5.    The relevance of the preceding discussion in this section largely rests with the fact that the illegal compelled association and compelled expression that the USMS and CSOs have long subjected me to by posting images of me and my name on tablet computer screens inside of public areas of federal courthouses to smear my reputation has unduly prejudiced various opportunities for me that partly include employment opportunities by fraudulently insinuating to groups that include potential employers that I did something wrong instead of having masterfully and legally mauled the USMS, CSOs, and the USAO by virtue of the dismissal of K23 at the request of the USAO.  By materially and unduly prejudicing potential employment opportunities through such blatant, pretextual, and constant stigmatization and demonization, that circumstance has made it even more critical for me to promptly seek and be granted a writ of certiorari from SCOTUS to end that illegal custom, pattern, and practice by the USMS and CSOs and be awarded severe and retroactive sanctions.

6.    I have a deadline of 7/9/23 to submit a notice of appeal for in response to the 6/9/23 decision that Judge Tisch issued in NTT7 in which he lied about material matters of fact and law. For example, he lied in his 6/9/23 decision by claiming that NTT1 is stayed. I seek to promptly

exercise my right to try to bypass the Appellate Division for that appeal by appealing that decision directly to SCOTUS pursuant to 28 U.S.C. §2101(e). Since hindsight confirms that the Appellate Division subjected me to obstruction of justice while it perpetrated fraud upon the court through its decisions in **a)** _Komatsu v. New York City Human Resources Administration_, 2021 N.Y. Slip Op 65928 (App. Div. 2021)[3] and **b)** _Komatsu v. New York City Human Resources Admin._, 2021 N.Y. Slip Op 72645 (App. Div. 2021)[4], that circumstance is sufficient grounds for SCOTUS to let me bypass the Appellate Division and act in its place. That appeal certainly isn't the only appeal of mine about which I seek to promptly appeal to SCOTUS. Quite to the contrary, K25, K6, and K11 are ongoing appeals of mine that the Second Circuit is vexatiously slow-walking as an ongoing pattern, practice, and custom of bad-faith and harassment that is causing me harm. This is particularly true about K25. That circumstance warrants allowing me to treat the Second Circuit as trash bags in my way that I need to throw away in order to have proper access to the courts. Due to the futility of pursuing appeals to the Second and prohibited bias and prejudice that the Second Circuit has exhibited towards me, my pursuit of immediate writs of certiorari from SCOTUS for K25, K6, and K11 is clearly appropriate. The ideal outcome would be for SCOTUS to swiftly reverse decisions in the underlying cases that K25, K6, and K11 concern, grant me a change of venue for all of my federal court litigation to somewhere beyond the second judicial circuit, and reassign those cases to other judges to allow for the appearance of justice to exist.

---

[3] The Appellate Division confirmed in this decision that it chose to ignore evidence that was discovery material that I received on 2/1/21 from the Law Department in K3 and entitled me to a reversal of K1's dismissal as well as partial summary judgment due to the smoking-gun nature of that evidence that was primarily e-mail evidence.

[4] Hindsight confirms that the Appellate Division fraudulently subjected me to obstruction of justice by prejudicially **a)** blocking me from pursuing an appeal to the NYSCOA and **b)** denying me oral arguments with it previously for that appeal.

7.    The remarks by Judge Bannon in the excerpts from her 1/22/16 decision in _NRI Group LLC v. Crawford_, 2016 N.Y. Slip Op 50129 (Sup. Ct. 2016) that I included in the order to show cause component of this application underscore my need to be immediately **a)** restored to possession of my old Urban apartment and **b)** granted a subpoena against HRA and Urban to be enforced by this Court in order to be provided highly probative and detailed evidence and testimony under the penalties of perjury about how current and former personnel of HRA and Urban **a)** orchestrated, perpetrated, directed, condoned, and covered-up the B&S against me and **b)** committed fraud on the court in K1, K2, and K10 partly by using my BS Urban lease as a false instrument while lying partly by claiming that my BS Urban lease was a copy of my old Urban lease instead of being nothing more than a forgery and certainly not a valid lease agreement. The fact that Judge Garland told me on 6/9/23 during a court hearing in K10 that she wouldn't overrule an arbitrary, capricious, biased, and unduly prejudicial determination that Judge Ibrahim made in that case to not grant me a subpoena against HRA partly for records confirms that I need this Court to grant me relief to remedy that by ordering HRA to fully comply with discovery demands that I made to it in K2. That would enable me to use that discovery material in K10 to more easily prevail due to overlapping claims. By prevailing in K10, I can be restored to possession of my old Urban apartment and be awarded severe sanctions against Urban and its attorneys. Urban's personnel illegally caused me to be constructively evicted from my old Urban apartment in January of 2023 by continuing to engage in criminally trespassing in my old Urban apartment in December of 2022 while I had confidential legal records and evidence in it for use partly against Urban and HRA. That trespassing coerced me to vacate that apartment in order to safeguard such legal records and evidence.

8.    But-for the ongoing cover-up by personnel of HRA and Urban of the B&S, I wouldn't

have been in an area in the Bronx near the BHC on 6/9/23 because I would have otherwise had

sufficient evidence to more easily and further expose K10 as being nothing more than an entirely

frivolous lawsuit in need of dismissal and severe sanctions against Urban and its attorneys.

However, ongoing and longstanding criminal acts and omissions by current and former

personnel of HRA and Urban caused me to have to be in that area near the BHC on 6/9/23 in

order to attend a court hearing for K10 that was recorded on audio and during which an attorney

for Urban named Harold Rosenthal didn't deny that Urban's personnel had opened the front door

to that apartment partly in December of 2022 without my consent. That circumstance explains

why I was in the area then where I was criminally assaulted on 6/9/23 shortly after I left the BHC

following a court hearing in K10. As a reminder, page 131 in the PDF file for the complaint that

I filed in this case shows an injury to my right elbow that I sustained during that assault as a

result of being shoved into metal scaffolding on a sidewalk near the BHC.

9.      Between the bottom of page 50 and top of page 51 in the PDF file for my complaint in

this case, I clearly pointed out that 18 NYCRR §358-5.6(b) confirms that **a)** the OTDA ALJ who

conducted the FH on 4/23/23 between HRA and I for OTDA FH number 8593909M lied to me

towards the end of that hearing by fraudulently telling me that she couldn't issue a subpoena and

**b)** Defendant Nigel Marks similarly lied to me on 8/27/21 by fraudulently claiming that OTDA

couldn't compel HRA to provide me discovery material that I sought for fair hearings in K2. On

a related note, the following is a relevant excerpt from an e-mail that I sent partly to Defendants

Nigel Marks, Samuel Spitzberg, Ann Marie Scalia, and Molly Park about the material fact that

HRA subjected me to obstruction of justice by illegally not providing me any discovery material

in flagrant violation of 18 NYCRR §358-3.7(b)(2), my HRA contract's terms, and my First and

Fourteenth Amendment rights for the FH that OTDA conducted on 4/20/23 between HRA and I

for FH number 8593909M that was about the fact that HRA illegally violated 18 NYCC

491.15(b) by having not provided me any advance notice about its decision to transfer me to a

new shelter on 4/12/23 while HRA was legally required to have instead provided me 48 hours of

advance notice about that:

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Illegal gamesmanship by HRA
> **Date:** April 21, 2023 at 8:09:26 AM EDT
> **To:** "Marks, Nigel A (OTDA)" <Nigel.Marks@otda.ny.gov>
> **Cc:** "Spitzberg, Samuel L (OTDA)" <samuel.spitzberg@otda.ny.gov>, "Scalia, Ann
> Marie (HRA)" <scaliaa@dss.nyc.gov>, "Gill Lambert, Allison (HRA)" <gill-
> lamberta@dss.nyc.gov>, "Fitzpatrick, Lisa (HRA)" <fitzpatrickl@hra.nyc.gov>,
> "Press.Office@exec.ny.gov" <press.office@exec.ny.gov>, "parkm@dhs.nyc.gov"
> <parkm@dhs.nyc.gov>
>
> Mr. Marks,
>
> HRA illegally didn't get me the packet of information that it provided to OTDA for
> yesterday's fair hearing involving me until several hours after that hearing ended.
> That flagrantly violated my First Amendment rights and other prevailing legal
> standards.
>
> I'm going to apprise the Second Circuit that you and other OTDA personnel have
> known about such illegal gamesmanship and haven't fixed that.

10.     Between pages 117 and 119 in the PDF file for my complaint in this case, I included

relevant e-mails that I sent to and received from Defendant Samuel Spitzberg between 6/20/23

and 6/22/23 about the fact that OTDA tried to illegally coerce me to agree to participate in a FH

on 6/23/23 between HRA and I in flagrant violation of my First and Fourteenth Amendment

rights partly about due process and equal protection while depriving me of sufficient time to **a)**

submit a discovery demand to HRA personnel prior to that FH partly for that FH and **b)** have

HRA fully comply with that discovery demand. Mr. Spitzberg's remarks to me in those e-mails

were partly about the fact that he informed me that the issues for that 6/23/23 FH would have

been about the following matters:

a.      HRA having again illegally caused me to be transferred on 6/3/23 to a shelter located at 781 East 135th Street in the Bronx without complying with HRA's legal duty to have provided me 48 hours of advance notice about that transfer.

b.      The fact that the shelter to which I was transferred by HRA on 6/3/23 was clearly inadequate partly due to poor conditions at that shelter.

11.     Bronx Criminal Court Judge Jeffrey Zimmerman's 5/16/22 decision in *People v. Beshiri*, *No. 2019BX019319 (Bronx Crim. Ct., May. 16, 2022)* adapted remarks by Daniel Patrick Moynihan by stating that "deviancy can be defined downward only so far before there are consequences". A true crime that was perpetrated against me relates to the fact that deliberate and criminal indifference by judges that include Judge Swain and Judge Stanton are largely to blame for the circumstances that enabled me to be criminally assaulted on 6/9/23 near the BHC. That assault wouldn't have occurred if Judge Bannon, Judge Stanton, Judge Swain, the Second Circuit, and the Appellate Division hadn't engaged in deviant behavior and had instead properly done their jobs in K1, K14, K15, K7, K12, and *Komatsu v. New York City Human Resources Administration*, 2021 N.Y. Slip Op 65928 (App. Div. 2021). I'm referring to the material fact that I would certainly have been provided highly probative discovery material years ago as a result of such litigation (especially in K2) that would have further confirmed that personnel of HRA and Urban subjected me to the B&S. By proving that, I would be entitled to the immediate dismissal of K10 because it was always an entirely frivolous lawsuit that was closely tied to the B&S.

12.     On a related note, I also need immediate injunctive relief that immediately causes me to be immediately restored to possession of my old Urban apartment after Urban's personnel caused me to be constructively evicted from it in January of 2023 partly by continuing to engage

in criminally trespassing in it while K10 was ongoing. In the same way that I certainly am prohibited from entering and freely walking around the law offices of attorneys for people I sue due to clear privacy rights and risk of obstruction of justice, Urban's personnel were prohibited from entering my old Urban apartment while K10 was active. However, they repeatedly violated that fact. They also may have done so while not wearing face masks after I repeatedly fell victim to Covid-19. This explains why I also need an immediate restraining order against Urban that will prohibit its personnel from entering my old Urban apartment after I'm restored to possession of that apartment and while litigation is ongoing between **a)** Urban and I and **b)** personnel of HRA and I.

13.     New York City Housing Court Judge Jean Schneider has established that a legal precedent exists for me to be restored to possession of my old Urban apartment. She is the wife of former HRA Commissioner Steven Banks ("Mr. Banks"). She has also been the supervising judge citywide for New York City's housing courts. The New York Times published a news article on 12/22/14 that is entitled "After Suing, Tenant Comes Home to the Brooklyn Apartment She Was Made to Leave". That article is available at

https://www.nytimes.com/2014/12/23/nyregion/after-suing-tenant-comes-home-to-the-brooklyn-apartment-she-was-made-to-leave.html and was about a decision that Judge Schneider issued that is related to the case of *Alvillar v. Reno Capital, LLC*, 2014 N.Y. Slip Op 92484 (App. Term 2014). That following excerpt from that news article confirmed that Judge Schneider issued a decision in June of 2014 that withstood an appellate challenge and caused a woman named Tranquilina Alvillar to be restored to possession of her apartment after she was wrongfully displaced from it in spite of the fact that someone else was issued possession of that apartment after Ms. Alvillar was wrongfully displaced from it:

"In June, a decision was rendered that tenants' rights advocates said set an important precedent. Judge Jean T. Schneider, in a striking move, ordered that the market-rate tenant who was living in Ms. Avillar's apartment be evicted and that Ms. Avillar could move back in. After the landlord appealed, Judge Schneider's decision was upheld earlier this month by an appellate court and the eviction was scheduled for Friday, although by the time a city marshal arrived, the tenant was gone."

14.    The material fact that personnel of HRA have clearly, repeatedly, and outrageously abused their discretion and violated my HRA contract's terms partly by doing the following necessarily means that I need to be immediately restored to possession of my old Urban apartment:

a.    Transferred me to the Skillman shelter on 6/30/23 about which the following is true:

i.    What I discussed earlier in this complaint about the fact that a female Black security guard who is a supervisor for other guards at that shelter criminally harassed, threatened, and physically assaulted me at that shelter on 7/4/23 applies.

ii.    Staff members who work for that shelter that include someone whose last name is Witt despicably assigned me a bed on 6/30/23 that had both dirty sheets and a bag full of trash on it instead of performing their duty to assign me a bed that would be sanitary. That circumstance likely explains why I woke up with a sore throat on 7/1/23 after likely breathing in germs from that dirty mattress.

iii.    The bed that I was assigned is in a dormitory that lacks window screens for at least 2 of the windows in it that are being kept open. That circumstance likely explains why I have been repeatedly bitten by mosquitos in that dormitory.

iv.    Mr. Witt and other shelter staff have abusively ignored entirely valid complaints that I have reported to them about the material fact that prohibitions against excessive

noise in that shelter and having food in the dormitory are being ignored by some residents and are being discriminatorily enforced. That circumstance has proven to be detrimental to my ability to sleep by virtue of the fact that residents in that dormitory loudly use cell phones and/or tablet computers while playing video games and playing music. On a related note, after NYPD personnel previously informed me that I am free to gather evidence inside of shelters partly of crimes, I recorded a video on 7/2/23 at 10:01 am in the dormitory where my assigned bed is located at the shelter where I currently reside. I recorded that video of 2 other residents in that dormitory as they briefly fought each other. That video is available at

https://drive.google.com/file/d/1zUtgQwu2t-Sb3lA6C7E9o4RgtL_qxStU/view?usp=sharing. I later learned that what triggered that fight was the fact that one of the residents involved in it was loudly playing music with a cell phone while the other participant in that fight was making a telephone call nearby. When the person who was making that phone call approached the other person and ordered him to turn his music down, he wasn't aware of the fact that the other person didn't speak English before matters between them quickly escalated.

v.    There are no video security cameras installed in that shelter and security guards who work in that shelter for an organization named FJC Security **a)** sleep in that shelter while they're on-duty, **b)** play with their cell phones while they're on-duty, and **c)** leave security logbooks out the open and unattended in flagrant violation of privacy rights. On 5/29/18, the New York Daily News published a news article that is entitled "Private Security Firms at Homeless Shelters Facing 21 Lawsuits Over Alleged Violence". That article is available at

https://www.nydailynews.com/new-york/private-security-shelters-facing-21-lawsuits-violence-article-1.4014201 and reported that "FJC guards beat a resident" while he resided at the shelter where I now reside and that they did so "after mistaking him for a man they were chasing". Also,

a news article that the New York Times published on 7/8/22 that is entitled "He Had a Dark

Secret. It Changed His Best Friend's Life." reported that someone who resided at the shelter

where I now reside was criminally and severely assaulted in it on 8/1/14. That article is available

at https://www.nytimes.com/2022/07/08/nyregion/brooklyn-homeless-shelter-friendship.html.

On 1/1/87, the New York Times published a news article that is entitled "Homeless Working

Men Get Their Own Shelter" that is available at

https://www.nytimes.com/1987/01/01/nyregion/homeless-working-men-get-their-own-

shelter.html. That article is about the Skillman shelter and reported that one of its residents stated

that fights were occurring in that shelter. The news articles about that shelter that I just discussed

coupled with the history involving FJC guards at this shelter and their recent behavior towards

me at this shelter confirm that it's inexcusable that video security cameras aren't installed in this

shelter to provide inconvertible evidence and oversight. When I asked a member of the staff on

7/3/23 who works for that shelter's operations team about why there weren't any video security

cameras installed in that shelter, he told me that I needed to ask that question to HRA. That

answer sufficiently confirms that HRA controls how that shelter is operated and establishes that

sufficient entwinement exists between HRA and those who work in that shelter for private

organizations to pursue claims under 42 U.S.C. §1983 against HRA and those who work in that

shelter for private organizations.

     b.     Transferred me to a shelter located at 781 East 135th Street in the Bronx on 6/3/23

about which the following is true:

         i.     That shelter is operated by a organization named Westhab.

        ii.     HRA illegally violated its legal duty to provide me 2 days of advance

notice prior to transferring me to that shelter. Prior to doing that, HRA also did that when it

transferred me to another badly run shelter on 4/12/23 in the Bronx that is located at 1068

Franklin Avenue and is operated by Acacia Networks.

        iii.     I was told on 6/3/23 when I arrived there that that shelter was **a)** mainly

for parolees and sex offenders and **b)** unsafe.

        iv.     Roughly 98% of the showers that I took while I resided at that shelter were

with cold water because hot water wasn't available and my complaints about that to both

Westhab staff and HRA personnel were ignored.

        v.     Meals that were served at that shelter were both very small and largely

inedible.

        vi.     Cockroaches and flies were frequently present in the cafeteria where meals

were served.

        vii.     DHS police inconsistently and discriminatorily enforced prohibitions

about bringing food and beverages into that shelter.

        viii.     A DHS police officer whose last name is Rosa and likely held the rank of

lieutenant illegally assaulted both me and a black male on 6/8/23 at roughly 9:47 pm just inside

of the entrance to that shelter in an area where a video security camera was then installed. Mr.

Rosa illegally pushed me for no valid reason and without prior warning then as he rushed

towards a black male who was either recording a video of Mr. Rosa or taking a photograph of

him that he clearly stated was for an attorney. Mr. Rosa then illegally struck that black male on

his throat in a manner that is consistent with an illegal chokehold. The fact that I thereafter

continued to see Mr. Rosa in that shelter on 6/27/23 confirms that criminal behavior by senior

DHS police officers inside of shelters is illegally condoned. Between 6/8/23 and 6/27/23, I

reported the 6/8/23 assault by Mr. Rosa via e-mail at 10:02 pm partly to Defendants Ann Marie

Scalia, Molly Park, Jocelyn Carter, Vincent Pullo, Elizabeth Iannone, Samuel Spitzberg, and

Nigel Marks.

### Reasons to Grant the Relief Requested

1.      The excerpts from relevant court decisions that I included on pages 110 and 111 between

numbered paragraphs 6 and 14 in the PDF file for complaint that I filed in this case sufficiently

establish that my HRA contract is a binding, fully-enforceable, and permanent agreement to

which Defendant Ann Marie Scalia ("Ms. Scalia"), DSS, and HRA were and remain legally

bound. This mostly because there is no disclaimer, caveat, qualifying remark, nor expiration date

in **a)** my HRA contract that is shown on page 167 in the PDF file for the complaint that I filed in

this case nor **b)** the e-mail that I received from Ms. Scalia on 8/1/17 at 5:58 pm that is shown on

page 166 in that PDF file. This is also because Ms. Scalia issued me my HRA contract while she

then worked for HRA as its Senior Deputy General Counsel. That fact establishes that she should

have known the consequences of not including a disclaimer, caveat, qualifying remark, and

expiration date in my HRA contract. The operative text in my HRA contract appears at the end

of it and explicitly states the following that indisputably established a special-duty that Ms.

Scalia and HRA had to me and still have:

"We will continue to try to address your concerns and assist you in any way possible."

2.      The following facts confirm that **a)** Mr. Banks personally caused Ms. Scalia to contact

me to follow-up with me about face-to-face conversations that I had with him during a resource

fair meeting on 7/18/17 in Kew Gardens in Queens and a town hall meeting on 7/19/17 in

Astoria in Queens; **b)** Mr. Banks and Martha Calhoun were among those to whom my HRA

contract was legally bound between 8/1/17 and the remainder of the time that they were

employed by HRA; and **c)** HRA and DSS have been legally bound by my HRA contract since

8/1/17:

    a.    I recorded an audio recording at 10:35 pm on 12/14/17 that is available at

https://drive.google.com/open?id=1ReYEiEDkUue5EaRZfkSmNxEF_xr_3Lyj as I had a face-

to-face conversation with Mr. Banks during a town hall meeting that members of the public

conducted in Brooklyn at 544 7th Avenue with me, Mr. Banks, Bill de Blasio, and others as Mr.

Banks made remarks to me at the elapsed time of **a)** 4 minutes and 19 seconds and **b)** 5 minutes

and 3 seconds in that recording. While making those remarks, he confirmed that he personally

arranged for me to be granted access to Ms. Scalia and stated that most of HRA's other clients

didn't have that access. The following facts confirm this:

        i.    Mr. Banks stated the following at the elapsed time of 4 minutes and 19

seconds:

> "You have direct access to the Deputy General Counsel of our agency.
> …Ann Marie Scalia …you're in touch with her. Most do not have that
> access."

        ii.    Mr. Banks stated the following at the elapsed time of 5 minutes and 3

seconds:

> "I've given you direct access….I've given you direct access to the
> Deputy General Counsel of our agency. "

    b.    The names of Mr. Banks and Ms. Calhoun also appear in my HRA contract while

they then were HRA's Commissioner and HRA's General Counsel.

3.    On page 109 in my complaint, I included a link to a video recording on the Internet that is

available at https://drive.google.com/open?id=1yoQvpg51rvMhP3Q6zIr652NwR6LkA_n2 that I

recorded on 4/9/18 of a telephone conversation that I then had with Defendant Ann Marie Scalia

("Ms. Scalia"). I pointed out that she is heard in that recording at the elapsed time of roughly 3

minutes and 33 seconds as she stated the following about her legal and special-duty pursuant to

my HRA contract to assist me "in any way possible":

> "And of course I'm going to help you in any way possible, but only if you are
> eligible."

4.       That video further confirms that at the elapsed time of roughly 9 minutes, she stated that

she would assist me in getting stuff that I had at an HRA job center with being "pushed through".

What she meant by that remark was that she would assist me partly by having government

benefits to which I was legally entitled to receive from HRA with being pushed through HRA's

processes to enable me to receive those benefits.

5.       The excerpts from the four court decisions presented next support having this Court

declare that those who reside in shelters are legally entitled to freely **a)** record video and audio

recordings in them and take photographs in them and **b)** share that information with others

largely to befit the public's interest in government transparency, government accountability, and

proper procurement pratices.

6.       _Elrod v. Burns_, 427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) contains the

following findings that are about violations of First Amendment rights:

     a.       "The loss of First Amendment freedoms, for even minimal periods of time,
        unquestionably constitutes irreparable injury."

     b.       "The timeliness of political speech is particularly important."

     c.       "[T]he purpose of the First Amendment includes the need . . . `to protect parties in
        the free publication of matters of public concern, to secure their right to a free
        discussion of public events and public measures, and to enable every citizen at
        any time to bring the government and any person in authority to the bar of public
        opinion by any just criticism upon their conduct in the exercise of the authority
        which the people have conferred upon them.'"

7.       The following excerpt from _Buckley v. American Constitutional Law Foundation, Inc._,

525 U.S. 182, 119 S. Ct. 636, 142 L. Ed. 2d 599 (1999) is also about the importance of First

Amendment rights:

"[a] public armed with information . . . is better able to detect" wrongdoing. See id., at 67; see also _Grosjean v. American Press Co._, 297 U. S. 233, 250 (1936) (observing that an "informed public opinion is the most potent of all restraints upon misgovernment"). "`Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.' " _Buckley v. Valeo_, supra, at 67, and n. 80 (quoting L. Brandeis, Other People's Money 62 (1933))."

8.     _Higginbotham v. City of New York_, 105 F. Supp. 3d 369 (S.D.N.Y. 2015) contains the

following findings that also buttress this point about transparency:

   a.      ""[t]here is an undoubted right to gather news `from any source by means within the law""

   b.      "[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw"

   c.      ""`[t]here is practically universal agreement that a major purpose of' the First Amendment `was to protect the free discussion of governmental affairs.'""

   d.      ""the dissemination of information relating to alleged governmental misconduct... l[ies] at the core of the First Amendment.""

9.     The following are relevant excerpts from _Piesco v. City of New York, Dept. of Personnel,_

933 F.2d 1149 (2d Cir. 1991):

   a.      "A statement that is made about the competency of a police officer "clearly is a matter of public concern" because "the police officer represents the most basic unit of government, one which arguably most affects the day-to-day lives of the citizenry".

   b.      "Summary "judgment is inappropriate when `questions of motive predominate in the inquiry about how big a role' "protected behavior played in" causing an adverse action to occur."

   c.      "Without a searching inquiry into these motives, those intent on punishing the exercise of constitutional rights could easily mask their behavior behind a complex web of post hoc rationalizations."

   d.      "A court is required to accept as true a plaintiff's allegation that retaliatory actions by the City of New York were precipitated by prior testimony he or she gave to a committee."

   e.      "The Supreme Court has recognized that one of the critical purposes of the first amendment is to provide society with a basis to make informed decisions about

the government."

f.    "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes."

g.    "The "first amendment guarantees that debate on public issues is "`uninhibited, robust, and wide open'".

10.    On 6/2/23, I recorded a video recording at 2:44 am with my cell phone of a conversation that I was then having with members of the NYPD in Room 205 in a shelter that is located at 1068 Franklin Avenue in the Bronx. That video is available at

https://drive.google.com/file/d/1_6tHnPOMj40zhPiAnumKlKW3yUKWx4NR/view?usp=sharin g. During part of the conversation that I had with them while they were then meeting with me that wasn't recorded on video, one of those police officers told me that I could record video recordings and take photographs inside of shelters partly to provide that to the NYPD in connection with complaints that I might report to the NYPD about dangerous conditions in shelters. They were meeting with me then in response to a valid complaint that I reported to the NYPD about the fact that someone in that shelter had recently made verbal threats of violence against me.

11.    On 4/19/18, the New York Daily News published a news article that is entitled, "Greg Smith, "Homeless Shelter Covers Up Assaults, Drug Deals, Theft: Suit" that is available at

https://www.nydailynews.com/new-york/homeless-shelter-covers-assaults-drug-deals-theft-suit-article-1.3944250. That article was about **a)** how HRA and DHS were illegally covering up crimes in New York City's shelter system and **b)** the case of _Kennedy v. City of New York_, No. 153406/2018 (Sup. Ct. New York Cty.) that ended with what may have been a settlement having been reached. That lawsuit was commenced by a whistleblower named Daniel Kennedy who

worked for DHS and had claimed that HRA personnel had been engaging in a cover-up of illegal

acts inside of shelters in New York City. He also claimed that he was fired from his job with

DHS for refusing to participate in that illegal cover-up.

12.     On 11/1/22, DHS issued a policy that corresponds to a code of DHS-PB-2022-015, and is

available at http://onlineresources.wnylc.net/nychra/docs/protecting_client_privacy_-

_prohibition_against_photos_recording_in_dhs__pb_2022_015.pdf. That policy prohibits taking

photographs, recording video recordings, and recording audio recordings in DHS facilities

without prior authorization from DHS..

13.     On 11/23/22, a news organization named City Limits published a news article that is

entitled "'No Recording' Policy in City Shelters Draws Backlash From Residents and

Advocates". That article is available at https://citylimits.org/2022/11/23/no-recording-policy-in-

city-shelters-draws-backlash-from-residents-and-advocates/. The following are a few relevant

excerpts from that article:

    a.     "A new rule banning photos and video inside New York City homeless shelters
       could prevent residents from documenting dangerous conditions and fuel
       unnecessary run-ins with security, warn clients and advocates now urging the city
       to change the broad regulation."

    b.     "The agency said the new rule does not prohibit recordings or photos that show
       shelter conditions as long as client faces are not shown. But DHS has not spelled
       out any of that nuance in the "No Recording" posters now stuck to shelter walls."

14.     Shelters that are funded partly by HRA and/or DHS are funded by taxpayers and

taxpayers have a clear First Amendment right to know how badly those shelters are operated and

maintained. That certainly is achievable by removing restraints that would block those who

reside in shelters from being able to freely record video recordings, record audio recordings, and

take photographs of deficient and dangerous conditions in shelters to publicly and widely share.

The public shouldn't have to stomach lies and misleading statements partly by personnel of

HRA, DHS, DSS, OTDA, and their business partners about how well shelters are operated and supervised partly by HRA, DSHS, and OTDA. That fact underscores why it's necessary for this Court to immediately declare that the prohibition against freely recording video recordings, recording audio recordings, and taking photographs inside of shelters is unenforceable.

15.     The simple fact that shelters have vending machines that sell soda and snacks inside of them in areas that are located past the security screening area that visitors must clear prior to going to other areas in those shelters establishes that there isn't any rational basis for why DHS has a policy that prohibits residents from being able to freely bring food and non-alcoholic beverages into such shelters to consume there as long as such food and beverages aren't a health hazard for others, don't create odors that others must smell, don't attract pests, and don't otherwise pose a safety hazard nor get in the way of others. The material fact that that is served by shelter staff to residents often is inadequate, inedible, and not sufficiently nutritious supports having this Court declare that DHS nor shelter operators may interfere with the Fourteenth Amendment liberty rights that people have that include the right to consume food and beverages of their own choosing where and when they may wish to do so in an objectively responsible and safe fashion. The fact that buying things in bulk saves money and people who reside in shelters have limited finances also supports this.

16.     The fact that Ms. Scalia, HRA, and DSS have been violating legal duties that they have had to me as a result of my HRA contract and still have to me requires this Court to compel full compliance by them with my HRA contract's terms by continuously, permanently, and promptly **a)** assisting me "in any way possible" instead of ways that are discretionary, merely practical, convenient, and temporary and **b)** trying to address my concerns in good-faith instead of ignoring them.

17.     Page 169 in the PDF file for my complaint in this case shows a report that contains

information about fraudulent transactions that I didn't authorize, didn't make, and were illegally

made on 2/27/23 to make an ATM withdrawal and purchases from a grocery store by using cash-

assistance benefits and food-stamp benefits that HRA issued to me. Those illegal transactions

proximately cost me my right to access and use cash-assistance benefits totaling $347.72 and

food-stamp benefits totaling $752.

18.     Page 170 in the PDF file for my complaint in this case shows a copy of a receipt that I

was given by the NYPD after reporting a complaint to its personnel on 4/3/23 about the fact that

I was defrauded on 2/27/23 of the cash-assistance and food-stamp benefits that I just discussed.

18 NYCRR §352.31(f)(1) legally required HRA to replace those benefits within 30 days for me

to have access to and use after I apprised HRA personnel that included Ms. Scalia on 4/3/23 via

e-mail about the fact that I was illegally defrauded of those benefits. Page 171 in the PDF file for

my complaint shows that 4/3/23 e-mail. The reason why 18 NYCRR §352.31(f)(1) applies to this

circumstance is because it's about correcting underpayments and it was HRA's error instead one

by me that resulted in an underpayment by HRA to me for both cash-assistance and food-stamp

benefits. Such negligence by HRA proximately enabled one or more people that could possibly

have been HRA personnel to defraud me of my cash-assistance and food-stamp benefits on

2/27/23 as a result of the fact that HRA unconscionably didn't have sufficient safeguards in place

to have prevented that.

19.     Page 110 in my complaint in this case includes the following excerpt from SCOTUS'

decision in _Noble v. Union River Logging R. Co._, 147 U.S. 165, 13 S. Ct. 271, 37 L. Ed. 123

(1893) that is controlling law and clearly confirms that I can have this Court compel full

compliance with my HRA contract's terms and 18 NYCRR §352.31(f)(1) by granting me

immediate and decisive injunctive relief in response to instances in which government personnel don't do what they're legally required to do and otherwise do things that they're prohibited from doing:

> "it has been well settled that when a plain official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a mandamus to compel its performance; and when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which adequate compensation cannot be had at law, may have an injunction to prevent it."

20.    My remarks on page 115 in my complaint present sufficient grounds for this Court to grant my request to have it order HRA to similarly reimburse me within 24 hours for the $16.50 difference between the **a)** $33 normal cost that I repeatedly paid in May of 2022 to buy 7-day unlimited-ride MTA metrocards for multiple weeks and the $16.50 rate that I would have otherwise paid for that on a per week basis while having a 50% discount for that if HRA hadn't violated my HRA contract's terms as it negligently failed to issue me a new MTA FairFares metrocard to replace the one that I had that had expired.  Although I requested for OTDA to conduct a FH about that, OTDA illegally and biasedly didn't do so fully after it briefly and incompletely conducted a FH about that on 6/7/22. The material fact that OTDA never completed the FH about that firmly establishes that OTDA has been and remains an inadequate legal forum for me for claims that I assert against HRA. That circumstance conforms that I'm authorized to bypass having to contend with OTDA about claims that I assert against HRA due to futility and bad-faith by OTDA in violation of my constitutional and other rights.

21.    My remarks in numbered paragraph 33 that spans pages 125 and 126 in my complaint in this case present sufficient grounds for this Court to grant my request to have it order HRA to reimburse me within 24 hours for the $16.50 difference between the **a)** $33 normal cost that I paid on 5/8/23 for a 7-day unlimited-ride MTA metrocard and the $16.50 rate that I would have

otherwise paid for that while having a 50% discount for that if HRA hadn't violated my HRA contract's terms as it negligently failed to issue me a new MTA FairFares metrocard by then to replace the one that I had that had expired.

22. The following facts support my request to have this Court order HRA to reverse all deductions within 24 hours that HRA has made to the cash-assistance benefits that I have received from HRA since 2016 by causing that sum to be available within 24 hours for me to use:

a.    *Toy Manufacturers v. Helmsley-Spear*, 960 F. Supp. 673, 42 U.S.P.Q.2d 1203 (S.D.N.Y. 1997) contains the following findings that confirm that this Court may and should promptly grant me equitable relief about this as an offsetting penalty partly in response to the fact that current and former HRA personnel have been sabotaging my employment prospects since 2017:

> "It is well-established that "[i]n fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable." *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 390 (5th Cir.1977). *See generally* 4 McCarthy § 30:4 at 30-11 (explaining courts have power to enjoin "an act, which if done alone could be legal, but when performed in the context of a totality of acts does constitute unfair competition")."

b.    Current and former HRA personnel and other current and former City of New York personnel have long been materially sabotaging my employment prospects and continue to do so. They have done so partly by continuing to not grant me job interview with HRA and other City of New York agencies for jobs that I apply for, am fully qualified for, and am supposed to receive preferential consideration for because of my status as a military veteran. In fact, though *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972) explicitly confirms that my Fourteenth Amendment liberty rights includes the right to

"engage in any of the common occupations of life", Pinny Ringel and Joni Kletter flagrantly

violated that on 11/16/21 while they worked for the City of New York by criminally interfering

with my efforts to talk with Mr. Banks during a public resource fair meeting that all of us were

then attending in Brooklyn. They did so then right after I had just talked with Bill de Blasio

during that public forum while he was then New York City's Mayor and standing next to Eric

Adams (New York City's current mayor).  When they did so, that occurred after my

conversation with Mr. de Blasio was about the fact that he was continuing to fraudulently

misrepresent the material fact that his administration really didn't support the hiring of military

veterans as he **a)** lied by suggesting otherwise and **b)** facetiously suggested that I needed to talk

with Mr. Banks about being granted a job interview for a job with HRA. On 11/17/21, I

submitted a letter (Dkt. 259) in K4 in which I apprised Judge Ramos about the fact that Mr.

Ringel and Ms. Kletter criminally prevented me from talking with Mr. Banks during that meeting

after I talked with Mr. de Blasio during it. Although I included a link to a video recording that I

recorded during that meeting that confirms what I just discussed, Judge Ramos continued to

prove that he is a corrupt judge by fraudulently condoning the fact that Mr. Ringel and Ms.

Kletter flagrantly violated my First and Fourteenth Amendment right to talk to Mr. Banks during

that public forum. The fact that Ms. Kletter explicitly told me while I recorded her on video that

her actions against me during that meeting were due to what was then ongoing litigation of mine

as she suggested that such litigation was against HRA or HRA's personnel confirms that Ms.

Kletter's illegal acts against me during that meeting were attributable to and implicated HRA.

   c.  On page 109 of my complaint in this case, I talked about a video recording that I

recorded on 4/9/18 of a telephone conversation that I had with Ms. Scalia on that date. I also

included a link on that page to a relevant clip from that video recording. Although Ms. Scalia **a)**

issued me my HRA contract on 8/1/17 that obligated her to assist me "in any way possible", **b)** 18 NYCRR §352.23(a) required her to "rehabilitate the client" and that applied to me, and **c)** New York State's constitution confirms that she was and remains required to provide "aid, care and support of the needy" partly for me, the video clip to which I referred above confirms that Ms. Scalia willfully violated those legal requirements during my 4/9/18 phone call with her by stating the following to me at the elapsed time of 8 minutes and 43 seconds:

> "I am not going to be getting you a job with HRA. That is not what I do."

d.      E-mail evidence that I received on 2/1/21 from the Law Department as discovery material in K3 and after an attorney for HRA named Jeffrey Mosczyc flagrantly violated my privacy rights in K1 on 4/7/17 partly by including my full social security number and date of birth in the legal filing that he then filed in K1 confirms that **a)** current and former HRA personnel that include Mr. Banks and **b)** other current and former City of New York personnel also materially sabotaged my employment prospects partly by causing me to be **a)** barred from attending public town hall meetings and resource fair meetings since 4/11/17 and otherwise blocked in my efforts to lawfully attend those public forums from within the room in which they were conducted while they were conducted. The fact that Mr. Mosczyc violated my privacy rights in the way that I just discussed coupled with the fact that personnel of the City of New York violated the sealing orders that were issued in K1 on 1/17/17 at my request and K5 on 1/23/20 confirm that the City of New York and its personnel reciprocally haven't had any privacy rights that could be enforceable against me due to offsetting penalties and estoppel. I included some of the e-mail messages from the 2/1/21 discovery material that I received from the Law Department in K3 between pages 101 and 103 in my complaint in this case. The sum and substance of what is discussed in those e-mails confirm that senior HRA personnel criminally

conspired and colluded with other City of New York personnel since April of 2017 to illegally

discriminate against me by causing me to be **a)** illegally barred from lawfully attending public

meetings that were public forums and **b)** otherwise illegally and intentionally segregated from

others by being restricted in my ability to attend them to overflow rooms in instances in which I

was allowed to be in the buildings that hosted such public forums while they were conducted in a

different room. What is shown next is an e-mail message that was sent on 10/25/17 about me by

Scott French of HRA in his capacity as Mr. Banks's Chief of Staff. He sent that partly to Mr.

Banks as they criminally conspired with other City of New York in a manner that proximately

contributed to my having been criminally prevented by members of the NYPD security detail for

Bill de Blasio from attending a public resource fair meeting on 10/25/17 in Brooklyn that I

sought to lawfully attend partly to engage in networking with others to try to improve my job

prospects:

> **From:** "French, Scott" <frenchs@hra.nyc.gov>
> **Date:** October 25, 2017 at 8:54:48 AM EDT
> **To:** "Haley, Molly (MHaley@cityhall.nyc.gov)" <MHalev@cityhall.nyc.gov>,
> "Lauter, Rachel" <rlauter@cityhall.nyc.gov>, "mcarrion@cityhall.nyc.gov"
> <mcarrion@cityhall.nyc.gov>
> **Cc:** "Banks, Steven" <banksst@hra.nyc.gov>
> **Subject:** Resource FAiur
>
> Hi Rachel, Molly and Commissioner Carrion -
>
> I just wanted to make you aware that Mr. Komatsu, who has attended several
> events where the Mayor and Commissioner Banks are in attendance, indicated at
> a Access to Counsel Town Hall last night that CM Levine and CM Perkins held
> that he was planning on attending today's Resource Fair and expected that he
> wouldn't be allowed in to the Fair.
>
> Wanted to flag for you so you could let Redmond know (who is very familiar
> with Mr. Komatsu). He may ultimately not show up but wanted to flag as a
> possibility.
>
> Thanks
> Scott

**Scott French** | *Chief of Staff*
Office of the Commissioner
150 Greenwich St. Floor 42, New York, NY 10007
T: 929-221-7371
*frenchs@hra.nyc.gov* | **NYC.gov/dss**

e.      Those illegal acts by City of New York personnel proximately blocked me from

engaging in networking with others during such meetings partly to increase my job prospects

partly by striving to persuade those who attended them and those they knew directly and

otherwise partly through word-of-mouth advertising to fire incumbents in New York City's

government through the 2017 New York City government elections. If such incumbents had

been fired, then that would have boosted my job prospects with City of New York government

agencies by removing obstacles.

f.      The basis for deductions that HRA has been making to cash-assistance benefits

that I receive from it appears to have been due to income that I received more than 6 years ago

that HRA deemed excessive. However, the fact that personnel of HRA sabotaged my

employment prospects in the following additional ways retrospectively establishes that HRA has

been estopped from making deductions to cash-assistance benefits that it issues to me partly

because hindsight establishes that such excessive income was needed by me as a sort of rainy-

day fund to be able to pay for certain expenses while contending with economic hardships

caused by illegal acts and omissions by HRA:

i.      HRA fraudulently caused the property of mine that I kept in a storage unit

that I rented from a storage company named Cubesmart in Queens to be auctioned in April of

2019. Property that was auctioned then included my suit that I have needed for job interviews,

other attire for work, and training materials related to jobs that I have held.

ii.      HRA subjected me to the B&S that proximately caused me to have to have

a roommate in my old Urban apartment who thereafter criminally and viciously assaulted me on 7/2/16 in my old Urban apartment that caused me to sustain a concussion. I thereafter struggled mightily from the effects from that concussion during a job interview that I had on 8/18/16 for a job with an investment bank that would have paid me $450 daily.

23.    The material fact that HRA actually owes me reimbursement for both **a)** storage expenses that I paid to Cubesmart while I resided in my old Urban apartment and the $5,000 insured value of that property as a result of HRA having fraudulently caused an auction of that property in April of 2019 to occur as a result of its negligence by not paying Cubesmart for storage expenses on my behalf that I was both eligible and legally entitled to have HRA to pay confirms that it's inequitable and manifestly unjust for HRA to deduct funds from cash-assistance benefits that HRA would otherwise provide to me as greater cash-assistance benefits.

24.    My HRA contract's terms entitle me to have HRA to:

a.    Cause me to consistently be issued the first of two monthly payments for cash-assistance benefits on the earliest date each month when such benefits are issued to others by HRA.

b.    Cause me to consistently be issued the second of two monthly payments for cash-assistance benefits on the earliest date each month when such benefits are issued to others by HRA.

c.    Cause me to consistently be issued monthly food-stamp benefits on the earliest date each month when such benefits are issued to others by HRA.

25.    What I will discuss next further confirms that HRA personnel committed fraud in both K1 and K2 partly by claiming that I wasn't eligible and legally entitled to have HRA to pay for storage unit rental expenses while I resided in my old Urban apartment. That fact supports my

request for this Court to order HRA to inform both Judge Bannon and OTDA within 24 hours

that personnel of HRA named Jeffrey Mosczyc and Marin Gerber lied to both Judge Bannon and

OTDA in K1 and K2 by claiming that **a)** I was residing in permanent housing instead of

temporary shelter while I resided in my old Urban apartment; **b)** I was ineligible to have HRA to

pay for storage unit rental expenses on his behalf while I resided there; and **c)** HRA complied

with the 9/15/16 decision that OTDA issued for FH number 7316477K.

26.    Page 6 of Judge Bannon's 8/10/17 decision in K1 contains the following text that

authorized me to thereafter reinstate claims against HRA that concerned having HRA ordered to

pay for storage unit rental expenses on my behalf and otherwise reimburse me for storage unit

rental expenses that I paid:

> "Since the submissions do not reflect that the petitioner requested a fair hearing in
> connection with either of those determinations, so much of the petition as seeks to
> review those determinations must be dismissed, without prejudice, for failure to
> exhaust administrative remedies."

27.    On 7/7/23, the Second Circuit stated the following in is decision in _Singh-Kaur v._

_Garland_, No. 21-6328 (2d Cir. Jul. 7, 2023):

   a.    "We review an adverse credibility determination "under the substantial evidence
         standard""

   b.    "the administrative findings of fact are conclusive unless any reasonable
         adjudicator would be compelled to conclude to the contrary"

   c.    "Although we have limited authority to question the agency's determination that a
         petitioner lacked credibility, this is the rare case where the agency's reasoning is
         sufficiently flawed to warrant a remand."

28.    In both K1 and K2, attorneys for HRA claimed to Judge Bannon that the reason why

HRA didn't pay for the storage unit rental expenses that I paid to Cubesmart for the storage unit

rental period of May of 2016 thru July of 2016 that totaled $1,296.70 by causing me to be

reimbursed for that was because HRA claimed that I was ineligible to have it do so strictly

because HRA claimed that my old Urban apartment was permanent housing for me. However, HRA never explained to Judge Bannon nor OTDA how it could reconcile the fact that HRA's actual practices belied the lies that was fraudulently expressing in K1 and K2 about this. I'm referring to the fact that though HRA's personnel made the fraudulent claim that I discussed above, HRA was actually paying for storage unit rental expenses on my behalf to Cubesmart on a continuous basis for the storage unit rental periods of September of 2016 thru September of 2018 while I resided in my old Urban apartment. Concerning this fact, I pointed out in the order to show cause component of this application that the seventh exhibit that appears within the annexed **Exhibit A** show 2 checks that HRA issued on 9/11/18 to Cubesmart to pay for storage unit rental expenses on my behalf while I continued to reside in my old Urban apartment.

29.    The material fact that attorneys for HRA that include Ms. Scalia lied by both mail and wire and as recently as 4/9/18 during a telephone call that I had with Ms. Scalia as they lied by claiming that I was ineligible to have HRA to pay for storage unit rental expenses on my behalf while I resided in my old Urban apartment causes me to have valid civil RICO claims against them about that. That means that I'm entitled to both equitable tolling of my claims against HRA pertaining to storage unit rental expenses and treble damages for those claims. I'm similarly entitled to reimbursement by HRA of a trebled amount of the $5,000 insured value of the property that I kept in the storage unit that I rented from Cubesmart that HRA's fraud and negligence caused to be auctioned in April of 2019. This point is supported by but-for causation.

30.    Furthermore, the material fact that a news organization named The City published a news article on 8/9/19 that indicated that former HRA Commissioner Steven Banks expressed that HRA is able to seek reimbursement from the U.S. federal government for payments that it issues for storage unit rental expenses confirms that the issue and real controversy about whether this

Court should grant me injunctive relief against HRA concerning storage unit rental expenses is a matter that is squarely within this Court's jurisdiction to adjudicate. I'm referring to the news article that is entitled "City Pays Storage Fees for Homeless, but One Bronx Family Still Lost Items". That article is available at https://www.thecity.nyc/housing/2019/8/9/21210915/city-pays-storage-fees-for-homeless-but-one-bronx-family-still-lost-items. Moreover, the material fact that the FH decision that OTDA issued on 11/12/02 for FH number 3792259Q that is available at http://www.wnylc.com/kb_wnylc/afile/11/659/ confirms that the appellant was ordered by OTDA to be reimbursed for storage unit rental expenses that he or she paid confirms that I have a clear Fourteenth Amendment due process and equal right to benefit from that precedent by having this Court grant me the relief that I seek against HRA concerning storage unjt rental expenses.

31.    My HRA contract's terms, what I discussed earlier about the fact that no video security cameras are installed in the Skillman shelter, and what I will discuss next supports having this Court grant my request to order HRA to cause me to be provided temporary housing within 24 hours by causing me to be provided a hotel room located at the Candlewood Suites hotel in Manhattan that is located at 339 West 39th Street where I must be provided a kitchenette, queen-sized bed, desk, printer, printer paper, printer ink, envelopes, free high-speed and unlimited data wireless Internet service, free laundry service, television, and a private bathroom and shower. Prior to 2/16/16, I briefly resided at that hotel in 2016. I did so then as a result of arrangements that DHS made through one of its business partners named Services for the Underserved, Inc. to use that hotel and others to provide temporary housing for me and other military veterans. While I stayed there then, I had all of the amenities and services available to me that I identified above in this paragraph. 18 NYCRR §491.18 is a New York State regulation that HRA, DHS, and those

who operate shelters in New York City are required to fully and continuously comply with. However, DHS, HRA, and shelter operators for the Skillman shelter and the previous 3 shelters where I resided have been and are still violating the terms of 18 NYCRR §491.18 while OTDA illegally ignores this. That regulation governs environmental standards in shelters and points out all of the following:

a.      18 NYCRR §491.18(f)(4) requires that blankets and pillows to "be laundered as often as necessary for cleanliness and freedom from odors." The Skillman shelter is violating that by virtue of the fact that the pillows aren't machine washable and aren't laundered before they're assigned to people in this shelter. This could partly explain why I have been coughing consistently ever since I arrived at that shelter and was assigned a bed there.

b.      18 NYCRR §491.18(a)(2) requires that "all bathrooms, sleeping areas, recreational areas, hallways, and other living areas" to be "kept clean, sanitary, and free of insects, rodents and trash." The fact that I have repeatedly been bitten by mosquitoes in the Skillman shelter and seen a cockroach near the bed to which I have been assigned while cockroaches have been known to spread diseases confirms that the operator of the Skillman shelter has violated this regulation. The fact that I was assigned a bed there that had dirty sheets, a dirty blanket, and a bag of trash on it that presumably was from the former occupant of that bed reinforces this point. The fact that tables and chairs used in the recreation room in the Skillman shelter aren't cleaned further reinforces this point.

c.      18 NYCRR §491.18(e)(9) requires that heating and cooling systems be in good working order. However, conditions in the dormitory where my bed is located have instead been hot and humid in spite of the material fact that at least 10 air conditioners are seen hanging out of windows in the Skillman shelter in the front of that building. In a similar vein, air-conditioning

wasn't available at the least 3 shelters where I resided in stark contrast to the material fact air-conditioning likely is available for migrants who reside in hotels that are being used as shelters in New York City and other parts of New York State that causes my Fourteenth Amendment equal rights to apply to that.

d.      18 NYCRR §491.18(h)(7)(iii) requires hot water for bathing and washing to be maintained at no less than 110 degrees Fahrenheit. Despite that fact, DHS, HRA, OTDA, and Westhab illegally failed to make certain that I could take hot showers in the shelter located at 781 East 135th Street in the Bronx where I previously resided. Instead, I consistently had to endure cold showers there because hot water consistently wasn't available for showering, even after I reported valid complaints about that.

e.      18 NYCRR §491.18(h)(7)(v) requires all toilet and shower areas to be properly enclosed and separated from other areas by ceiling-high partitions and doors. In spite of this fact, the operator of the Skillman shelter doesn't have toilet and shower areas separated from other areas by ceiling-high partitions and doors. Instead, toilet areas are separated from **a)** sinks and **b)** shower areas nearby by a rather minimal partition.

f.      18 NYCRR §491.18(h)(1) and 18 NYCRR §491.18(h)(2) jointly point out that **a)** every shelter must have space for dining and leisure activities and **b)** space used for sleeping or for passage shall not be considered as dining or leisure space. Despite this fact, guards and other staff who work for the Skillman shelter and the previous 2 shelters were I resided allowed people to sleep in recreation rooms.

g.      18 NYCRR §491.18(e)(7) requires all operable windows to be equipped with screens and where necessary to provide privacy, with curtains, shades or other appropriate widow covering to ensure privacy. Despite this fact, windows in the Skillman shelter lack

screens, curtains, and shades. That circumstance has enabled me to be frequently bitten by mosquitoes and not have sufficient privacy when showering and otherwise using a restroom.

32.    New York State Social Services Law §136(2) and 18 NYCRR §357 confirm that HRA and DHS are required to safeguard my privacy rights in regards to benefits and services that I receive from them and otherwise apply to them to receive. Those protections extend to business partners of HRA and DHS that include organizations that operate shelters that are funded partly by DHS and/or HRA and security companies that provide security services in those shelters. As recently as 7/8/23, personnel of FJC have continued to illegally leave security logbooks unattended and open in public areas in the Skillman shelter in flagrant violation of New York State Social Services Law §136(2) and 18 NYCRR §357. When I talked with a member of FJC's staff at that shelter on 7/8/23 about that, he rudely asked me what business it was of mine that FJC personnel were leaving such logbooks unattended and wide open in that shelter. One of the things that this means is that it's highly likely that those logbooks would be deemed to be inadmissible as evidence in litigation due to the distinct possibility of tampering with them as a direct result of a lack of proper chain-of-custody control for them.  That circumstance further underscores the material and intolerable fact that there is grossly inadequate security at the Skillman shelter. Furthermore, the material fact that I told shelter staff at the Skillman shelter on 7/8/23 about the fact that **a)** the person who is assigned the bed located immediately to the right of the one that is assigned to me was using what appeared to be marijuana on 7/8/23 at his bed and **b)** the person who is assigned another bed located near the bed that is assigned to me smoked a cigarette at his bed while fans in that dormitory blew parts of the marijuana and cigarette smoke to me clearly demonstrates that the Skillman shelter isn't conducive to my health needs and instead illegally jeopardizes my health. This is borne out by the fact that I have been

frequently coughing at that shelter since my arrival there. Being near those who engage in smoking and marijuana use exacerbates that coughing.

33.     The following excerpts from *Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995) support my request for this Court to cause the Black female security guard who is shown in the screenshot shown next that is from a video recording[5] that I recorded on 7/4/23 in the Recreation Room on the second floor of the Skillman shelter to be immediately prohibited from being employed **a)** in any shelter that is funded partly by HRA and/or DHS and **b)** otherwise on the property of such shelters for proper risk-management reasons:

---

[5] That video was recorded at 10:44 am on 7/4/23 and is available at
https://drive.google.com/file/d/1c3iMt82jpbHiUkIF1IxkFWVRHPw6E2oX/view?usp=sharing.



- **Excerpts from _Vann v. City of New York_:**

a.  "municipality "should not take a laissez-faire attitude toward the violation by its peace officers of the very rights they are supposed to prevent others from violating""

b.  "To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. _See Canton v. Harris,_ 489 U.S. at 390, 109 S.Ct. at 1205. An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."

34.    At 10:49 am on 7/4/23, I recorded an audio recording of a conversation the male FJC

security guard who is shown in the preceding screenshot. That recording is available at

https://drive.google.com/file/d/1w9lDJtVs3bjppGKe7na1dHqXd6UL_uBP/view?usp=sharing.

While I asked him then if he was required to record information in a security logbook nearby about the fact that the Black female FJC security guard to whom I just referred illegally threw a bottle at me and threatened me in his presence, he didn't deny that she did both of those things in his presence. The screenshot shown next is from a photograph that I took on 7/4/23 at 9:22 am in that same room and of the male FJC security guard who I talked with about what I just discussed. He was on-duty as a guard when I took that photo. I took that photo to establish the fact that there really isn't any security worth its salt in the Skillman shelter partly because there aren't video security cameras installed in that shelter and the guards who work in it are often **a)** sleeping while on-duty, **b)** playing with their cell phones while on-duty, and **c)** leaving security logbooks out in the open and unattended.



35.    The next screenshot shows the Black female FJC security guard as she recorded an entry

in a security logbook on 7/4/23 at 10:44 am while it's objectively reasonable to presume that she illegally then didn't report the fact that she had just criminally thrown a bottle at me and threatened to stab me in my face with a pen that she held and raised towards my face that would have caused me to mercilessly kill her as a result of legal self-defense if she had struck me with that pen. This information is sufficient grounds for this Court to issue an order to cause all entries about me that have been recorded in logbooks in that shelter to be immediately preserved and provided to me without redactions partly to ascertain whether that woman engaged in a cover-up and committed defamation against me.



36.    The next screenshot is of another male FJD security guard and from a video that I recorded of him on 7/2/23 at 11:58 am in that same room and as he sat at the same table shown in the preceding screenshot while he was sleeping while he was on-duty and was leaving the security logbook in front of him wide-open. That video is available at

https://drive.google.com/file/d/16hOxunO1X_oBQRD1DLI4InaPoTo3F035/view?usp=sharing.



37.    The next two screenshots are from a video recording that is available at

https://drive.google.com/file/d/1RSZ46bZgnXnZxtoB0Rsvwv9UgogWiw8g/view?usp=sharing

that I recorded on 7/4/23 at 10:15 pm. Those screenshots show **a)** a security logbook and **b)** a

Black male FJC security guard while his back was turned to me in a hallway on the fourth floor

in the Skillman shelter as he left the security logbook unattended and freely available to me to

open, read, and tamper with if I had chosen to do so.

 

38.     The next screenshot is from a photograph that I took on 7/8/23 at 6:43 pm in the

Recreation Room on the second floor in the Skillman shelter and shows a security logbook that

was wide-open while it was left unattended by FJC security personnel. One of the reasons why

this is important is because it's highly likely that security logbook would be inadmissible in

litigation primarily because of a lack of proper access control to it partly to block tampering with

its contents. Another reason why this is important is because this confirms that anyone could

freely violate the privacy rights of people about whom information was recorded in that logbook

by reading its contents. I didn't do so.



39.     The next screenshot is from a photograph that I took on 7/6/23 at 8:46 am in that same

Recreation Room while FJC security guards were illegally engaging in selective-enforcement

and discrimination as they allowed the person shown in this screenshot to have been able to bring

a large canned beverage into that shelter in defiance of prohibitions against bringing in food and

beverages into that shelter that DHS established and were previously enforced against me at that

shelter.



40.     The next screenshot is from a photograph that I took on 7/6/23 at 8:24 am in that same Recreation Room while FJC security guards were illegally engaging in selective-enforcement and discrimination as they allowed the person shown in this screenshot to sleep in that room across chairs with bed sheets and a pillow after I was previously told by FJC security guards that I couldn't bring a pillow in that room and lay down in that room at a time when conditions in the dormitory where my assigned bed is located were too hot and humid to sleep there.



41.    The next screenshot is from the elapsed time of 30 seconds in a video that I recorded on

7/9/23 at 9:14 pm that is available at

https://drive.google.com/file/d/1aMWP_xS_At43LYmmfI0t6CcaZmwC_UI-/view?usp=sharing.



42.    The person who is shown in the preceding screenshot is a staff member for that shelter to whom I have been reporting numerous entirely valid complaints mostly about how that shelter is being negligently operated. I recorded that video while standing in a hallway on the first floor of that shelter as I talked with that staff member about the fact that I had just observed a male FJC security guard in the security screening area in that building near its entrance while he kept his gaze down and on his cell phone as I just walked through the magnetometer device next to that guard while he never paid attention to me. At the elapsed time of 34 seconds in that video, I'm heard making remarks to that staff member to apprise him about what I just discussed. At the elapsed time of 38 seconds, that staff member is heard telling me that I didn't need to be concerned about the fact that FJC security guards were looking at their cell phones in that building instead of properly doing their jobs by paying proper attention to things occurring around them while they were on-duty as guards in that shelter.

43.    The terms of my HRA contract and my First Amendment rights support my requests for this Court to order HRA to:

    a.    Provide me a copy of all logbook entries within 24 hours and without redactions that may have been recorded about me by security personnel and all other shelter staff since 6/30/23 who have worked in the Skillman shelter.

    b.    Have video security cameras installed throughout the Skillman shelter within 48 hours and require them to be continuously watched thereafter by security personnel who will not condone nor cover-up illegal and otherwise abusive acts and omissions that may be committed by anyone in that shelter that includes security personnel and other shelter staff.

44.    The terms of my HRA contract also support my requests for this Court to order HRA to **a)** establish strict policies that prohibit all personnel who work in and for shelters that are funded

partly by HRA and/or DHS from doing the following in them while such personnel are on-duty and **b)** consistently enforce those policies by prohibiting those who violate them from being able to work for such shelters:

a.    Sleeping, participating in cover-ups, lying, leaving security logbooks unattended, and using cell phones for purposes that are unrelated to the jobs that they have for such shelters.

b.    Failing to promptly and decisively intervene against security personnel and shelter staff in such shelters in response to illegal and otherwise abusive acts and omissions..

c.    Initiating physical contact against others and/or throwing objects at others without objectively valid legal grounds.

d.    Discriminatorily enforcing applicable rules and policies.

45.    The terms of my HRA contract and other factors that include the public's interest in having shelters operated properly with their tax dollars support my requests for this Court to order HRA to:

a.    Have paper towels, disposable sanitary wipes, spare towels, wireless high-speed and unlimited data Internet service, free and unlimited printing and document scanning services continuously available for residents in the Skillman shelter.

b.    Have window screens, air conditioners, cockroach traps, and Flowtron Diplomat indoor fly control devices installed in the dormitories in the Skillman shelter within 48 hours partly to keep out mosquitoes and provide proper cooling.

c.    Require all mattresses and storage lockers located in shelters that are funded partly by HRA and/or DHS to be thoroughly cleaned and disinfected prior to being assigned to people.

46.    The terms of my HRA contract, my First and Fourteenth Amendment rights, my rights

pursuant to FOIL and 18 NYCRR §358-3.7(b)(2) that governs discovery rights for OTDA fair hearings support my requests for this Court to order HRA, DSS, DHS, and Ms. Scalia to provide me all records within 72 hours that have been in their possession and that of other current and former personnel of HRA, DSS, and DHS in electronic and text-searchable format; without redactions and other edits; and without any confidentiality and protective order that are about the following matters:

a.      How current and/or former personnel of HRA, DHS, DSS, and Urban subjected me to the B&S.

b.      How current and/or former personnel of HRA, DHS, DSS, and Urban directed, condoned, covered-up, and coordinated their actions in regards to the B&S.

c.      How current and/or former personnel of HRA, DHS, DSS, and Urban directed and otherwise caused the reassignment of the SEPS rental subsidy application that I completed and submitted to HRA on 2/16/16 to have HRA provide me a rental subsidy for apartment 4C in my old Urban building to be reassigned to Room 1 within apartment 4B located in that building.

d.      The degree to which and when current and/or former personnel of HRA, DHS, DSS, and Urban were aware of and condoned an attempted assault against me by Ronald Sullivan on 5/12/16 that occurred inside of my old Urban apartment before Mr. Sullivan was able to and did, in fact, viciously assault me in that apartment on 7/2/16.

e.      The degree to which, when, and why current and/or former personnel of HRA, DHS, DSS, and Urban were aware of and condoned Mr. Sullivan's 7/2/16 assault against me by not forcing Mr. Sullivan to be immediately evicted from my old Urban building after 7/2/16.

f.      How and why current and former personnel of HRA, DSS, and DHS acted in concert with others that caused me to be prevented from attending public meetings that were

public forums and otherwise discriminated against in his efforts to lawfully attend them in rooms in which they were conducted instead of doing so from within overflow rooms.

g.      How and why current and former personnel of HRA, DSS, and DHS acted in concert with others that has caused me to be unable to visit HRA's offices that are located in the building at 150 Greenwich Street in Manhattan.

h.      How and why current and former personnel of HRA, DSS, and DHS never granted me a job interview with those agencies and otherwise sabotaged my efforts to learn about, apply for, and be properly considered for other job opportunities.

i.      How and why current and former personnel of HRA and DSS sabotaged my ability to be provided pro-bono legal representation.

j.      How and why current and former personnel of HRA and DSS engaged in illegal gamesmanship against me in litigation partly by **a)** stealing my scheduled 4/12/17 oral arguments hearing in K1 by engaging in illegal ex-parte communications and **b)** illegally not complying with my discovery demands in litigation.

47.    The material fact that HRA personnel have continuously and prejudicially violated my discovery rights in K2 support my request for this Court to impose daily sanctions in the amount of $10,000 against the City of New York to be payable to me within 24 hours in the event that the City of New York, its agencies, and/or its personnel fail to comply with this order.

48.    On 6/28/23, HRA posted a public notice in an official New York City government report that is named "The City Record". That public notice is available at https://a856-cityrecord.nyc.gov/RequestDetail/20230621038. That public notice also includes a link to a related PDF file that is available at https://a856-cityrecord.nyc.gov/Search/GetFile?sectionId=4&requestId=20230621038&requestStatus=Archiv

ed&documentId=177611. That PDF file indicates that those who seek to be provided a voucher from the City of New York to receive a rental subsidy need to be employed for at least 10 hours per week. Earlier in this affirmation, I pointed out that Pinny Ringel and Joni Kletter were City of New York personnel when they illegally prevented me from talking to Mr. Banks on 11/16/21 during a public resource fair meeting that was a public forum while I sought to talk with Mr. Banks then partly to try to improve my job prospects. That circumstance was a continuing violation by Mr. Ringel that dates back to 4/27/17. On 4/27/17, he was among City of New York personnel who criminally prevented me from lawfully attending a public town hall meeting in Queens that I sought to attend partly to improve my job prospects by networking with others there partly for that purpose. These facts are sufficient for this Court to grant my request for it to declare that the City of New York is estopped from requiring me to satisfy a work requirement in order to be eligible to receive a voucher from the City of New York for a rental subsidy. The material fact that the City of New York, its agencies, and those who have been among its personnel have never granted me a job interview for jobs with City of New York agencies that I have been qualified to perform and have applied for reinforces this point. The fact that a suit, ties, dress shirts, and other clothing of mine that were suitable for job interviews were auctioned in April of 2019 as a result of a storage unit that I was renting from Cubesmart having been auctioned then as a result of HRA having illegally discontinued making payments on my behalf to Cubesmart for the rental costs for that storage unit while I resided in my old Urban apartment further demonstrates that estoppel applies to this matter.

## Conclusion

As a result of the matters of fact, law, and evidence that I have brought to this Court's attention in this OSC, the annexed exhibits, and the information that I have otherwise incorporated by

reference as though fully set forth herein, I have satisfied my burden to present sufficient

information t o this Court in order for it to grant me the relief that I have requested in this OSC

together with such other, different, and further relief that this Court may deem just, equitable,

and proper.

Dated: July 10, 2023

_____
Towaki Komatsu
*Plaintiff, Pro Se*

300 Skillman Ave.
Brooklyn, NY 11211

Tel: 305-784-7450
Towaki_Komatsu@yahoo.com

# Exhibit A



**NEW YORK STATE OF OPPORTUNITY.**

# Office of Temporary and Disability Assistance

**KATHY HOCHUL**
Governor

**DANIEL W. TIETZ**
Commissioner

**BARBARA C. GUINN**
Executive Deputy Commissioner

May 2, 2023

Towaki Komatsu
towaki_komatsu@yahoo.com

Dear Towaki,

    This letter is in response to your correspondence dated April 30, 2023, directed to the Office of Administrative Hearings (OAH) within New York State's Office of Temporary and Disability Assistance (OTDA). Your inquiry was forwarded to the attention of OTDA's Supplemental Nutrition Assistance Program (SNAP) Bureau on May 1, 2023.

    OTDA is currently working with authorities to address ongoing scams targeting EBT cardholders, which have resulted in a growing number of benefit theft occurrences nationally. Please note, we have shared your report of stolen benefits with the OTDA Audit and Quality Improvement division (A&QI) who monitors program integrity and tracks incidents of scam-related benefit theft statewide.

    Federal requirements prohibited us from replacing stolen SNAP benefits until a recent rule change. Based on these new federal rules, OTDA has developed a plan which outlines the requirements and processes to replace certain stolen SNAP benefits. New York State recently received federal approval to replace stolen SNAP benefits in certain circumstances and is finalizing the processes necessary to issue replacement benefits.

    Please note that once the replacement processes are in place, an application for replacement of stolen SNAP benefits will be made available to the public. Beginning in late June 2023, OTDA will update our website (EBT Scam Alert | OTDA (ny.gov)) with information on the process and timeline for impacted households to apply for replacement benefits along with what types of benefits may be eligible for replacement.  You will also find additional resources on our website that may assist you to protect your benefits from theft (such as the *Act Fast* public service announcement video).

    We encourage you to continue to monitor your EBT account balance. You can protect your benefits by changing your personal identification number (PIN) often, and never give your EBT card number or PIN to anyone. You may track your account activity and change your PIN anytime by visiting www.connectebt.com, through the Connect EBT mobile app, or by calling the EBT Helpline at **1-888-328-6399**.

    Should you have any further questions or concerns, please contact me at (518) 473-1469.

Sincerely,

*/s/JP 5/2/2023*
Jarrod Parker
Temporary Assistance Specialist II
SNAP Bureau

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

**FILED**

AUG 21 2017

COUNTY CLERK'S OFFICE
NEW YORK

**PRESENT:** Hon. Nancy Bannon

*Justice*

PART 42

RECEIVED

AUG 14 2017

NYS SUPREME COURT - CIVIL
GENERAL CLERK'S OFFICE

In the Matter of
ANONYMOUS

- v -

NEW YORK CITY HUMAN RESOURCES
ADMINISTRATION

INDEX NO. 100054/2017

MOTION DATE 6/7/2017

MOTION SEQ. NO. 001, 002, 003

The following papers were read on this proceeding pursuant to CPLR article 78 to review a determination of the New York City Human Resources Administration and cross motion to dismiss the petition (001), motion to recuse this court, amend the caption, and for relief in the nature of mandamus to compel (002), and motion for relief in the nature of mandamus to compel (003).

| | |
|---|---|
| SEQ 001 Notice of Petition/ Order to Show Cause — Affirmation — Affidavit(s) — Exhibits — Memorandum of Law | No(s). 1 |
| Notice of Cross Motion---Answering Affirmation(s) — Affidavit(s) — Exhibits | No(s). 2 |
| Replying Affirmation — Affidavit(s) — Exhibits | No(s). 3 |
| SEQ 002 Notice of Motion/ Order to Show Cause — Affirmation — Affidavit(s) — Exhibits — Memorandum of Law | No(s). 4 |
| Answering Affirmation(s) — Affidavit(s) — Exhibits | No(s). |
| Replying Affirmation — Affidavit(s) — Exhibits | No(s). |
| SEQ 003 Notice of Motion/ Order to Show Cause — Affirmation — Affidavit(s) — Exhibits — Memorandum of Law | No(s). 5 |
| Answering Affirmation(s) — Affidavit(s) — Exhibits | No(s). |
| Replying Affirmation — Affidavit(s) — Exhibits | No(s). |

The petition, cross-motion, and motions are determined in accordance with the Decision and Order of this court, dated August 9, 2017, attached.

Dated: 8/10/17

HON. NANCY M. BANNON, JSC

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE

FOR THE FOLLOWING REASON(S):

1. Check one: ............................ □ CASE DISPOSED ■ NON-FINAL DISPOSITION
2. Check as appropriate: PETITION IS: □ GRANTED ■ DISMISSED □ GRANTED IN PART  SEQ 001
3. Check as appropriate: CROSS MOTION IS: ■ GRANTED □ DENIED □ GRANTED IN PART  SEQ 001
4. Check as appropriate: MOTION IS: □ GRANTED □ DENIED ■ GRANTED IN PART  SEQ 002
5. Check as appropriate: MOTION IS: □ GRANTED ■ DENIED □ GRANTED IN PART  SEQ 003

A2

relief in the nature of mandamus to compel the HRA to reimburse him for all of his requested storage expenses. Under sequence 003, the petitioner again moves for relief in the nature of mandamus to compel the HRA to reimburse him for all of his requested storage expenses.

The petition/complaint also seeks money damages and/or injunctive relief against the HRA and several other municipal agencies and their employees, asserting that his personal property was stolen due to the HRA's alleged negligence in providing security in the homeless shelter in which he resided, his wages were stolen or converted by the HRA, and he was unlawfully precluded from public meetings of municipal agencies in violation of his constitutional rights.

The cross motion under sequence 001 to dismiss the petition is granted, and the petition and the proceeding are dismissed. That branch of motion sequence 002 which is for leave to amend the caption is granted, and that motion is otherwise denied. The motion under sequence 003 is denied. The court severs the causes of action seeking money damages and/or injunctive relief, and transfers them to a City part of this court.

## II. BACKGROUND

The petitioner is a recipient of public assistance from the HRA. See 18 NYCRR part 397. On May 26, 2016, he requested the

2

A2

HRA to award him a storage allowance pursuant to 18 NYCRR 352.6(f), and thereupon reimburse him for storage expenses that he incurred to maintain his belongings while he was allegedly residing in a temporary shelter. On May 27, 2016, the HRA denied the petitioner's request, determining that he was required to obtain three estimates for moving expenses. The petitioner thereafter sought a fair hearing before the Office of Temporary and Disability Assistance (OTDA) of the New York State Department of Social Services in connection with the HRA's denial. After the OTDA conducted a fair hearing, it rendered a decision dated September 15, 2016, reversing the HRA's denial dated May 27, 2016, upon concluding that the HRA impermissibly determined that it needed estimates for moving services, when the petitioner had made only a simple request for storage expenses.

Crucially, however, the OTDA did not direct the HRA to approve the petitioner's request for storage expenses or immediately pay all of the storage fees that he sought. Rather, it remitted the matter to the HRA to properly apply the provisions of 18 NYCRR 352.6, and thereafter "make a determination as to the [petitioner]'s eligibility for Storage of Possession expenses from May 2016 to present time." The OTDA ordered that "[i]n the event that the [petitioner] is found to be eligible for Storage of Possession expenses, the [HRA] is directed to make payments retroactive to the date of request."

3

A2

(emphasis added).  It further directed the HRA to "advise the [petitioner] of any additional documents which are required to make this determination."

On September 27, 2016, the HRA, in accordance with the OTDA's directive, requested in writing that the petitioner provide it with a "storage letter" from the petitioner's storage facility covering the period from May through October 2016, as well as the petitioner's lease from his current landlord, which he had entered into on February 16, 2016.  The petitioner did not respond to that request.

On September 28, 2016, the HRA issued a check in the sum of $984 to the facility in which the petitioner had stored his belongings, ostensibly covering the period from May through September 2016.  In a fair-hearing compliance report and determination dated October 6, 2016, the HRA, in accordance with the OTDA's directive, denied the petitioner's request to be reimbursed the sum of $3,066.69 for storage expenses from October 22, 2015, through August 19, 2016.  In that determination, the HRA indicated that, inasmuch as the petitioner did not provide the documentation requested in the letter dated September 27, 2016, it was "unable to determine" if the petitioner was "eligible for the benefits that were the subject of [the] Fair Hearing."  On October 19, 2016, the OTDA sent the petitioner a letter confirming its receipt of a report from the HRA, and

4

A2

concluded that the HRA "has taken appropriate action to comply with the [fair hearing] decision's directives."

The petitioner did not seek a fair hearing before the OTDA in connection with the HRA's determination dated October 6, 2016.

On January 17, 2017, the petitioner commenced this hybrid proceeding and action, naming only the HRA as a respondent/defendant. To the extent that it seeks relief pursuant to CPLR article 78, the petition/complaint seeks review only of the HRA's determination dated October 6, 2016.

While this hybrid proceeding and action was pending before this court, the HRA reopened its administrative review of the petitioner's case file, and determined that, as of February 2016, he was no longer residing in a temporary shelter, but resided in permanent housing. It thus issued a new notice of determination on March 28, 2017, concluding that the petitioner was not entitled to any storage allowance after February 2016, but did not seek reimbursement of the $984 it had already awarded. There is nothing in the parties' submissions indicating that the petitioner sought a fair hearing before the OTDA in connection with the new HRA determination dated March 28, 2017.

### III. DISCUSSION

A.   EXHAUSTION OF ADMINISTRATIVE REMEDIES (SEQ 001).

Where, as here, a statute, ordinance, or regulation permits

5

A2

an administrative appeal, and a party has an opportunity to
pursue it, he or she must exhaust all administrative remedies
(see Matter of Carter v State of New York, 95 NY2d 267 [2000]),
and judicial review of the initial administrative determination
is foreclosed.  See Matter of Harrell v New York City Housing
Auth., 300 AD2d 54 (1st Dept. 2002).  18 NYCRR 358-3.1(a) affords
the petitioner the right to challenge HRA's determinations dated
October 6, 2016, and March 28, 2017, by requesting a fair hearing
before the ODTA in accordance with 18 NYCRR 358-3.5(a).  Since
the submissions do not reflect that the petitioner requested a
fair hearing in connection with either of those determinations,
so much of the petition as seeks to review those determinations
must be dismissed, without prejudice, for failure to exhaust
administrative remedies.

    Contrary to the petitioner's contention, the HRA, when
acting in its governmental capacity, is not estopped from
reconsidering an administrative determination.  See Matter of
Gonzalez v New York City Hous. Auth., 148 AD3d 505 (1st Dept.
2017).  Hence, its partial payment of a storage award is not a
binding determination that the petitioner was eligible therefor,
and the HRA was permitted to reopen its own proceedings in order
to further review the petitioner's eligibility.  See Matter of
Adams v Joy, 48 AD3d 914 (3rd Dept. 2008).  The court also
rejects the petitioner's contention that the HRA and the OTDA are

6

A2

barred by the doctrine of res judicata from reconsidering a prior determination.  See Matter of Ireland v Zoning Bd. of Appeals of Town of Queensbury, 195 AD2d 155 (3rd Dept. 1994).


B. RECUSAL (SEQ 002)

The court discerns no basis upon which to recuse itself in this matter.  See Mehulic v New York Downtown Hosp., 140 AD3d 417 (1st Dept. 2016); Judiciary Law § 14.


C. AMENDMENT OF CAPTION (SEQ 002)

A party will be generally permitted to proceed anonymously upon alleging that the matter implicates "a privacy right so substantial as to outweigh the customary and constitutionally embedded presumption of openness in judicial proceedings." "J. Doe No. 1" v CBS Broadcasting Inc., 24 AD3d 215, 215 (1st Dept. 2005).  The circumstances presented here are not so "drastic" as to warrant maintaining the secrecy of the petitioner's identity (id.), and the petitioner himself requests the court to permit him to reveal his identity in the caption.  Moreover, leave to amend a caption to reflect the correct name of a party should be freely granted. See Clarke v Laidlaw Tr., Inc., 125 AD3d 920 (2nd Dept. 2015).  The court thus grants that branch of the motion under sequence 002 which is for leave to amend the caption.


7

A2

D.  <u>MANDAMUS TO COMPEL</u> (SEQ 002 and 003)

In motion sequences 002 and 003, the petitioner moves for relief in the nature of mandamus to compel the HRA to reimburse him for the entirety of the $3,066.69 in storage expenses that he seeks.  <u>See</u> CPLR 7803(1).  This request for relief articulates a cause of action distinct from the request for relief set forth in the petition, which seeks to review the HRA's determination on the ground that it is arbitrary and capricious.  <u>See</u> CPLR 7803(3).  Thus, in the absence of a proper motion pursuant to CPLR 3025(b) for leave to amend the petition/complaint to add a claim under CPLR 7803(1), the allegations are not properly before the court.  <u>See</u> <u>State Farm Mut. Auto. Ins. Co. v Clouden</u>, 50 AD3d 1552 (4th Dept. 2008).

Nonetheless, "[a] CPLR article 78 proceeding seeking mandamus to compel the performance of a specific duty applies only to acts that are ministerial in nature and not those that involve the exercise of discretion."  <u>Matter of Maron v Silver</u>, 14 NY3d 230, 249 (2010).  "Mandamus is available . . . only to enforce a clear legal right where the public official has failed to perform a duty enjoined by law."  <u>New York Civil Liberties Union v State of New York</u>, 4 NY3d 175, 185 (2005); see CPLR 7803(1).  Since the determination of eligibility for a storage allowance is discretionary (<u>see</u> <u>Matter of Marquart v Perales</u>, 142 AD2d 678 [2nd Dept. 1988]), any such request for relief must be

denied here regardless of the form in which the claim is made.

IV. CONCLUSION

In light of the foregoing, it is

ORDERED and ADJUDGED that the respondent's cross motion under sequence 001 to dismiss the petition is granted, and the proceeding is dismissed, without prejudice; and it is further,

ORDERED that the motion under sequence 002 is granted to the extent that leave to amend the caption is granted, and the motion is otherwise denied; and the caption is amended to read as follows:

---

In the Matter of
TOWAKI KOMATSU
     v
NEW YORK CITY HUMAN
RESOURCES ADMINISTRATION

---

and it is further,

ORDERED that the Clerk of the court and the Trial Support Office shall update their records accordingly; and it is further,

ORDERED that the petitioner's motion under sequence 003 is denied as academic in light of the court's determination of the motion under sequence number 002; and it is further,

ORDERED that the remaining causes of action in the petition/complaint, which allege that the respondent/defendant was negligent in the provision of security at a homeless shelter,

9

converted the petitioner/plaintiff's property to its own use, and unlawfully precluded the petitioner/plaintiff from attending certain public meetings, and seek both damages and injunctive relief, are severed, and the matter is referred to the Trial Support Office for reassignment to a City Part of this court.

    This constitutes the Decision, Order, and Judgment of the Court.

Dated: August 10, 2017      ENTER: _____

J.S.C.

**HON. NANCY M. BANNON**



Clerk

**FILED**

AUG 21 2017

COUNTY CLERKS OFFICE
NEW YORK

10

A2



**Office of Temporary and Disability Assistance**

**KATHY HOCHUL**
Governor

**DANIEL W. TIETZ**
Acting Commissioner

**BARBARA C. GUINN**
Executive Deputy Commissioner

February 24, 2022

Towaki Komatsu
802 Fairmount Place
Apt. 4B
Bronx, NY 10460

<u>By Email</u>: towaki_komatsu@yahoo.com

Re: FH: 8227101K

Dear Towaki Komatsu:

This is in response to your February 16, 2022, email to me, and your February 22, 2022, voicemail messages to me and Deputy Commissioner Esnard in which you claim that "HRA illegally created a forgery from the apartment lease agreement [you] signed on 2/16/16." You stated that due to the "forgery" the CPLR and New York Judiciary Law "all apply to immediately warrant complete reversal of OTDA fair hearing decisions." The Office of Administrative Hearings (OAH) has carefully reviewed your request and the complete fair hearing record and determined that there is no valid basis for reopening the hearing.

You requested a fair hearing alleging that the Agency failed to provide you with assistance to pay storage fees. During the hearing, which was held on December 23, 2020, and February 9, 2021, you testified that you no longer have any items in storage. The Decision After Fair Hearing (Decision) held that you failed to meet your burden of establishing that you were eligible for the relief you are seeking. Based on the evidence presented and your testimony at the hearing the Decision is correct. The information you submitted in your email and voicemail messages provide no valid basis for overturning the Decision or reopening the hearing.

The basis for your request that the Decision be revisited is your allegation that HRA forged your lease agreement. OAH is an entity of limited jurisdiction. Issues that are subject to OAH's jurisdiction are enumerated in the regulations at 18 NYCRR Section 358-3.1. Jurisdiction over an allegation of forgery by HRA or any other social service district statewide is not listed in the regulations. The determination of whether HRA forged your lease agreement must be made by a court with jurisdiction over that issue.

Yours truly,

Nigel A. Marks
Downstate Director
Office of Administrative Hearings

NAM: nnm

A3

**STATE OF NEW YORK**
**OFFICE OF TEMPORARY AND DISABILITY ASSISTANCE**

**REQUEST:** June 6, 2016
**CASE #:** ▮▮▮▮▮▮
**CENTER #:** 46
**FH #:** 7316477K

---

In the Matter of the Appeal of                    :

Towaki Komatsu                                    :    **DECISION**
                                                  :    **AFTER**
                                                  :    **FAIR**
                                                       **HEARING**
from a determination by the New York City         :
Department of Social Services                     :

---

## JURISDICTION

Pursuant to Section 22 of the New York State Social Services Law (hereinafter Social Services Law) and Part 358 of Title 18 NYCRR, (hereinafter Regulations), a fair hearing was held on September 7, 2016, in New York City, before Joab Okello, Administrative Law Judge. The following persons appeared at the hearing:

For the Appellant

Towaki Komatsu, Appellant (by telephone)

For the Social Services Agency

James Calttrell, Fair Hearing Representative

## ISSUE

Was the Agency's determination to deny the Appellant's application for Storage of Possession expenses correct?

## FINDINGS OF FACT

An opportunity to be heard having been afforded to all interested parties and evidence having been taken and due deliberation having been had, it is hereby found that:

1.    The Appellant is in receipt of Public Assistance benefits.

2.    The Appellant's household consists of one person.

3.    On May 26, 2016, the Appellant requested that the Agency provide for Storage of Possession expenses.

4.    On May 27, 2016, the Agency denied the Appellant's application for Storage of Possession expenses.

5.    On June 6, 2016, the Appellant requested this fair hearing.

**APPLICABLE LAW**

Section 352.6 of 18 NYCRR provides that an allowance for storage of furniture and personal belongings shall be made when it is essential, for circumstances such as relocation, eviction or temporary shelter, so long as eligibility for public assistance continues and so long as the circumstances necessitating the storage continue to exist.

Section 370.3 of 18 NYCRR provides that Agencies must authorize emergency and short term assistance to provide for the effective and prompt relief of identified needs which cannot be met under Emergency Assistance to Needy Families with Children (EAF), Family Assistance, the Home Energy Assistance Program (HEAP) or Safety Net Assistance. In cases where the need is determined to be temporary, the grant may be limited to those items for which there is immediate need. Emergency Safety Net Assistance can only be provided where there is an identified emergency need and where the applicant is without income or resources immediately available to meet the emergency need. The household's gross income at the time of application cannot exceed 125 percent of the federal income official poverty line unless the emergency is the result of a fire, flood or other like catastrophe or the emergency assistance is granted in accordance with Section 352.5(c), (d) and (e) of 18 NYCRR. An emergency is defined as a serious occurrence or situation needing prompt attention. Emergency Safety Net Assistance is not available if the emergency arose because the applicant failed to comply with the requirements of Part 385 of the regulations relating to employment and training and was therefore disqualified from receiving assistance.

**DISCUSSION**

During a telephone hearing, the Appellant stated that he applied to the Agency for assistance to pay Storage of Possession expenses on May 26, 2016, because he was residing in a temporary residence which was a very small room in an apartment that he shared with a roommate. The Appellant testified further that he was residing in a very hostile environment, his roommate having assaulted him on one occasion and also threw away his personal belongings. The Appellant testified that his personal belongings, already in storage, will be auctioned if the Agency does not pay for the storage fee from May 2016 to the present time.

The Agency presented a notice of denial dated May 27, 2016, indicating that the Agency determined to deny the Appellant's application for storage fee because the Appellant "did not get three moving estimates to move items from storage". The Agency did not offer any explanation as to why the Agency's denial was addressing "moving expenses" instead of the Appellant's

3

FH# 7316477K

request for Storage fee". The Agency did not present any other documents to sustain its determination.

Section 352.6 of 18 NYCRR provides that an allowance for storage of furniture and personal belongings shall be made when it is essential, for circumstances such as relocation, eviction or temporary shelter, so long as eligibility for public assistance continues and so long as the circumstances necessitating the storage continue to exist.

The Appellant's testimony is found to be credible to sustain his claim that he met *prima facia* eligibility for Storage fee Expenses on the grounds that he was residing in a temporary shelter which was too small to accommodate all his personal belongings and that he was a recipient of Public Assistance. Accordingly, the Agency's determination to deny the Appellant's request for Storage of Possession expenses cannot be sustained.

## DECISION AND ORDER

The Agency's determination to deny the Appellant's application for Storage of Possession expenses is not correct and is reversed.

1.     The Agency is directed to make a determination as to the Appellant's eligibility for Storage  of  Possession expenses from May 2016 to present time.

2.     The Agency is directed to advise the Appellant of any additional documents which are required to make this determination.

3.     The Agency is further directed to advise the Appellant in writing of its determination to provide any allowances to which the Appellant may be entitled.

4.     In the event that the Appellant is found to be eligible for Storage of Possession expenses, the Agency is directed to make payments retroactive to the date of request.

Should the Agency need additional information from the Appellant in order to comply with the above directives, it is directed to notify the Appellant promptly in writing as to what documentation is needed. If such information is requested, the Appellant must provide it to the Agency promptly to facilitate such compliance.

As required by 18 NYCRR 358-6.4, the Agency must comply immediately with the directives set forth above.

A4

4

FH# 7316477K

DATED:    Albany, New York
          09/15/2016

                    NEW YORK STATE OFFICE OF
                    TEMPORARY AND DISABILITY ASSISTANCE

              By

                    Commissioner's Designee

FIA-1127 (E) 09/23/14
LLF

CROTONA JOB CENTER (046)
1910 MONTEREY AVENUE, 1ST FLOOR

BRONX, NY 10457

**NYC** Human Resources | Family Independence
Administration | Administration
Department of
Social Services

Date: 01/27/2017

*0101250000000026*

Case Number:

Case Name: KOMATSU TOWAKI

KOMATSU   TOWAKI

Center: 046

798-802 FAIRMONT PL   4B
BRONX, NY 10460-

## Notice to Household of Storage Fee Payment to Vendor

Dear KOMATSU TOWAKI                :

We are notifying you that the agency has agreed to pay your storage fee of $ 339.00

beginning 01 / 27 / 2017 . This payment is being made to:

Vendor's Name CUBESMART STORAGE FR K #6006

Vendor's Address: 33-24 WOODSIDE AVE.

City: QUEENS          State: NY     Zip Code: 11101

The account number assigned to you by the CUBESMART STORAGE FR K #6006

facility is #6006                             .

This payment will continue to be made as long as you reside in a Department of Homeless Services (DHS)
shelter.

A5

**NYC**

**Human Resources
Administration**
Department of
Social Services

**Office of the
Legal Affairs**

W-2-110N
Rev. 12/15

Steven Banks
Commissioner

Martha A. Calhoun
General Counsel

Ann Marie Scalia
Senior Deputy General
Counsel/Fair Hearings

150 Greenwich Street
New York, NY 10007

929 221 5408

August 1, 2017

Mr. Towaki Komatsu

Re: Addressing your concerns

Dear Mr. Komatsu:

I am the Senior Deputy General Counsel for the Fair Hearing Administration of the Department of Social Services. I am responding to the concerns you recently raised with Commissioner Banks at a town hall meeting in Queens.

1. Storage Fees: HRA has contacted Cube Smart in order to address your outstanding storage fees. The account is paid in full and there is currently a credit of $108. They confirmed that there is no longer an auction date on your storage account.
2. Urban Pathways building: An initial attempt was made on or about July 21, 2017, by staff from New York City Housing Preservation Development (HPD) to inspect your premises, however they were unable to gain access to your unit. Another attempt was made over the weekend of July 22nd and they were again unable to gain access.
3. Job opportunities: The NYC Department of Veterans Services reached out to you by phone and email on July 24, 2017. They are, as they have been in the past, willing to assist you with employment related services. Please respond to their outreach in order to avail yourself of their services.
4. Request for a legal services provider: We have identified a legal services provider that is able to conduct an intake appointment with you regarding your legal matters. The organization is Mobilization for Justice and you should contact: John Bart, Esq. at (212) 417-3766, in order to make an intake appointment. Their address is 100 William Street, 6th Floor, New York, NY 10038.

We will continue to try to address your concerns and assist you in any way possible.

Sincerely,

Ann Marie Scalia

A6



THIS CHECK CONTAINS MULTIPLE FRAUD DETERRENT SECURITY FEATURES

No. **EA** 38085607
NOT VALID OVER $999.99

52-153
112

**EMERGENCY PUBLIC ASSISTANCE ACCOUNT**
DEPARTMENT OF SOCIAL SERVICES
THE CITY OF NEW YORK          CENTER NO. **38**          DO NOT FOLD

**WARNING**

Two

**PARTY CHECKS**

| CENTER | CHG. | CASE NO. | SUF. | CAT. | SP-GR-CD | DATE |
|--------|------|----------|------|------|----------|------|
| 038 | | | 01 | SNCA | 21 | 09/11/18 |

PAY TO THE
ORDER OF     KOMATSU T & CUBESMART 6006        $ 988.80
             NINE-HUNDRED  EIGHTY EIGHT  & 80/100 DOLLARS

Bank of America

ARE    NOT    VALID
UNLESS ENDORSED
BY  BOTH  PAYEES
AND    ARE    FOR
DEPOSIT  BY  THE
SECOND PAYEE ONLY

⑈38085607⑈ ⑆011201539⑆ 002220018318⑈

---

THIS CHECK CONTAINS MULTIPLE FRAUD DETERRENT SECURITY FEATURES

No. **EA** 38085608
NOT VALID OVER $999.99

52-153
112

**EMERGENCY PUBLIC ASSISTANCE ACCOUNT**
DEPARTMENT OF SOCIAL SERVICES
THE CITY OF NEW YORK          CENTER NO. **38**          DO NOT FOLD

**WARNING**

Two

**PARTY CHECKS**

| CENTER | CHG. | CASE NO. | SUF. | CAT. | SP-GR-CD | DATE |
|--------|------|----------|------|------|----------|------|
| 038 | | | 01 | SNCA | 21 | 09/11/18 |

PAY TO THE
ORDER OF     KOMATSU T & CUBESMART 6006        $ 988.80
             NINE-HUNDRED  EIGHTY EIGHT  & 80/100 DOLLARS

Bank of America

ARE    NOT    VALID
UNLESS ENDORSED
BY  BOTH  PAYEES
AND    ARE    FOR
DEPOSIT  BY  THE
SECOND PAYEE ONLY

⑈38085608⑈ ⑆011201539⑆ 002220018318⑈

A7

```
** SCHEDULE OF FAIR HEARING **          ** SCHEDULE OF FAIR HEARING **          ** SCHEDULE OF FAIR HEARING **
OAH - 457                        NEW YORK STATE OFFICE OF TEMPORARY AND DISABILITY ASSISTANCE        DATE CREATED 03/22/17
NOTICE OF                                        OFFICE OF ADMINISTRATIVE HEARINGS                           PAGE 207
CASE #    :              CIN  :            FAIR HEARING # : 7406570N   DISPOSITION:
OFFICE    : 046          UNIT :            WORKER       : 00213        REPRESENTATIVE:
CASE NAME : KOMATSU        TOWAKI          REQUEST DATE  : 10/20/16
STREET    : 1 PENN PLAZA , STE 6321        REQUEST SOURCE : FAX
CITY      : NY            ST NY ZIP 10119   POST/FAX DATE :
PHONE     : 201-315-5484  SEX M DOB         SOC SEC NUMBER :
DAI       :
HEARING DATE: 04/11/17  TIME: 01:30PM  HO ASSIGNED: 326    OLD HEARING DATE/TIME: 03/10/17  01:30PM   OLD HO ASSIGNED: 326
LOCATION  : TELEPHONE    HEARING TYPE: TELEPHONE HEARG    SCHEDULE STATUS: X                      SCHEDULING RESTRICTIONS
                                                                                                     M T W T F
AGENCY    : N046         INTERPRETER : SECURITY          ISSUE DATE:                               AM X X X X X
CATEGORY  : SNA          SUB-CATEGORY : PERS             COMPLAINCE COMPLAINT:                     PM      X
                                                         COMPLIANCE OBTAINED :
CAT  ACTION ISSUES                                                          AIDSTATUS  NOTICE #   NOTICE DATE  EFFECTIVE DATE
SNA  INAD  044 - STORAGE OF POSSESSIONS                                        NA
SNA  INAD  998 - TELEPHONE HEARING FOR NON-HOMEBOUND APPELLANTS                NA
SNA  REDU  004 - SHELTER ALLOWANCE                                             NA

COMMENTS:  PA:INAD STORAGE FEES
           ...
           STORAGE FEE INAD: APP CONTESTING INADEQUACY OF AG PAYMENT OF $984 ON 9/29/16
           TO CUBESMART FOR PERIOD: 5/1/16 - 9/30/16 AS PER COMPLIANCE WITH DECISION
           OF FH#7316477K HELD 9/7/16. PER WMS PAYMENT OF 984 REDEEMED ON 10/7/16.
           ******APP CLAIMS SHE STILL HAVE A BALANCE OF $426 TO BE PAID.
           **PER REPORT FROM C/C ON PRIOR FH#7316477K,CLT WOULD NEED TO BRING IN
           MONTHLY BILL TO STORAGE CO.FOR PAYMENT, AS STORAGE FEES ARE NOT A RECURRING
           GRANT"
           ***** PER C/UNIT (LK, ALBANY):
           "I CALLED THE STORAGE COMPANY AND THE AUTOMATED SYSTEM SAID CLIENT
           STILL HAS A BALANCE OF $426.00 BUT IT DOESN'T SAY WHY OR FOR WHAT PERIOD".
           AS THE DECISION ONLY ADDRESSED A DENIAL OF STORAGE AND STORAGE HAS BEEN PAID
           THROUGH THE MONTH OF THE DECISION DATE, COMPLIANCE IS SATISFIED"
           PER FH7316477K "SECU ADDED PER INCIDENT REPORT AND SS"
                                                                 REVD W/ EGR
                                                                  10/26/16 LMN
           *ADVISED PA & LIAISON UNITS OF SECU CODING ON THIS FH.   10/26/16 LMN
           (AF) DUP REQ REC'D 10/27/16                              10/27/16 CMB
           *FROM CC-31:  PLEASE NOTE THAT AGENCY PAID $984 AS RESULT OF FH 7316477K.
           CLT APPEARS TO SAY HIS MONTHLY STORAGE IS IN EXCESS OF $400.  APPEARS CLT
           HAS PAID SOME OF HIS STORAGE AND THAT IS WHY THE AGENCY ONLY PAID $984
           COVERING MAY THROUGH SEPTEMBER 2016.  THERE MAY BE A REIMBURSEMENT ISSUE
           TO ADDRESS UNDER THIS FH ALONG W/ THE ADEQUACY ISSUE.   11/1/16-LJK
           HADG 30 OF   11/29/16 02:30  HEARING                     11/29/16 LPS
           ......
           APPELLANT REQUESTED STATED HE DID NOT REQUEST HEARING HE ONLY WANTED
           COMPLIANCE. STATED HE WAS @ HRA & REQUESTED AN ADJOURNMENT AND HUNG UP THE
           PHONE.
           AS PER EMAIL RECEIVED FROM ALJ. 326 SHE IS REQUESTING THAT THIS CASE BE
           SCHEDULED AS AN AFTERNOON TELEPHONE HEARING AND THAT HIS CASE BE THE ONLY
           CASE SCHEDULED. PERSONALIZE TO ALJ. 326 AND EMAIL SENT TO SCHEDULING UNIT
           AS REQUESTED BY ALJ. GAMBLE AND PHO DALTON REQUESTING THAT THIS CASE BE THE
           ONLY ONE ON HER CALENDAR FOR THE AFTERNOON THE DAY HEARING IS SCHEDULED.
           ......                                                   11/29/16 LPS
           HADG    OF   01/24/17 01:30  HEARING                     01/24/17 LD
           REASON CHANGE                                            01/25/17 AIM
           APP DID NOT REC THE EVIDENCE PACKET
           //APPELLANT IS NOW CLAIMING REIMBURSEMENT FOR LATE FEES ON HIS CREDIT CARD
           AS A RESULT OF HRA NOT COMPLYING WITH THE PRIOR FAIR HEARING DECISION.  HE
           IS ALSO SEEKING REIMBURSEMENT FOR STORAGE FEES FOR A PRIOR PERIOD IN TIME

                                                               FAIR HEARING # : 7406570N   PAGE 208

           NOT COVERED BY 7316477K.
           *62 PAGE FAX REC'D FROM CLIENT ADDRESSED TO J.D. ON  2/10/17 WITH VARIOUS
           DOCUMENTS INCLUDING STORAGE BILLS/NOTICES/ETC... FORWARDED FAX TO J.D.
           ON 2/14/17.   2/16/17-LJK
           PACKET SENT TO FILE REGARDING ADDITIONAL ISSUES APPELLANT WANTS TO ADDRESS.
           JMD 3-3-17
           ......
           (NYC) ADDITIONAL DOCUMENTS RECEIVED FROM ALBANY ONE SET 19 PAGES AND 2ND SET
           ARE INVOICES TO SHOW HE PAID APR. TO AUG.TO CUBESMART 3 PAGES.
           ALL DOCUMENTS RECEIVED AND PLACED INSIDE FILE FOLDER.         3-8-9/LPS.
           ......
           OADG 12 OF   03/10/17 01:30  HEARING                     03/09/17 CRN
           LEFT APP. V/M ADVISING FH WAS ADJOURNED DUE TO SCHEDULING ERROR, LEFT DIRECT
           NUMBER TO CALL BACK  3/9/17 CRN
           ...
           //APPELLANT HAD RENT ON THE BUXGET IN OCTOBER 2016 WHEN THE AGENCY CLOSED
           HIS CASE ON 10-14-16.  WHEN THE CASE REOPENED 11-1716, NO RENT WAS PUT ON
           THE BUDGET.  JMD 3-17-17
COPY SENT TO:
```

### GREAT AMERICAN STORED PROPERTY INSURANCE PROGRAM
### offered by City Securities Insurance LLC, a Licensed Agent

### Personal Property Insurance Participation Form

**Name:** 6604 CUBESMART NY QUEENS WOODSIDE AVE    **Phone:** (718)606-9326
**Address:** 33-24 Woodside Avenue
**City:** Queens    **State:** NY    **Zip Code:** 11101

As a condition of your lease, the Customer is required to insure their personal property for Fire and Extended Coverage perils including Burglary and Transit. The Customer may participate in the Great American Stored Property Insurance Program from City Securities Insurance LLC, a licensed agent. Neither the landlord nor the leasing agent is an insurance agent.

**CUSTOMER INFORMATION**

**Customer's Name(s):** Towaki Komatsu    **Effective Date:** 1/10/2017

**Customer's Address:** 1 Penn Plaza Suite 6321    **Cube #:** 6006

**Disc/Cylinder Lock:** ✔YES or NO

**City, State, Zip:** New York NY 10119

**Daytime Phone #:** (201)315-5484

**Email Address:** towaki_komatsu@yahoo.com

**COVERAGE SELECTION (Initial one box and complete the information)**

[✔] **I AGREE TO PARTICIPATE IN THE GREAT AMERICAN STORED PROPERTY INSURANCE PROGRAM** from City Securities Insurance, LLC. The coverage from Great American is for goods you store at this leased Cube. Covered causes of loss include fire or lightning, sonic boom, explosion, windstorm or hail, smoke, aircraft or vehicles, riot or civil commotion, vandalism, sinkhole collapse, falling objects, weights of snow, ice, or sleet, water damage and earthquake. **Flood coverage is not provided**. The policy contains exclusions, limitations, definitions and conditions. Coverage is in effect only in the event you pay the monthly cost listed below and you continue to pay monthly through the duration of your lease. I understand a portion of the cost I pay is applicable to the storage company's expense in collecting, accounting and remitting payment to the Insurance Company.

| Coverage: | ☐$2,000 | ☐$3,000 | ☑$5000 |
|---|---|---|---|
| Monthly Cost: | $ 12 | $17 | $27 |
| Type of Goods Stored: | ☑ Household Goods/Personal Property) furniture, boxes, clothes, | | |
| | ☐ Business/Trade Property (describe) _____ | | |
| | ☐ Vehicle, Boat/Trailer (describe) _____ | | |

All Insurance related questions and requests should be directed to: City Securities Insurance, LLC, 8900 Keystone Crossing, Ste. 300, Indianapolis, IN 46240, (317) 808-7177 (office), (317) 972-7101 (fax), storage@citysecurites.com

**Signature(s):** _____    **Date:** 1/10/2017

[    ] **I have contents coverage of the type checked below.** A copy of my policy Declarations page is attached as evidence of coverage. I agree to keep coverage in force during the term of my lease.

**Insurance Company Name:** _____
☐ Homeowners    ☐ Renters    ☐ Business    ☐ Owners    ☐ Other: _____
Policy #: _____    Limit $: _____    Effective Date: _____    Term: _____

**Signature(s):** _____    **Date:** _____



Customer Name: Towaki Komatsu    Cube or Space Number: 6006

A9

6604 CUBESMART NY QUEENS WOODSIDE AVE
33-24 Woodside Ave

Long Island City, NY  11101
(718) 606-9326

Towaki Komatsu
802 Fairmount Place Apt 4B

Bronx, NY  10460

## NOTICE OF UNPAID STORAGE RENT
## AND PENDING SALE OF YOUR STORED PROPERTY

3/14/2019

Dear Valued Customer

We are sending this letter to notify you that we have not received rent or other charges that are due for the Rented Space at the location below. As a result, you are in default of your rental agreement and the Stored Property is subject to a lien in the amount of the unpaid rent and charges. **The current amount of unpaid rent and charges due for the Rented Space is shown in "A" below.** This amount includes late fee(s), our administrative lien fee, and other applicable charges described in your rental agreement. This amount will increase as rent and other applicable charges continue to accrue. Please refer to the enclosed itemized statement which describes the amounts due and the dates that these amounts became due. Please refer to your rental agreement for a detailed description of all applicable charges and the dates that these charges are, or will become, due. You may obtain itemized statements and copies of your rental agreement from the Store. **All payments must be made at the Store in the form of cash, certified check, or money order.**

As a result of your default, you will not be permitted to access the Rented Space until we have received payment in full of all unpaid rent and charges.  Payment must be made before the Sale Date shown in "E" below.

| Customer Name: | Towaki Komatsu | | Rented Space: | 6006 |
|---|---|---|---|---|
| **Store Name:** | 6604 CUBESMART NY QUEENS WOODSIDE AVE | | | |
| **Store Address:** | 33-24 Woodside Ave, Long Island City, NY 11101 | | | |
| **Store Phone:** | (718) 606-9326 | | **Store Email:** | STORE6604@CUBESMART.COM |
| **General Description of items stored in Rented Space** ("**Stored Property**"): *(Description **not** intended to be all inclusive; **may** not be based on an inspection of the Rented Space).* | | Household and/or business goods and/or any other items stored in the Rented Space. | | |

| | |
|---|---|
| **A. Current Total Amount of Unpaid Rent and Charges:** | $2,469.59 |
| **B. Current Total Amount of Unpaid Insurance Premiums:** | $0.00 |
| **C.  Account Credits:** | $0.00 |
| **D.  Grand Total of Current Amount Due:** | $2,469.59 |

| E. Sale Date:   4/10/2019 | F. Estimated Sale Time:   Apr 10, 2019 12:30 PM | G. Sale Location:   www.storagetreasures.com |
|---|---|---|

A10

If you have not done so already, you must immediately pay, in full, all unpaid rent and charges shown in "A" above to prevent the sale of the Stored Property in an effort to satisfy our lien for all unpaid rent and charges. **If we do not receive payment in full within TEN (10) DAYS, the Stored Property will be advertised for sale and SOLD, at public or private sale, in a commercially reasonable manner. The sale or other disposition of the Stored Property will occur at the Sale Location shown in "G" above on the Sale Date and Estimated Sale Time shown in "E" and "F" above.** The exact time of the sale or other disposition is subject to change. You may contact the Store prior to the Sale Date to confirm the time. In certain circumstances, the sale or other disposition may occur after the Sale Date shown above. It is your responsibility to contact the Store to learn of any such delay. Any person claiming an interest in the Stored Property is entitled to bring a proceeding pursuant to NY CLS Lien §182(9) within ten (10) days of the service of this notice if such person disputes the validity of the lien or the amount claimed.

Although we do not have a lien on any insurance fees that you may pay to insurance providers together with your monthly rent, we would like to remind you that your insurance may be canceled if you do not make timely payments of your insurance fees. The total amount that you owe for insurance fees, if any, is shown in "B" above. Please pay these insurance fees immediately if you wish to continue to insure the Stored Property. Please contact your insurance provider directly with any questions regarding your insurance policy. Please note that your failure to maintain insurance for the Stored Property may be a default under your rental agreement.

If you have any questions or if you wish to confirm our receipt of your payment, please contact your Store Manager at the phone number or e-mail address above. We are happy to assist you.

Sincerely,
CubeSmart Management

enc. Itemized Statement of Account

### ITEMIZED STATEMENT OF ACCOUNT OF
### Towaki Komatsu

| Date | Description | Charge | Tax | Payment | Balance |
|------|-------------|--------|-----|---------|---------|
| 2/19/2019 | Rent Unit 6006 - 10x15x8 | $457.00 | $0.00 | $0.00 | $457.00 |
| 2/19/2019 | Rent Unit 6006 - 10x15x8 | $457.00 | $0.00 | $0.00 | $914.00 |
| 2/19/2019 | Rent Unit 6006 - 10x15x8 | $457.00 | $0.00 | $0.00 | $1,371.00 |
| 2/19/2019 | Rent Unit 6006 - 10x15x8 - Split For Import | $441.67 | $0.00 | $0.00 | $1,812.67 |
| 2/19/2019 | Rent Unit 6006 - 10x15x8 - Split For Import | $15.33 | $0.00 | $0.00 | $1,828.00 |
| 2/19/2019 | Imported Invoice Fee Balance | $5.00 | $0.00 | $0.00 | $1,833.00 |
| 2/19/2019 | Imported Other Fee Balance | $457.00 | $0.00 | $327.41 | $1,962.59 |
| 2/19/2019 | Imported NSF Fee Balance | $30.00 | $0.00 | $0.00 | $1,992.59 |

| Date | Description | Charge | Tax | Payment | Balance |
|------|-------------|--------|-----|---------|---------|
| 2/19/2019 | Imported Late Fee Balance | $20.00 | $0.00 | $0.00 | $2,012.59 |
| 2/20/2019 | Rent Unit 6006 - 10x15x8 | $457.00 | $0.00 | $0.00 | $2,469.59 |

Total Due: $2,469.59

A10



**NEW YORK STATE OF OPPORTUNITY.**

**Office of Temporary and Disability Assistance**

| | | |
|---|---|---|
| **KATHY HOCHUL**<br>Governor | **DANIEL W. TIETZ**<br>Acting Commissioner | **BARBARA C. GUINN**<br>Executive Deputy Commissioner |

March 9, 2022

Towaki Komatsu
802 Fairmount Place. Apt. 4B
Bronx, NY 10460

Dear Towaki Komatsu:

The Office of Temporary and Disability Assistance (OTDA) is in receipt of your February 18, 2022 e-mail in which you have lodged a complaint against NYC HRA. Specifically, you assert therein that "The attached PDF file confirm [sic] that HRA committed fraud all along in the OTDA fair hearing process," and thereafter detailing several instances of purported forgeries on the document entitled "Rental Agreement."

After receiving your email, by letter dated February 24, 2022, Mr. Nigel Marks, Downstate Director, addressed your request that the subject Decision be revisited. Pursuant to OTDA regulations, local social services districts are responsible for reviewing their own activity. Therefore, OTDA has forwarded your complaints to NYC HRA and we have asked that it respond to this office with a report summarizing its investigation findings and any actions taken. Once that report has been received, we will evaluate whether further action is needed.

Sincerely,

Craig M. Crist
Deputy Counsel

A11

| CASE Number | | CASE Name | KOMATSU, TOWAKI | CIN | |
| Suffix | 01 | Case Head: | KOMATSU, TOWAKI | SSN: | |
| From: | 10/27/2015 | To: | 01/18/2017 | Search Clear Save | |

| ■ | Date | Activity | Staff Member | COMMENT |
|---|---|---|---|---|
| ☐ | | | | |
| ☐ | 2/18/2016 | Approve EC - CA Application Interview | Glasgow,W | : : : approve |
| ☐ | 2/18/2016 | Error Correction | Benjamin-Solis,K | As per regional Directive placing case in SI status code Y19 for CA due to SEPS approval package. Caseload changed to SP000 and address was updated. Furniture allowance was already issued. SEPS subsidy checks will be issued in PAM once case is in SI ststaus for CA. |
| ☐ | 2/18/2016 | Error Correction | Benjamin-Solis,K | Correction to Aprtment number |
| | | | | |

A12

| | | | | |
|---|---|---|---|---|
| ☐ | 3/16/2016 | CA Application Interview | Mensah,R | .00 that was surpose to be issued by SSU progam state he will receive for moving into apartment. He also provided a lease stating in apartment by himself but when he moved he found out there was someone else sharing the apartment with him. and the first lease he signed was change by landlord. He also stated heAs per management change address and mailing address only. Please, review and approve case action. Thanks. |
| ☐ | 3/16/2016 | Make Case Comment | Harris,V | Case Comment: : : Applicant in service inquiring about $1028.00 that was surpose to be issued by SSU progam state he will receive for moving into apartment. He also provided a lease stating this is where he moved to but stated he was surpose to be moving in apartment by himself but when he moved he found out there was someone else sharing the apartment with him. and the first lease he signed was change by landlord. He also stated he have a storage bill that needed to be paid. Applicant complained agency and SSU give out wrong information about apartment and furniture allowanceand he was going to make a complaint to Mr. Steven Banks. He ask if he could speak to my supervisor who came over and explained to him how the agency work. I reviewed case and found that on 02/17/16 the agency issued security, rent, and gave applicant funiture allowance totalling $1028.00 I explained to applicant this benefits was in EBT. ON 02/18/16 was approved. Case was approved for SEPS on 02/18/16. Storage w |
| ☐ | 3/24/2016 | Make Case Comment | Pellot,B | : : : applicant has also been informed this will be last storage pymt sent by agency. client is residing in an apartment. Explained to client he must provide 3 estimates from 3 licensed movers along with lease, inventory and residency letter. |



Human Resources | Homelessness Prevention
Administration | Administration
Department of
Social Services

SEPS APPROVAL REQUEST – ROOM HRA-129d (E)

## Request for Approval for the SEPS Program (Room)

Submit this application for any individual or adult family who is potentially eligible for the SEPS rent supplement program to preserve their apartment or move to a new room.

### 1. Referral Source

☐ SEPS Provider   ☒ HRA Rapid Rehousing   ☐ Homebase   ☐ HRA NOVA

### 2. Eligibility Category

**Shelter Referral**

☐ Eviction, Foreclosure, Vacate Order, City Health/Safety Determination and residing in a DHS shelter

☒ Previous or Current United States Military Service and residing in a DHS shelter

☐ Certified as a survivor of domestic violence by HRA, residing in DHS or HRA shelter

☐ Discharged into DHS shelter from a residential substance abuse treatment program, residential treatment program/facility licensed by the NYS OMH or NYS OASAS

☐ Discharged into DHS shelter system from foster care placement

☐ Discharged into DHS shelter system from a correctional institution

**Community Referral**

☐ At risk of entry into a DHS Shelter for Single Adults or Adult Families and, 1.) has previous or current United States military service; **or** 2.) within the last 12 months has been evicted or has lived in a residence in NYC that was or is the subject of an eviction proceeding, a vacate order issued by a City agency or a foreclosure action, or was or is required to leave such a residence for health or safety reasons as determined by a City agency

### 3. Household Information

Head of Household Name: Towaki Komatsu     PA Case Number: ▮▮▮▮▮▮

Address: 802 Fairmount Place, Bronx, NY  10460

| Name | DOB | Relationship to Applicant | PA Status | Income/ Frequency | Type of Income |
|------|-----|---------------------------|-----------|-------------------|----------------|
| Towaki Komatsu | ▮▮▮ | Self | Fs | — | — |
| | | | | | |

1. Room Rent: — 800
2. Household Size (no more than 2 allowed): — 1
3. Monthly Contribution for Household (30% of household income): —
4. Proposed SEPS Monthly Rent Supplement: (#1 - #3): 800

### 4. Room Information

**Landlord Room Rentals**

Landlord's Name: Urban Pathways

Landlord's Address: 575 58th Avenue, New York, NY 10014

**Primary Tenant Room Rentals**

Primary Tenant's Name: Towak Komatsu

Primary Tenant's Address: 802 Fairmount Place Bronx, NY 10460

Address of Premises to be rented:
802 Fairmount Place
Bronx, NY 10460

 **Human Resources Administration** | **Homelessness Prevention Administration**
Department of Social Services

**SEPS APPROVAL REQUEST – ROOM HRA-129d (E)**

## 5. Clearances Completed

**Landlord Room Rentals Inspection Checklist**
☒ Inspection Completed, Residence approved — Date: _____
☐ Room is NOT in a unit subject to Rent Stabilization — Date: _____
☐ Apartment does NOT have more than 3 bedrooms — Date: _____
☐ Apartment does NOT currently have more than 2 unrelated adults — Date: _____

**Primary Tenant Room Rentals**
☑ Inspection Checklist completed: Residence approved — Date: _____
☐ Is the Room in a Unit subject to Rent Stabilization: ☐ Yes ☐ No — Date: _____
☐ Apartment does NOT have more than 3 bedrooms: — Date: _____
☐ Apartment does NOT currently have more than 2 unrelated adults: — Date: _____
☐ Primary Tenant Resides in the apartment: — Date: _____
☐ Is the apartment subsidized housing (e.g. NYCHA, Section 8, FEPS) If yes, subsidy type: _____
Is the Primary Tenant on PA? ☐ Yes ☐ No

## 6. Payment and Voucher Request

☐ Payment in the amount of $ _____, representing the first full month's rent made payable to:

_____
(Landlord, managing agent, or Primary Tenant)

☐ Payment in the amount of $ _____, representing broker's fee, made payable to:

_____
(broker name or company name)

☑ Security Deposit Voucher, HRA Form W-147N (landlord's or primary tenant name and address)
☑ Furniture Allowance Request (W-137A)
☐ Broker's Check Request (HRA-121E)
☐ Check box if pro-rated rent for current month is requested*

\* Pro-rated rent is available if the household can move in immediately beginning one day after RAU approval (except for approvals on or before the 3rd day of the month or on or after the 3rd day before the end of the month). In the case of RAU approvals on or before the 3rd day of the month, that month will count as the first full month.

Signed: _SARA HYLORUOS_

(Case Manager/HRA Worker - Print Name)     (Case Manager/HRA Worker - Signature)

_____     _____
Phone     Email

_____     _____
(Supervisor - Print Name)     (Supervisor - Signature)

### Certification

I declare under penalty of perjury that all statements made on and documents submitted with this application are correct and complete to the best of my knowledge. I certify that by signing this application, I agree to an investigation conducted by the New York City Human Resources Administration (HRA) to verify or confirm the information I have submitted, and determine my eligibility for the SEPS Program. I promise to let HRA know if I move from my room and, if I move, I assign to HRA my right, if any, to the return of any SEPS rent/supplement payments to which the landlord is not entitled. I understand I will not be eligible for SEPS in a new room or apartment without HRA prior approval.

_____   _2/6/16_   _201-315-5484_
Signature of Applicant    Date    Phone Number

 Human Resources | Homelessness Prevention
Administration | Administration
Department of
Social Services

**SEPS APPROVAL REQUEST – ROOM HRA-129d (E)**

## Documents Attached

## 1. Proof of Eligibility

- Pay stubs or other income documents for household members not on public assistance
- <u>Single Adults in shelter</u>: Shelter Residency Letter which verifies current stay in shelter that includes or is in addition to at least one stay between 5/1/15-7/31/15
- <u>Adult Families in shelter</u>: Shelter Residency Letter which verifies current stay in shelter
- SEPS Referral Letter
  - o Applicants pre-identified by DHS and HRA will have an eligibility certification number
  - o Applicants who do not have an eligibility certification number must submit documentation for one of the following categories:
    - *Eviction, Foreclosure, Vacate, Health and Safety*: Legal or City Agency notices
    - *Military Service:* Documents establishing US Military Service
    - *Discharge (DHS Shelter Only):* Foster Care discharge letter, Correctional Institution Discharge Letter, NYSOMH or NYS OASAS documents
    - *Domestic Violence Certification:* HRA NOVA eligibility letter
    - *At-Risk of Shelter Entry:* SEPS Verification of Risk of Shelter Entry form

## 2. Rental Documents

<u>Landlord Room Rentals</u>

- Lease or Rental Agreement for one year (heat and hot water included)
- Landlord Proof of Ownership
- W9 (from Landlord)
- Security Voucher (W-147N)
- Printout from DHCR website

<u>Primary Tenant Room Rentals</u>

- Primary Tenant Statement of Occupancy
- Primary Tenant Cash Assistance Release
- Primary Tenant Lease from Landlord
- W9 (from Primary Tenant )
- Security Voucher (W-147N)
- Primary Tenant Room Rental Maximum Rent Calculation Spreadsheet
- Printout from DHCR website

**Optional for all rentals**
  - o Furniture Allowance Request (W-137A)
  - o Broker's Check Request (HRA-121E)
  - o Broker's License
  - o Moving Fee Request (including inventory and 3 estimates)

A14

This Rental Agreement ("Lease" or "Agreement"); ated 3/1/6, and is between        Urban Pathways    Inc.    (the    "LESSOR"),    and Towaki (the "TENANT(S)").
Komatsu

WHEREAS, Urban Pathways hereby leases to TENANT, a fully-furnished **1BR/2BR** Apartment 4 C on the 4 floor of the Building known as **798-802 Fairmount Place, Bronx, New York 10460**, in the Borough of **Bronx** and State of **New York** (the "Premises"), for the term of **12 Months**, unless sooner terminated as hereinafter provided, to be used and occupied as a strictly private residential dwelling by TENANT at the **12-month rental rate of $14,400/$19,200**, which represents equal monthly payments of **$1,200/$1,600** each, in advance, to be paid as specified in this Agreement.

NOW THEREFORE, the Parties agree as follows:

**1.**    **TERM**: The term of this Agreement will be for a term of 12 months, from to _____. LESSOR reserves the right and option to renew this lease for an additional 12 month term. If LESSOR elects to renew this lease, LESSOR will provide TENANT with a renewal lease no later than 90 days before the end of the initial term.

**2.**    **PAYMENTS**: Rent and/or other charges are to be paid at such place or method designated by the LESSOR as follows directly to LESSOR a monthly amount of $. TENANT shall pay, representing 30% of TENANT'S monthly income. The remaining balance of the rent due pursuant to the terms of this lease shall be paid to the Landlord directly on behalf of the TENANT through various rental assistance programs for which the TENANT may be eligible. All TENANT payments are to be made by check or money order. All payments are to be made payable to LESSOR. TENANT shall promptly assign all government rental assistance received to LESSOR.

**3.**    **UTILITIES**: LESSOR will supply (a) heat as required by law, (b) hot and cold water for bathroom and kitchen sink, and (c) cooling if central air-conditioning is installed. TENANT may enforce its rights under the warranty of habitability. TENANT must pay for the costs of all electric, gas, telephone and other utility services used in the Apartment to the extent these costs exceed any governmental utility allowances for which TENANT may be eligible.

**4.**    **FURNISHINGS**: TENANT accepts all furniture and other furnishings within the Apartment as is. At the end of the Term, TENANT shall return the furniture and other furnishings clean and in good order and repair, reasonable wear excepted.

**5.**    **REPAIRS**: TENANT must take good care of the Apartment and all equipment and fixtures in it. LESSOR will repair the plumbing, heating and electrical systems. TENANT must, at TENANT'S cost, make all repairs and replacements whenever the need results from TENANT'S act or neglect.

**6.**    **OCCUPANTS**: Guest(s) staying over 15 days without the written consent of LESSOR shall be considered a breach of this Agreement. ONLY the following individuals AND NO OTHERS shall occupy the subject residence for more than 15 days unless the expressed written consent of LESSOR obtained in advance _____.

**7.**    **PETS**: TENANT shall not keep any pets within the premises.

**8.**    **NOISE**: TENANT agrees not to cause or allow any noise or activity on the premises which might disturb the peace and quiet of another TENANT and/or neighbor. Said noise and/or activity shall be a breach of this Agreement.

**9.**    **DESTRUCTION OF PREMISES**: If the premises become totally or partially destroyed

A15

comply with all such House Rules, and noncompliance may constitute a default as defined herein. In the event of a conflict between the House Rules and the terms of this Agreement, the terms of this Agreement shall prevail.

**16.    TENANT DEFAULTS**: LESSOR must give TENANT written notice of default stating the type of default. The following are defaults and must be cured by TENANT within the time stated:

A.    Failure to pay TENANT'S portion of the rent on time, 3 days

B.    Failure to move into the Apartment within 15 days after the beginning date of the Term, 10 days

C.    Issuance of a court order under which the Apartment may be taken by another party, 10 days

D.    Improper conduct by TENANT annoying other tenants, including, but not limited to nuisance and harassment, 10 days

E.    Failure to comply with any term or Rule in the Lease, 10 days.

If TENANT fails to cure the default in the time stated, LESSOR may cancel this Agreement by giving TENANT a cancellation notice. The cancellation notice will state the date the Term will end, which may be no less than 10 days after the date of the notice. On the cancellation date in the notice, the Term of this Agreement shall end. TENANT must leave the Apartment and give LESSOR the keys on or before the cancellation date. TENANT continues to be responsible as stated in this Agreement. If the default cannot be cured in the time stated, TENANT must begin cure within that time and continue diligently until cured.

**17.    CHANGE OF TERMS**: The terms and conditions of this Agreement are subject to future change by LESSOR after the expiration of the agreed lease period upon 30-days written notice setting forth such change and delivered to TENANT. Any changes are subject to laws in existence at the time of the Notice of Change of Terms.

**18.    POSSESSION**: If LESSOR is unable to deliver possession of the residence to TENANTS on the agreed date, because of the loss or destruction of the residence or because of the failure of the prior residents to vacate or for any other reason, the TENANT and/or LESSOR may immediately cancel and terminate this Agreement upon written notice to the other party at their last known address, whereupon neither party shall have liability to the other, and any sums paid under this Agreement shall be refunded in full. If neither party cancels, this Agreement shall be prorated and begin on the date of actual possession.

**19.    INSURANCE**: TENANT acknowledges that LESSOR'S insurance does not cover personal property damage caused by fire, theft, rain, war, acts of God, acts of others, and/or any other causes, nor shall LESSOR be held liable for such losses. TENANT is hereby advised to obtain TENANT'S own  insurance policy to cover any personal losses.

**20.    FIRE, ACCIDENT, DEFECTS, DAMAGE**: TENANT must give LESSOR prompt notice of fire, accident, damage or dangerous or defective conditions. If the Apartment cannot be used because of fire or other casualty, TENANT is not required to pay rent for the time the Apartment is unusable. If the Apartment cannot be used, LESSOR has 30 days to decide whether to repair. LESSOR'S decision to repair must be given TENANT within 30 days of the fire or casualty. LESSOR shall have a reasonable time to repair. If LESSOR fails to give TENANT notice of its decision within 30 days, TENANT may cancel the lease as of the date of the fire or casualty.

31. **KEYS AND ADDENDUMS:** TENANT acknowledges receipt of the following which shall be deemed part of this Agreement: (Please check)___ Keys #of keys and purposes House Rules___ Other

32. **LESSOR'S WARRANTY OF HABITABILITY**: LESSOR states that the Apartment and Building are fit for human living and there is no condition to health, life or safety.

33. **ENTIRE AGREEMENT**: This Agreement constitutes the entire Agreement between LESSOR and TENANT. No oral agreements have been entered into, and all modifications or notices shall be in writing to be valid.

34. **RECEIPT OF AGREEMENT**: The undersigned TENANT(S) has/have read and understand this Agreement and hereby acknowledge receipt of a copy of this Rental Agreement.

35. **SUBORDINATION TO MASTER LEASE**: Urban Pathways, Inc. is the tenant of the Building known as 798-802 Fairmount Place, Bronx, New York 10460 under a Prime Lease with Fairmount Place LLC. This Rental Agreement is subject and subordinate to the terms and conditions of the Prime Lease. The undersigned Tenant has had the opportunity to review the Prime Lease.

TENANT'S Signature

Date 2/16/16

TENANT'S Signature

Date 2/16/16

LESSOR'S or Agent's Signature

Date

This Rental Agreement ("Lease" or "Agreement") is dated 2/16 , and is between        Urban Pathways    Inc.    (the    "LESSOR"),    and Towaki Komatsu (the "TENANT(S)").

WHEREAS, Urban Pathways hereby leases to TENANT, a fully-furnished **1BR/2BR** Apartment 4b rm 1 on the 4th floor of the Building  known as **798-802 Fairmount Place, Bronx, New York 10460**, in the Borough of **Bronx** and State of **New York** (the "Premises"), for the term of **12 Months**, unless sooner  terminated as hereinafter provided, to be used and occupied as a strictly private residential dwelling  by TENANT at the **12-month** rental rate of **$9,600**, which represents equal monthly  payments of **$800** each, in advance, to be paid as specified in this Agreement.

NOW THEREFORE, the Parties agree as follows:

1. **TERM**: The term of this Agreement will be for a term of 12 months, from to_____ . LESSOR reserves the right and option to renew this lease for an additional 12 month term. If LESSOR elects to renew this lease, LESSOR will provide TENANT with a renewal lease no later than 90 days before the end of the initial term.

2. **PAYMENTS**: Rent and/or other charges are to be paid at such place or method designated by the LESSOR as follows directly to LESSOR a monthly amount of $. TENANT shall pay, representing 30% of TENANT'S monthly income.  The remaining balance of the rent due pursuant to the terms of this lease shall be  paid to the Landlord directly on behalf of the TENANT through various rental assistance programs  for which the TENANT may be eligible. All TENANT payments are to be made by check or money  order.  All payments are to be made payable to LESSOR. TENANT shall promptly assign all  government rental assistance received to LESSOR.

3. **UTILITIES**:  LESSOR will supply (a) heat as required by law, (b) hot and cold water for bathroom and kitchen sink, and (c) cooling if central air-conditioning is installed. TENANT may enforce its rights under the warranty of habitability. TENANT must pay for the costs of all electric, gas, telephone and other utility services used in the Apartment to the extent these costs exceed any governmental utility allowances for which TENANT may be eligible.

4. **FURNISHINGS**:  TENANT accepts all furniture and other furnishings within the Apartment as is. At the end of the Term, TENANT shall return the furniture and other furnishings clean and in good order and repair, reasonable wear excepted.

5. **REPAIRS**:  TENANT must take good care of the Apartment and all equipment and fixtures in it. LESSOR will repair the plumbing, heating and electrical systems. TENANT must, at TENANT'S cost, make all repairs and replacements whenever the need results from TENANT'S act or neglect.

6. **OCCUPANTS**: Guest(s) staying over 15 days without the written consent of LESSOR shall be considered a breach of this Agreement. ONLY the following individuals  AND NO OTHERS shall occupy the subject residence for more than 15 days unless the expressed written consent of LESSOR obtained in advance_____ .

7. **PETS**: TENANT shall not keep any pets within the premises.

8. **NOISE**: TENANT agrees not to cause or allow any noise or activity on the premises which might disturb the peace and quiet of another TENANT and/or neighbor. Said noise and/or activity shall be a breach of this Agreement.

9. **DESTRUCTION OF PREMISES**: If the premises become totally or partially destroyed during the term of this Agreement so that TENANT'S use is seriously impaired, LESSOR or

TENANT may terminate this Agreement immediately upon three day written notice to the other.

**10.    CONDITION OF PREMISES/END OF TERM**: TENANT acknowledges that TENANT has examined the Premises and that Premises, all furnishings, fixtures, furniture, plumbing, heating, electrical facilities, all items listed on the attached property condition checklist, if any, and/or all other items provided by LESSOR are all clean, and in good satisfactory condition except as may be indicated elsewhere in this Agreement. At the termination of this Agreement, all of above items in this provision shall be returned to LESSOR in clean and good condition except for reasonable wear and tear and the premises shall be free of all personal property and trash not belonging to LESSOR. It is agreed that all dirt, holes, tears, burns, and stains of any size or amount in the carpets, drapes, walls, fixtures, and/or any other part of the premises, do not constitute reasonable wear and tear.

**11.    ALTERATIONS**: TENANT shall not paint, wallpaper, alter or redecorate, change or install locks, install antenna or other equipment, screws, fastening devices, large nails, or adhesive materials, place signs, displays, or other exhibits, on or in any portion of the premises without the written consent of the LESSOR except as may be provided by law.

**12.    PROPERTY MAINTENANCE**: TENANT shall deposit all garbage and waste in a clean and sanitary manner into the proper receptacles and shall cooperate in keeping the garbage area neat and clean. TENANT shall be responsible for disposing of items of such size and nature as are not normally acceptable by the garbage hauler.

**13.    TENANT'S DUTY TO OBEY LAWS AND REGULATIONS**: TENANT must comply with all laws, orders, rules, requests and directions of all governmental authorities, LESSOR'S insurers, Board of Fire Underwriters, or similar groups. Notices received by TENANT from any authority or group must be promptly delivered to LESSOR. TENANT must not do anything which may increase LESSOR'S insurance premiums.

**14.    APARTMENT RULES**: TENANT must comply with the following rules:

    A.    TENANT must not interfere with the comfort or rights of neighbors or other tenants.

    B.    No one is allowed on the roof. Nothing may be placed on or attached to fire escapes, sills, windows, or exterior walls of the Apartment or in the hallways or public areas.

    C.    TENANT must give LESSOR keys to all locks. Doors must be locked at all times, and windows must be locked down when TENANT is out.

    D.    Apartment floors must be covered by carpets or rugs.

    E.    Garbage disposal rules must be followed.

    F.    Laundry machines, if any, are used at TENANT'S own risk and cost.

    G.    Moving furniture, fixtures, or equipment must be scheduled with LESSOR.

    H.    TENANT shall conserve energy.

**15.    HOUSE RULES**: LESSOR may, from time to time, establish, modify or revoke House Rules. Such House Rules are a supplement to the Lease and are incorporated herein. TENANT must

comply with all such House Rules, and noncompliance may constitute a default as defined herein. In the event of a conflict between the House Rules and the terms of this Agreement, the terms of this Agreement shall prevail.

**16.**     **TENANT DEFAULTS**:  LESSOR must give TENANT written notice of default stating the type of default. The following are defaults and must be cured by TENANT within the time stated:

A.     Failure to pay TENANT'S portion of the rent on time, 3 days

B.     Failure to move into the Apartment within 15 days after the beginning date of the Term, 10 days

C.     Issuance of a court order under which the Apartment may be taken by another party, 10 days

D.     Improper conduct by TENANT annoying other tenants, including, but not limited to nuisance and harassment, 10 days

E.     Failure to comply with any term or Rule in the Lease, 10 days.

If TENANT fails to cure the default in the time stated, LESSOR may cancel this Agreement by giving TENANT a cancellation notice. The cancellation notice will state the date the Term will end, which may be no less than 10 days after the date of the notice. On the cancellation date in the notice, the Term of this Agreement shall end. TENANT must leave the Apartment and give LESSOR the keys on or before the cancellation date. TENANT continues to be responsible as stated in this Agreement. If the default cannot be cured in the time stated, TENANT must begin cure within that time and continue diligently until cured.

**17.**     **CHANGE OF TERMS**: The terms and conditions of this Agreement are subject to future change by LESSOR after the expiration of the agreed lease period upon 30-days written notice setting forth such change and delivered to TENANT. Any changes are subject to laws in existence at the time of the Notice of Change of Terms.

**18.**     **POSSESSION**: If LESSOR is unable to deliver possession of the residence to TENANTS on the agreed date, because of the loss or destruction of the residence or because of the failure of the prior residents to vacate or for any other reason, the TENANT and/or LESSOR may immediately cancel and terminate this Agreement upon written notice to the other party at their last known address, whereupon neither party shall have liability to the other, and any sums paid under this Agreement shall be refunded in full. If neither party cancels, this Agreement shall be prorated and begin on the date of actual possession.

**19.**     **INSURANCE**: TENANT acknowledges that LESSOR'S insurance does not cover personal property damage caused by fire, theft, rain, war, acts of God, acts of others, and/or any other causes, nor shall LESSOR be held liable for such losses. TENANT is hereby advised to obtain TENANT'S own  insurance policy to cover any personal losses.

**20.**     **FIRE, ACCIDENT, DEFECTS, DAMAGE**:  TENANT must give LESSOR prompt notice of fire, accident, damage or dangerous or defective conditions. If the Apartment cannot be used because of fire or other casualty, TENANT is not required to pay rent for the time the Apartment is unusable. If the Apartment cannot be used, LESSOR has 30 days to decide whether to repair. LESSOR'S decision to repair must be given TENANT within 30 days of the fire or casualty. LESSOR shall have a reasonable time to repair. If LESSOR fails to give TENANT notice of its decision within 30 days, TENANT may cancel the lease as of the date of the fire or casualty.

**21.    RIGHT OF ENTRY AND INSPECTION**: LESSOR may enter, inspect, and/or repair the premises at any time in case of emergency or suspected abandonment. LESSOR shall give 24 hours advance notice and may enter for the purpose of showing the premises during normal business hours to prospective renters, buyers, lenders, for smoke alarm inspections, and/or for normal inspections and repairs. LESSOR is permitted to make all alterations, repairs and maintenance that in LESSOR'S judgment is necessary to perform.

**22.    ASSIGNMENT**: TENANT agrees not to transfer, assign or sublet the premises or any part thereof. LESSOR may assign or transfer its interest in the Premises to a new operator without prior notice to TENANT. TENANT acknowledges that any assignment or transfer by LESSOR shall not change TENANT'S obligations under this Agreement. TENANT agrees that upon notice of an assignment or transfer by LESSOR, TENANT will assign all government rental assistance over to the new operator.

**23.    PARTIAL INVALIDITY**: Nothing contained in this Agreement shall be construed as waiving any of the LESSOR'S or TENANT'S rights under the law. If any part of this Agreement shall be in conflict with the law, that part shall be void to the extent that it is in conflict, but shall not invalidate this Agreement nor shall it affect the validity or enforceability of any other provision of this Agreement.

**24.    STATUTORY OR HOLDOVER TENANT.** If, subsequent to the expiration of the term of this Lease, TENANT remains in possession, as a holdover tenant, TENANT shall pay the maximum legal rent which is obtainable there under without prior notice or demand.

**25.    NO WAIVER**: LESSOR'S acceptance of rent with knowledge of any default by TENANT or waiver by LESSOR of any breach of any term of this Agreement shall not constitute a waiver of subsequent breaches. Failure to require compliance or to exercise any right shall not be constituted as a waiver by LESSOR of said term, condition, and/or right, and shall not affect the validity or enforceability of any provision of this Agreement.

**26.    JOINTLY AND SEVERALLY**: The undersigned TENANTS are jointly and severally responsible and liable for all obligations under this Agreement.

**27.    REPORT TO CREDIT/TENANT AGENCIES**: You are hereby notified that a nonpayment, late payment or breach of any of the terms of this rental Agreement may be submitted/reported to a credit and/or tenant reporting agency, and may create a negative credit record on your credit report.

**28.    LEAD NOTIFICATION REQUIREMENT**: For rental dwellings built before 1978, TENANT acknowledges receipt of the following: (Please check)____Lead Based Paint Disclosure Form____EPA Pamphlet

**29.    NOTICES**: All notices to TENANT shall be served at TENANT'S premises and all notices to LESSOR shall be served at
Urban Pathways Inc. 575 8th Avenue New York, N.Y. 10018                        .

**30.    INVENTORY**: The premises contain the following items that the TENANT may use.
_____

A16

**31.**    **KEYS AND ADDENDUMS:** TENANT acknowledges receipt of the following which shall be deemed part of this Agreement: (Please check)/ ⟋Keys #of keys and purposes
⟋House Rules____Other

**32.**    **LESSOR'S WARRANTY OF HABITABILITY**: LESSOR states that the Apartment and Building are fit for human living and there is no condition to health, life or safety.

**33.**    **ENTIRE AGREEMENT**: This Agreement constitutes the entire Agreement between LESSOR and TENANT. No oral agreements have been entered into, and all modifications or notices shall be in writing to be valid.

**34.**    **RECEIPT OF AGREEMENT**: The undersigned TENANT(S) has/have read and understand this Agreement and hereby acknowledge receipt of a copy of this Rental Agreement.

**35.**    **SUBORDINATION TO MASTER LEASE**: Urban Pathways, Inc. is the tenant of the Building known as 798-802 Fairmount Place, Bronx, New York 10460 under a Prime Lease with Fairmount Place LLC. This Rental Agreement is subject and subordinate to the terms and conditions of the Prime Lease. The undersigned Tenant has had the opportunity to review the Prime Lease.

TENANT'S Signature

Date 2/16/16

TENANT'S Signature

Date 2/16/16

LESSOR'S or Agent's Signature X

Date

A16